## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
### CASE NO. 22-5407

**[FILED ELECTRONICALLY]**

———————————————————

### JULIE HELPHENSTINE,
**Administratrix of the Estate of Christopher Dale Helphenstine and Guardian of B.D.H., the minor son of Christopher Dale Helphenstine,**

**Plaintiff – Appellant**

v.

### LEWIS COUNTY, KY; JEFF LYKINS, Individually; ANTHONY RUARK, Individually; ANDY LUCAS, Individually; BEN CARVER, Individually; AMANDA MCGINNIS, Individually; SANDY BLOOMFIELD, Individually; MARK RILEY, Individually; MELINDA MONROE, Individually; JEFFERY THOROUGHMAN, Individually; TOMMY VON LUHRTE, D.O., Individually; JOHNNY BIVENS, Individually; and JOHN BYARD, Individually,

**Defendants - Appellees**

———————————————————

On Appeal from the United States District Court
Eastern District of Kentucky, Northern Division at Ashland
Case No. 0:18-cv-00093
Hon. Henry R. Wilhoit, Jr., District Judge

# APPELLANT'S BRIEF

Gregory A. Belzley
Belzley, Bathurst & Bentley
P.O. Box 278
Prospect, KY 40059
(502) 292-2452
gbelzley3b@gmail.com

James L. Thomerson
Rose Grasch Camenisch Mains PLLC
326 South Broadway
Lexington, KY 40508-2592
(859) 721-2100
jim.thomerson@rgcmlaw.com

**Counsel for Plaintiff – Appellant**

## PLAINTIFF-APPELLANT'S DISCLOSURES OF
## <u>CORPORATE AFFILIATIONS AND FINANCIAL INTEREST</u>

Pursuant to 6th Cir. R. 26.1, Plaintiff-Appellant Julie Helphenstine makes the following disclosures:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?

**ANSWER:  No.**

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

**ANSWER:  No.**

# **TABLE OF CONTENTS**

**Page No.**

TABLE OF CITATIONS ……………………………………………………..5

STATEMENT REGARDING ORAL ARGUMENT……………………………...8

JURISDICTIONAL STATEMENT……………………………………………9

STATEMENT OF ISSUES PRESENTED FOR REVIEW …………..……........9

STATEMENT OF THE CASE …………………………………………….....10

STATEMENT OF FACTS …………………………………………………...13

SUMMARY OF ARGUMENT ……………………………………………....25

ARGUMENT ………………………………………………………………..26

    I.    Standard of Review……………………………………………26

    II.    The District Court Erred in the Test It Applied to Plaintiff's Claims ...................................................................................27

        A.    The Supreme Court's Decision in *Kingsley* .............................27

        B.    *Brawner* Eliminates the Need for Evidence of a Defendant's Actual Knowledge When the Risk is Obvious .....30

        C.    *Trozzi* Attempts to Insert a Requirement for Evidence of Actual Knowledge Back into the *Brawner* Test .......................32

        D.    The District Court Cited *Trozzi* and pre-*Brawner* Deliberate Indifference Cases to Support its Decision, Not *Brawner* or *Greene* ..........................................................33

    III.    Whether Defendants Violated Helphenstine's Constitutional Rights is a Genuine Issue of Material Fact that Must Be Resolved by a Jury................................................................................35

        A.    Defendants' Self-Serving Testimony Warrants a Heightened  Degree of Skepticism ..........................................35

B.      Helphenstine Had an Obviously Serious Medical Need ..........37

C.      Defendant Lewis County ............................................................39

D.      Defendant Jailer Lykins .............................................................44

E.      Defendant Von Luhrte ...............................................................48

F.      The Defendant Deputy Jailers ...................................................50

      1.      Defendant Lucas .......................................................51

      2.      Defendant Riley .......................................................52

      3.      Defendant Bloomfield ..................................................53

      4.      Defendant McGinnis ....................................................54

      5.      Defendant Ruark ......................................................56

F.      Defendant Deputy Sheriff/Bailiff Byard .................................56

G.      Defendants Are Not Entitled to Qualified Immunity ..............57

IV.      Plaintiff's State Claims ........................................................58

CONCLUSION ……………………………………………………....59

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(B)(i)……………….59

CERTIFICATE OF SERVICE …………………………………………....60

APPENDIX .............................................................................60

## **TABLE OF CITATIONS**

### **Federal Cases**

Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397 (1997) ....................39

Blackmore v. Kalamazoo County, 390 F.3d 890 (6th Cir. 2004) ...........................33

Brawner v. Scott County, Tennessee, 14 F.4th 585 (6th Cir. 2021) ..................*passim*

City of Canton, Ohio v. Harris, 489 U.S. 378 (1989) ...............................39

Clark-Murphy v. Foreback, 439 F.3d 280 (6th Cir. 2006) .......................................34

Comstock v. McCrary, 273 F.3d 693 (6th Cir. 2001) ........................................27, 45

Croley v. Matson Navigation Co., 434 F.2d 73 (5th Cir. 1970) ................................34

Estate of O'Bert v. Vargo, 331 F.3d 29 (2nd Cir. 2003) ............................................35

Farmer v. Brennan, 511 U.S. 825 (1994) ........................................................*passim*

Fitzke v. Shappell, 468 F.2d 1072 (6th Cir. 1972) ....................................................57

Gonzalez v. City of Anaheim, 747 F.3d 789 (9th Cir. 2014) ....................................35

Greene v. Crawford County, 22 F.4th 593 (6th Cir. 2022) ...........................31, 32, 50

Griffith v. Franklin County, 975 F.3d 544 (6th Cir. 2020) .......................................57

Hale v. Boyle County, 18 F.4th 845 (6th Cir. 2021) ..................................................30

Harris v. City of Circleville, 583 F.3d 356 (6th Cir. 2009) .......................................58

Hays v. Jefferson County, 668 F.2d 869 (6th Cir. 1982) ...........................................45

Ingle v. Yelton, 439 F.3d 191 (4th Cir. 2006) ..........................................................35

In re Grand Jury Subpoena John Doe, 150 F.3d 170 (2nd Cir. 1998) .......................48

Kanawha & Michigan R. Co. v. Kerse, 239 U.S. 576 (1916) ..................................37

Kingsley v. Hendrickson, __ U.S. __, 135 S. Ct. 2466 (2015) ........................*passim*

Monell v. New York City Dep't of Soc. Servcs., 436 U.S. 658 (1978) .............33, 39

Mullins v. Cyranek, 805 F.3d 760 (6th Cir. 2015) ....................................................30

Pembaur v. Cincinnati, 475 U.S. 469 (1986) ............................................................43

Phillips v. Roane County, 534 F.3d 531 (6th Cir. 2008) .....................................34, 58

Plakas v. Drinski, 19 F.3d 1143 (7th Cir. 1994) .......................................................36

Pryor v. Dearborn Police Department, 452 F. Supp. 2d 714 (E.D.Mich. 2006) .......58

Pryor v. Seyfarth Shaw, Fairweather & Geraldson, 212 F.3d 976 (7th Cir. 2000) ...37

Shadrick v. Southern Health Partners, Inc., 805 F.3d 724 (6th Cir. 2015) .........39, 44

Shehee v. Luttrell, 199 F.3d 295 (6th Cir. 1999) .......................................................45

Speers v. County of Berrien, 196 Fed. Appx. 390 (6th Cir. 2006) ...........................38

St. Louis v. Praprotnik, 485 U.S. 112 (1988) ............................................................43

Tompkins v. Crown Corr., Inc., 726 F.3d 830 (6th Cir. 2013) .................................26

Trozzi v. Lake County, Ohio, 29 F.4th 745 (6th Cir. 2022) .................................32, 32

Typeright Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151 (Fed. Cir. 2004) ......36

U.S. v. Real Property Located at 3234 Washington Ave. North,
   Minneapolis, Minn., 480 F.3d 841 (8th Cir. 2007) ...............................................36

Williams v. Deal, 659 Fed. Appx. 580 (11th Cir. 2016) ...........................................35

**Federal Statutes**

28 U.S.C. §1291 ........................................................................................9

28 U.S.C. §1331 ........................................................................................9

42 U.S.C. §1983 .................................................................................*passim*

**State Cases**

Laurie v. Senecal, 666 A.2nd 806, 809 (R.I. 1995) ...................................48

**Kentucky Statutes**

KRS 71.040 ........................................................................................40, 45

KRS 441.025 ..........................................................................................40

**Kentucky Administrative Regulations**

501 KAR 3:090 ...........................................................................13, 40, 42

501 KAR 3:170 ......................................................................................42

**Treatise**

10A Wright & Miller, Fed. Prac. & Proc. Civ. §2726 (3d ed.) ................36

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This case involves the proper application of this Court's *Brawner* test to medical claims of pretrial detainees, and the District Court's erroneous resolution of a number genuine issues of material fact in Defendants' favor. Given the ongoing debate in this Circuit over the proper application of *Brawner* and its progeny, and the fact-intensive inquiry necessary to a review of the District Court's errors, Plaintiff respectfully requests oral argument.

# JURISDICTIONAL STATEMENT

Plaintiff Julie Helphenstine, Administratrix of the Estate of her husband, Christopher Dale Helphenstine, and Guardian of their minor child, B.D.H., filed this action against Defendants on September 11, 2018. Plaintiff's Complaint included a claim under 42 U.S.C. §1983, giving the District Court jurisdiction under 28 U.S.C. §1331. Plaintiff's Complaint also asserted state law claims of negligence and gross negligence. RE 1, *Complaint*, Page ID #1-8.[1]

On May 5, 2022, after close of discovery, the District Court entered summary judgment dismissing all of Plaintiff's federal claims against Defendants under 42 U.S.C. §1983. The District Court left standing, but declined to exercise supplemental jurisdiction over, Plaintiff's state law claims against Defendants. RE 133, *Memorandum Opinion and Order*, Page ID #1826-55. Final judgment was entered the same day. RE 134, *Judgment*, Page ID #1856-57. Plaintiff timely filed her Notice of Appeal. RE 135, *Notice of Appeal*, Page ID #1858-59. This case is now ripe for consideration by this Court pursuant to 28 U.S.C. §1291.

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the District Court properly apply this Court's *Brawner* test to

---

[1] Plaintiff subsequently moved for leave to file a First Amended Complaint, but that motion was not ruled on by the District Court. RE 88, *Motion for Leave to File First Amended Complaint*, Page ID #652-56; RE 88-1, *First Amended Complaint*, Page ID #657-64.

Plaintiff's claims?

2.    Is there no evidence in this case on which a reasonable jury could base a finding that the conduct of one or more of Defendants violated the *Brawner* test?

## STATEMENT OF THE CASE

Chris Helphenstine was admitted to the Lewis County Detention Center ("the Jail") on April 14, 2017, after his arrest for a drug offense.  He began withdrawing from alcohol and/or drugs almost immediately.

After Helphenstine vomited on the floor of his general population cell the night of April 16, he was moved to a single-man detox cell just three or four feet from the Jail's control center where he was supposed to be – but was not -- checked at least every 20 minutes. By midnight on April 17, he was vomiting green and yellow emesis, was soiling himself, was refusing to eat or drink, and had not gotten out of bed for at least 24 hours.  Defendant deputy jailer Amanda McGinnis sent an "urgent" facsimile about Helphenstine to the office of Defendant Dr. Tommy Von Luhrte, an osteopath under contract with the Jail to attend to the medical needs of its inmates, but nothing more was done for Helphenstine. In depositions, the Defendant deputy jailers claimed that they did not know the Jail had a written policy that directed that withdrawal be treated as a medical emergency.  McGinnis said that had she known about the written policy, she would have sent Helphenstine to the hospital instead of faxing Von Luhrte.

The morning of April 18, Helphenstine was escorted to the courthouse next door for his arraignment by Defendant John Byard, a sheriff's deputy and bailiff. Byard told the court that Helphenstine was "acting like he's clear out of it," had "stuff coming out of his mouth," and was "really not coherent .... I mean, he don't even know – we had to tell him three times where to turn to go into the cell." The court cancelled Helphenstine's arraignment. Despite the fact that the Sheriff's Office had a policy that required its deputies to seek medical attention immediately for sick prisoners, and to call 911 in the event of a medical emergency, Byard did nothing more than walk Helphenstine back to the Jail.

After Helphenstine returned to the Jail, Defendant deputy jailer Melinda Monroe sent another fax to Von Luhrte stating that Helphenstine was "vomiting badly" and needed to be seen by the doctor. Von Luhrte testified that after receiving these faxes, he believed Helphenstine's condition was so serious that he needed to be hospitalized. He claims that he twice called the Jail and told them so, but was told on both occasions that Helphenstine refused to be taken to the hospital. Von Luhrte's claim is denied by the Jail Defendants, and there is no documentation indicating that Von Luhrte ever called the Jail about Helphenstine.

Von Luhrte faxed back to the Jail prescriptions for the anti-emitics Reglan and Zofran, and directions that Helphenstine be encouraged to "sip Kool-Aid popsicles" and fed "saltine crackers," "bread/toast," and "chicken noodle soup." Helphenstine

was administered dosages of *both* Reglan and Zofran. This reduced Helphenstine's nausea and vomiting, but did nothing else to stem the continued deterioration in his condition.

Around midnight on April 18, Helphenstine laid face-down on his mat and never got up again. For the next 3½ hours, he remained almost motionless but for periodic twitching of his body, and raising and involuntarily shaking his feet, which may have been caused by cramping. A little before 3 am on April 19, Defendants McGinnis and deputy jailer Anthony Ruark entered Helphenstine's cell. While Ruark lifted Helphenstine's head, McGinnis put a straw in his mouth and tried to get him to drink some Ensure. All of this was witnessed by Defendant deputy jailer Sandy Bloomfield, the shift supervisor who was in the control room watching on camera.

Thirty minutes later Helphenstine was unresponsive, blue in color, and cold to the touch. The EMTs who were summoned to the Jail said that when they arrived, Helphenstine was "drenched in sweat." Helphenstine was pronounced dead at 4:13 am while being rushed to the hospital. He died of severe dehydration caused by his withdrawal.

At no time during Helphenstine's 4½ days in the Jail had his vital signs ever been taken, nor had he been seen by a doctor, a nurse, or anyone able to competently assess and treat his severe withdrawal.

## STATEMENT OF FACTS

The deputy jailers in the Lewis County, Kentucky Detention Center ("the Jail") have no medical training beyond first aid and CPR.[2] The Jail has no medical professionals – no doctors, no nurses – on site.[3] The doctor that Lewis County ("the County") hired to come to the Jail once a week to attend to the medical needs of its inmates – an elderly osteopath whose license to practice in Ohio had been revoked for inappropriate contacts with patients, and who was willing to do the work for just $600 a month – rarely came to the Jail.[4] The nearest hospital was a 35-40 minute ambulance ride away, in Maysville, Kentucky.  If an inmate was experiencing a medical emergency that required hospitalization, it could take as much as an hour to summon an ambulance and get them to the nearest hospital.[5]

Fortunately, the County had a policy that all inmates exhibiting signs or

---

[2] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 15; RE 99, *Lucas depo.*, Page ID #879-98, at 20; RE 100, *Ruark depo.*, Page ID #899-929, at 19.

[3] RE 99, *Lucas depo.*, Page ID #879-98, at 21-22; RE 103, *Lykins depo.*, Page ID #1014-59, at 88-89; RE 98, *McGinnis depo.*, Page ID #846-78, at 73.

[4] Records produced in this case indicate that from January 1 through the end of April, 2017, Von Luhrte was at the Jail on six occasions, and conducted sick call only twice.  RE 124-1, *Von Luhrte Attendance Schedule*, Page ID #1740; RE 121, *Potter depo.*, Page ID #1584-1697, at 63-66; RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 47. 501 KAR 3:090 requires that county jails in Kentucky conduct sick call at least twice a week, at a minimum.

[5] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 13; RE 103, *Lykins depo.*, Page ID #1014-59, at 32-33; RE 121, *Potter depo.*, Page ID #1584-1697, at 54.

symptoms of a medical emergency were to be sent immediately to the hospital.[6] But the guards in the Jail had no qualifications or training to recognize anything but the most obvious signs of a medical emergency: i.e., an inmate who was unresponsive or bleeding profusely, or had a broken bone.[7]

Drug addiction is a problem in the area served by the Jail, and it was not unusual to have an inmate in the Jail who was going through withdrawal.[8] Withdrawal from alcohol or drugs can be fatal.[9] But the Jail's deputies had received no training on when the signs and symptoms of withdrawal indicated that the inmate's condition was becoming life-threatening.[10] For this reason, the Jail's

---

[6] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 20-21, 27; RE 99, *Lucas depo.*, Page ID #879-98, at 20, 24; RE 103, *Lykins depo.*, Page ID #1014-59, at 12-13, 34, 85-86, 97; RE 98, *McGinnis depo.*, Page ID #846-78, at 28-29, 83; RE 121, *Potter depo.*, Page ID #1584-1697, at 18-19; RE 107, *Riley depo.*, Page ID #1121-36, at 18-19; RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 42, 61, 69, 77-78.

[7] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 18-21, 27; RE 121, *Potter depo.*, Page ID #1584-1697, at 50-51; RE 100, *Ruark depo.*, Page ID #899-929, at 8-9.

[8] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 16; RE 103, *Lykins depo.*, Page ID #1014-59, at 116. According to Von Luhrte, it would not be practical for the Jail to treat withdrawal as a medical emergency because "that would be every patient in the Jail." RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 38. The Jail's "Medical Coordinator", Melissa Potter, said that withdrawal in the Jail happens enough that the staff is supposed to know what to do when they see its signs and symptoms. RE 121, *Potter depo.*, Page ID #1584-1697, at 47.

[9] RE 103, *Lykins depo.*, Page ID #1014-59, at 90; RE 98, *McGinnis depo.*, Page ID #846-78, at 75-76; RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 36; RE 71-1, *Expert Report of Richard Blondell, MD*, Page ID #348-53, pp. 3, 5.

[10] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 26, 38, 46; RE 99, *Lucas depo.*, Page ID #879-98, at 19, 21, 23; RE 103, *Lykins depo.*, Page ID #1014-59, at 15, 90, 102-04, 113-15; RE 98, *McGinnis depo.*, Page ID #846-78, at 28, 76-78, 82; RE 107,

written policies simply said that withdrawal was to be treated as a medical emergency, period. [11] *But no one working at the Jail knew that.* Instead, the practice in the Jail was that an inmate's signs and symptoms of withdrawal were not treated as an emergency until the inmate had a heart attack or a seizure, or became unresponsive.[12]

Chris Helphenstine – 40 years old, married, with a young son – began suffering from untreated drug and/or alcohol withdrawal soon after his admission to the Jail on April 14, 2017, after an arrest for a drug offense.[13] Around 8:30 pm on April 16, after Helphenstine had "vomit[ed] all over the floor" in general population, he was moved by Defendant deputy jailer Mark Riley to a single-man "detox" cell that was just three or four feet from the Jail's control center, where he was supposed

---

*Riley depo.*, Page ID #1121-36, at 20; RE 100, *Ruark depo.*, Page ID #899-929, at 21-22; RE 104, *Thoroughman depo.*, Page ID #1060-86, at 15-16, 50-51.

[11] RE 124-3, *Emergency Medical Services* ("EMS") *Policy*, Page ID #1742; RE 108, *Bloomfield depo.*, Page ID #1137-87, at 18-19, 97, 107; RE 99, *Lucas depo.*, Page ID #879-98, at 19-21, 23; RE 103, *Lykins depo.*, Page ID #1014-59, at 50; RE 98, *McGinnis depo.*, Page ID #846-78, at 28, 71; RE 121, *Potter depo.*, Page ID #1584-1697, at 62; RE 107, *Riley depo.*, Page ID #1121-36, at 17-18, 29; RE 100, *Ruark depo.*, Page ID #899-929, at 8, 10, 30-31; RE 104, *Thoroughman depo.*, Page ID #1060-86, at 11-12. According to Defendant deputy jailer Amanda McGinnis, because the deputy jailers don't know when withdrawal is becoming a medical emergency, it "makes sense" to treat it as a medical emergency. RE 98, *McGinnis depo.*, Page ID #846-78, at 78.

[12] RE 103, *Lykins depo.*, Page ID #1014-59, at 15-16.

[13] RE 124-4, *Admission Sheet*, Page ID #1743.

to be checked at least every 20 minutes but was not.[14]  Helphenstine told Riley then

that he was "dope sick."[15]  Riley testified that he believed that Von Luhrte should

have been called then, but couldn't remember whether he or anyone else called the

doctor's office and there's no record that anyone did.[16]  According to Jailer Lykins,

if an inmate is in withdrawal and Von Luhrte can't be reached, EMS is supposed to

be called.[17]  But it wasn't.

By midnight on April 17-18, Helphenstine's condition had so deteriorated that

Defendant deputy jailer Amanda McGinnis prepared an "urgent" medical request for

Helphenstine saying that he was in withdrawal, was vomiting green and yellow

emesis, was soiling himself, was refusing to eat or drink, and had not gotten out of

bed for at least 24 hours.[18]  This request was faxed to Von Luhrte's office (although

it was too early in the morning for anyone to be there to act on it), but nothing else

was done for Helphenstine.[19]  McGinnis testified that had she known that the Jail's

---

[14] RE 124-5, *Riley Incident Report*, Page ID #1744; RE 108, *Bloomfield depo.*, Page
ID #1137-87, at 28, 38-41, 81; RE 121, *Potter depo.*, Page ID #1584-1697, at 17;
RE 107, *Riley depo.*, Page ID #1121-36, at 8-10, 28; RE 100, *Ruark depo.*, Page ID
#899-929, at 19-20; RE 124-15, *Observation Logs*, Page ID #1759-61.
[15] RE 124-5, *Riley Incident Report,* Page ID #1744.
[16] RE 107, *Riley depo.*, Page ID #1121-36, at 10-13.
[17] RE 103, *Lykins depo.*, Page ID #1014-59, at 50.
[18] RE 98, *McGinnis depo.*, Page ID #846-78, at 40-41, 49-51, 55-56.
[19] RE 124-6, *McGinnis Request*, Page ID #1745.

policies said withdrawal was a medical emergency, she would have sent Helphenstine to the hospital then.[20]

About four hours later, a withdrawal monitoring sheet indicated that Helphenstine was weak, drowsy, nauseated, vomiting, and had the shakes.[21] This is the only time such a document was ever prepared for Helphenstine, and no one deposed in this case knew who prepared it, or knew that such a form was in the Jail's computer system and available for their use.[22]

Between 6 and 7 am the morning of April 18, Helphenstine, who was sweaty and smelling of vomit and feces,[23] spent almost an hour in the shower while deputy jailers cleaned up the vomit in his cell.[24] Around 9:15 am, Defendant John Byard – a Lewis County deputy sheriff and court bailiff – walked Helphenstine to the courthouse for his arraignment.[25] Byard knew Helphenstine was in withdrawal.[26] Before arraignment proceedings began, Byard approached the bench and told the Judge that Helphenstine was "acting like he's clear out of it," had "stuff coming out

---

[20] RE 98, *McGinnis depo.*, Page ID #846-78, at 75.
[21] RE 124-7, *Withdrawal Monitoring Sheet*, Page ID #1746.
[22] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 49; RE 98, *McGinnis depo.*, Page ID #846-78, at 66; RE 100, *Ruark depo.*, Page ID #899-929, at 34.
[23] RE 104, *Thoroughman depo.*, Page ID #1060-86, at 30.
[24] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 70, 95-96; RE 98, *McGinnis depo.*, Page ID #846-78, at 22-23; RE 104, *Thoroughman depo.*, Page ID #1060-86, at 31.
[25] RE 105, *Byard depo.*, Page ID #1087-1105, at 7, 12.
[26] RE 105, *Byard depo.*, Page ID #1087-1105, at 23.

of his mouth," and was "really not coherent .... I mean, he don't even know – we had to tell him three times where to turn to go into the cell."[27]    Based on Byard's representations, the Judge postponed Helphenstine's arraignment for a week without seeing him. The Sheriff's Office had a policy that required its deputies to seek medical attention immediately for sick prisoners, and to call 911 in the event of a medical emergency. But despite the fact that Helphenstine was in withdrawal and exhibiting obvious signs of someone in need of some medical attention, Byard did nothing more than walk Helphenstine back to the Jail.[28]    Like the deputy jailers, Byard didn't know what his own department's policies said he was supposed to do for someone in Helphenstine's condition.[29]    Byard claims that Helphenstine's condition "wasn't a crisis at that point," but admits that his medical training is limited to first aid and that he has no training on drug or alcohol withdrawal.[30]

---

[27] RE 124-8, *Transcript of Arraignment*, Page ID #1747-51; RE 105, *Byard depo.*, Page ID #1087-1105, at 23.   A videotape of the arraignment was obtained and transcribed after Byard testified under oath that there was nothing to indicate that Helphenstine couldn't competently participate in his arraignment, and that the Judge cancelled the arraignment after Helphenstine went up to the bench and the Judge observed his condition and cancelled the hearing. RE 105, *Byard depo.*, Page ID #1087-1105, at 16, 18.   Byard also told the Kentucky State Police investigator that "Helphenstine had to be led to the courthouse and told which direction to turn because he was not able to negotiate corners or directions." *Id.* at 13-15.

[28] RE 124-9, *Sheriff's Office Policy on Sick Prisoners*, Page ID #1752; RE 124-10, *Bailiff Medical Policy*, Page ID #1753-54; RE 106, *Bivens depo.*, Page ID #1106-20, at 13; RE 105, *Byard depo.*, Page ID #1087-1105, at 29.

[29] RE 105, *Byard depo.*, Page ID #1087-1105, at 24.

[30] *Id.* at 31, 35-36.

When Helphenstine came back from the courthouse, the Jail had still not received a response to the fax McGinnis had sent Von Luhrte's office.  At 11:10 am, Melissa Potter, the Jail's "medical coordinator,"[31] directed that Defendant deputy jailer Melinda Monroe fill out another medical request for Helphenstine and fax it to Von Luhrte's office.[32]  In that request, Monroe said that Helphenstine was "detoxing from drug use," was "vomiting badly," and had "not [been] able to eat or drink for a few days now."  She added: "He needs to be seen by Dr. Tommy."[33]

Von Luhrte claims that he never saw Monroe's fax, but that sometime later on April 18 McGinnis' midnight fax was brought to his attention.[34]  Von Luhrte admits that he's "never actually dealt with anybody that was withdrawing from a drug," and that he doesn't know what indicates that an inmate's withdrawal has become severe.[35] The types of problems Von Luhrte typically handled at the Jail were urinary tract infections, sore throats, and sinus problems.[36]

---

[31] The medical coordinator was not anyone with any special medical training, but just the person who corresponded with Von Luhrte's office, made medical appointments for inmates, and handled billing.  RE 121, *Potter depo.*, Page ID #1584-1697, at 7-10, 26, 28.

[32] RE 103, *Lykins depo.*, Page ID #1014-59, at 17; RE 121, *Potter depo.*, Page ID #1584-1697, at 20, 35.

[33] RE 124-11, *Monroe Request*, Page ID #1755.  Monroe disappeared, could not be found, and was never served.

[34] RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 108-09.

[35] *Id.* at 37, 69.

[36] *Id.* at 111.

Von Luhrte testified that McGinnis' description of Helphenstine's condition indicated that he needed treatment only a hospital could provide.[37] Von Luhrte claims that he called the Jail and directed that Helphenstine be taken to the hospital, but was told that Helphenstine refused to be taken.[38] Von Luhrte cannot remember who he talked to, he did not document the call, there is no record of Von Luhrte making such a call or one being received by the Jail, and none of the Jail's employees deposed in this case has any recollection of speaking to Von Luhrte about Helphenstine.[39] Although Defendant Riley claims that Helphenstine didn't want to go to the hospital when he was first moved to the detox cell the afternoon of April 16, no one else could remember any other treatment, help or assistance that Helphenstine refused while he was going through withdrawal in the Jail.[40]

---

[37] *Id.* at 86, 92, 101, 128.

[38] *Id.* at 84.

[39] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 80, 112, 115; RE 99, *Lucas depo.*, Page ID #879-98, at 15, 27-29,42, 46; RE 98, *McGinnis depo.*, Page ID #846-78, at 83; RE 121, *Potter depo.*, Page ID #1584-1697, at 12-13, 15, 18, 20, 27-28, 31-32, 37, 41-43; RE 107, *Riley depo.*, Page ID #1121-36, at 21; RE 100, *Ruark depo.*, Page ID #899-929, at 12, 27-28; RE 104, *Thoroughman depo.*, Page ID #1060-86, at 38, 40, 63; RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 85-86.  Potter testified that she's "never known Dr. Tommy to call the jail."  RE 121, *Potter depo.*, Page ID #1584-1697, at 31-32.

[40] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 125; RE 101, *Carver depo.*, Page ID #930-55, at 46; RE 99, *Lucas depo.*, Page ID #879-98, at 29; RE 103, *Lykins depo.*, Page ID #1014-59, at 66, 70; RE 98, *McGinnis depo.*, Page ID #846-78, at 75; RE 107, *Riley depo.*, Page ID #1121-36, at 28; RE 100, *Ruark depo.*, Page ID #899-929, at 64, 72; RE 104, *Thoroughman depo.*, Page ID #1060-86, at 64.

After allegedly being informed that Helphenstine had refused to be taken to the hospital, Von Luhrte did nothing more than fax back to the Jail a prescription for Reglan (Metoclopram) for Helphenstine's nausea and vomiting, and directions that Helphenstine be encouraged to "sip Kool-Aid popsicles" and fed "saltine crackers," "bread/toast," and "chicken noodle soup."[41] Though Von Luhrte's order that Helphenstine be given Kool-Aid popsicles and chicken noodle soup may have reflected some concern about the dehydration that would ultimately prove fatal, he gave no orders to monitor Helphenstine's food and fluid intake to insure he was out of danger, and no one did.

Helphenstine got his first dose of Reglan at 3 pm, but it did no good and his condition continued to deteriorate.[42] Von Luhrte claims he was called then by someone who was identified to him as "the Jailer." Von Luhrte claims he instructed "the Jailer" that Helphenstine needed to go the hospital, and after being informed by "the Jailer" that Helphenstine had again refused, Von Luhrte says he told "the Jailer" to try a second time, only to be informed that Helphenstine had refused again.[43]

---

[41] RE 124-12, *Von Luhrte Orders*, Page ID #1756.  Plaintiff's expert, Dr. Richard Blondell, stated that "Those who develop symptoms and signs of severe dehydration require intravenous fluid replacement since oral fluid replacement with items such as Kool-Aid Popsicles are usually not effective in the face of recurrent vomiting." RE 71-1, *Expert Report of Richard Blondell, MD*, Page ID #348-53, p. 5.

[42] RE 124-13, *Medication Administration Record*, Page ID #1757; RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 136.

[43] RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 116, 127.

There is no record of this call or conversation ever taking place, and Defendant County Jailer Lykins specifically denies ever speaking with Von Luhrte about Helphenstine.[44]    According to Jailer Lykins, an inmate who needed emergency medical treatment, for obvious reasons, *would not be permitted to refuse*.[45]

Von Luhrte says he then prescribed Zofran (Odansetron) for Helphenstine. Zofran is a strong antiemetic often given to cancer patients undergoing chemotherapy.[46]  Beyond the prescription and the dosage, Von Luhrte gave no other instructions to the Jail's staff.[47]  So, at 9 pm, Helphenstine was given *both* Reglan *and* Zofran by the Jail's staff.[48]

April 18 was a Tuesday, and Tuesday night was when Von Luhrte typically came to the Jail to see inmates who needed his attention, if he came at all. But despite the fact that there was an inmate in the Jail that Von Luhrte believed needed to be hospitalized, he never showed.[49] In the hours that followed, there were multiple

---

[44] RE 103, *Lykins depo.*, Page ID #1014-59, at 65; RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 127.

[45] RE 103, *Lykins depo.*, Page ID #1014-59, at 38, 66-67.

[46] RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 116-17.

[47] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 101; RE 103, *Lykins depo.*, Page ID #1014-59, at 88.

[48] RE 124-13, *Medication Administration Record*, Page ID #1757.

[49] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 12; RE 103, *Lykins depo.*, Page ID #1014-59, at 77; RE 121, *Potter depo.*, Page ID #1584-1697, at 41; RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 48, 62.  Von Luhrte also ignored three other inmates he was supposed to see that night, including one who was complaining of chest pain and another complaining of "really bad migraines" and constipation.  RE 124-14, *4/17/17 Sick Call List*, Page ID #1758.  Defendant deputy jailer Anthony

failures by the Jail staff to check Helphenstine at least every 20 minutes, as required by Jail policy.[50] Even when he was checked, Helphenstine's observation logs offer little to no information on his condition, most of the time just indicating that he was "laying down."[51] But a video shows that Helphenstine was exhibiting signs and symptoms of severe withdrawal around 11 pm, and at midnight he laid face-down on his mat and never got up again. For the next 3½ hours, he remained almost motionless but for periodic twitching of his body, and raising and shaking his feet, which may have been caused by cramping.[52] A little before 3 am on April 19, Defendants McGinnis and Defendant deputy jailer Anthony Ruark entered Helphenstine's cell, and while Ruark lifted Helphenstine's head, McGinnis put a

---

Ruark testified that there have been occasions when the Jail asked Von Luhrte to come see an inmate, only to have to take the inmate to Von Luhrte's office when he wouldn't come. RE 100, *Ruark depo.*, Page ID #899-929, at 15.

[50] RE 124-15, *Observation Logs*, Page ID #1759-61; RE 104, *Thoroughman depo.*, Page ID #1060-86, at 44-45.

[51] RE 124-15, *Observation Logs*, Page ID #1759-61. Out of 217 entries, 145 said nothing more than "laying down." Helphenstine was observed vomiting four times the night of April 16 and in the early morning hours of April 17. There are no entries of vomiting after that. But because Helphenstine was still vomiting the morning of April 18, we know that Helphenstine was vomiting far more frequently than was recorded in logs. RE 108, *Bloomfield depo.*, Page ID #1137-87, at 60; RE 103, *Lykins depo.*, Page ID #1014-59, at 79; RE 98, *McGinnis depo.*, Page ID #846-78, at 55-56; RE 104, *Thoroughman depo.*, Page ID #1060-86, at 47-48. The observation logs also show that Helphenstine was observed to be eating only twice, and drinking water or juice only three times.

[52] RE 126, *full video filed conventionally* (**CAUTION: This video of Helphenstine's last hours contains images that some viewers may find disturbing**); RE 124-16, *Video Summary*, Page ID #1762-66; RE 100, *Ruark depo.*, Page ID #899-929, at 60.

straw in his mouth and tried to get him to drink some Ensure.[53]  All of this was witnessed by Defendant deputy jailer Sandy Bloomfield, the shift supervisor who was in the control room watching on camera, who knew Helphenstine was in withdrawal and had been vomiting, sweating, and experiencing diarrhea.[54]

Thirty minutes later Helphenstine was unresponsive, blue in color, and cold to the touch.[55]  The EMTs who were summoned to the Jail said that when they arrived, Helphenstine was "drenched in sweat."[56]  Helphenstine was pronounced dead at 4:13 am while on the way to the hospital.[57]  He died of severe dehydration caused by his withdrawal.[58]  At no time during Helphenstine's 4½ days in the Jail had his vital signs been taken, nor had he been seen by a doctor, a nurse, or anyone able to competently assess and treat his severe withdrawal.[59]

---

[53] RE 98, *McGinnis depo.*, Page ID #846-78, at 36-37.

[54] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 69, 82-86, 108; RE 121, *Potter depo.*, Page ID #1584-1697, at 43-44, 48-49; RE 100, *Ruark depo.*, Page ID #899-929, at 20; RE 124-17, *04/19/2017 02:53 Log Entry*, Page ID #1767.

[55] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 81, 97.

[56] RE 124-18, *EMT Run Report*, Page ID #1768; RE 104, *Thoroughman depo.*, Page ID #1060-86, at 58-59.

[57] RE 124-19, *CAD Incident Detail*, Page ID #1769-70, p. 2; RE 124-18, *EMT Run Report*, Page ID #1768.

[58] RE 71-1, *Expert Report of Richard Blondell, MD*, Page ID #348-53, p. 5; RE 118, *Blondell depo.*, Page ID #1206-1421, at 91-92; RE 71-5, *Expert Report of Robert Pfalzgraf, MD*, Page ID #384-85, p. 2.

[59] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 48-50, 87; RE 101, *Carver depo.*, Page ID #930-55, at 31-32; RE 99, *Lucas depo.*, Page ID #879-98, at 26; RE 103, *Lykins depo.*, Page ID #1014-59, at 20, 76, 89-90; RE 98, *McGinnis depo.*, Page ID #846-78, at 58; RE 100, *Ruark depo.*, Page ID #899-929, at 56, 61.

Nothing happened at the Jail after Helphenstine's death. No one was punished, no one was retrained, no one was reminded of the Jail's policy that required that withdrawal be treated as a medical emergency.[60]   Von Luhrte terminated his relationship with the Jail after the County refused to pay his increased insurance premiums.[61]

## **SUMMARY OF ARGUMENT**

In *Brawner v. Scott County, Tennessee*, 14 F.4th 585 (6th Cir. 2021), this Court joined the Second, Seventh, and Ninth Circuits in applying the Supreme Court's decision in *Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466, 2472-74 (2015), to the 42 U.S.C. §1983 medical claims of pretrial detainees.  Under the *Brawner* test, Plaintiff must have evidence from which a reasonable jury could find:

(1) that Helphenstine had a serious medical need;

(2) that reasonable officials in Defendants' position would have known that Helphenstine's serious medical need posed an excessive risk to his health or safety; and

(3) that Defendants recklessly failed to act reasonably to mitigate the risk.

---

[60] RE 108, *Bloomfield depo*., Page ID #1137-87, at 124; RE 101, *Carver depo*., Page ID #930-55, at 46; RE 103, *Lykins depo*., Page ID #1014-59, at 91; RE 98, *McGinnis depo*., Page ID #846-78, at 74-75; RE 121, *Potter depo*., Page ID #1584-1697, at 24; RE 100, *Ruark depo*., Page ID #899-929, at 63, 69-70; RE 104, *Thoroughman depo*., Page ID #1060-86, at 46-47.
[61] RE 102, *Von Luhrte depo*., Page ID #956-1013, at 45-47.

*Brawner*, 14 F.4th at 596-97.

A reasonable jury in this case could find that Defendants violated *Brawner* based upon record evidence that established:

(1) that Helphenstine's symptoms of severe withdrawal – which included nausea, vomiting, diarrhea, sweating, shakiness, and confusion – signaled a serious medical need;

(2) that a reasonable official in Defendants' position would have understood that unless he received some medical attention, Helphenstine's condition could become emergent and even fatal; and

(3) that Defendants recklessly failed to obtain for Helphenstine any of the medical attention he needed to prevent his death.

Accordingly, the summary judgment below should be reversed, and all of Plaintiff's federal and state claims against Defendants should be remanded for trial.

## ARGUMENT

### I.   Standard of Review.

A district court's grant of summary judgment is reviewed *de novo*. Summary judgment is appropriate here only if Defendants showed that there were no facts which could lead a reasonable jury to believe that Plaintiff had satisfied the *Brawner* test. All evidence must be viewed in the light most favorable to Plaintiff, and all reasonable inferences must be drawn in his or her favor. *Tompkins v. Crown Corr.,*

*Inc.*, 726 F.3d 830, 837 (6th Cir. 2013).

## II.    The District Court Erred in the Test It Applied to Plaintiff's Claims.

### A.    The Supreme Court's Decision in *Kingsley*.

After the Supreme Court's opinion in *Farmer v. Brennan,* 511 U.S. 825 (1994), a prisoner had to prove an official's "deliberate indifference" to his safety to establish a constitutional violation. Because the prisoner in *Farmer* had been convicted of a criminal offense, he could constitutionally be punished, but not to a degree that was cruel and unusual, which was prohibited by the Eighth Amendment. Therefore, to show deliberate indifference, a prisoner had to prove that the official had a culpable "state of mind" – i.e., that the official *intended* to punish the prisoner in a manner that was cruel and unusual. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). More specifically, the prisoner had to show that the official actually knew -- and not merely should have known -- that the prisoner was exposed to a substantial risk of serious harm and intentionally failed to take the steps necessary to mitigate the risk. *Farmer*, 511 U.S. at 837.

In *Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466, 2472-74 (2015), the Supreme Court for the first time was confronted with the question of whether a test of deliberate indifference could be applied fairly to the Fourteenth Amendment claim of a pretrial detainee who had not been convicted of any offense, and who therefore enjoyed a presumption of innocence. The Court held that because "pretrial

detainees (unlike convicted prisoners) cannot be punished at all," proof of intent to punish was not required for a pretrial detainee to prevail on an excessive force claim. *Id.* at 2475 (citations omitted). Instead, a pretrial detainee could "prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* In other words, pretrial detainees cannot be subjected to any punishment – intended or not -- beyond that which is rationally related to a legitimate government objective (such as detention pending trial), nor can they be treated in a manner that exceeds that objective (which in *Kingsley* was the official's use of excessive force).

"Intent" remained an element of *Kingsley*'s objective unreasonableness test, but only insofar as the official's conduct was intentional, not inadvertent or accidental. As the Court explained:

> [I]f an officer's Taser goes off by *accident* or if an officer *unintentionally* trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim. But if the use of force is deliberate— *i.e.,* purposeful or knowing—the pretrial detainee's claim may proceed.

*Id.,* at 2472 (emphasis added).

Thus, if the official's conduct is purposeful and knowing, the recklessness of such conduct is immaterial. *Id.* In fact, the Supreme Court in *Kingsley* held that because the officials in that case admitted that their use of force was intentional, not accidental or inadvertent, the plaintiff did not have to prove recklessness. *Id.* For

that reason, the Supreme Court found that the district court erred in submitting an instruction to the jury that required the plaintiff in *Kingsley* to prove that the officials had acted with "reckless disregard" of the plaintiff's rights because: (a) the officials had already admitted their conduct was knowing and purposeful; and (b) it risked reinjecting an element of subjectivity into a test of objective reasonableness. *Id*. at 2476-77.[62]

The Supreme Court in *Kingsley* specifically rejected the argument that "recklessness" should be required in cases involving pretrial detainees to avoid constitutionalizing negligence claims.  According to the Supreme Court, a "recklessness" requirement was unnecessary given: (a) the courts' traditional deference to "reasonable solutions" devised by jail officials for "the problems they face"; (b) the requirement that the misconduct that injured the pretrial detainee be purposeful and knowing (or reckless if it was not); (c) the limitations imposed upon all incarcerated persons by the Prison Litigation Reform Act ("PLRA"); and (d) the protection afforded officials by the doctrine of qualified immunity. *Id.,* at 2474-76.

Finally, the use of an objective standard meant that in the case of a pretrial detainee, the question was no longer whether the official actually knew of the risk,

---

[62] Indeed, in *Farmer*, the Supreme Court said that "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of *recklessly disregarding* that risk." *Farmer*, 511 U.S. at 836 (emphasis added).

but whether a reasonable official in the defendant's position would have known of the risk and done something to abate it. *See, e.g., Hale v. Boyle County*, 18 F.4th 845, 852 (6th Cir. 2021); *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015).

## B.    *Brawner* Eliminates the Need for Evidence of a Defendant's Actual Knowledge When the Risk is Obvious.

In *Brawner, supra*, this Court joined the Second, Seventh, and Ninth Circuits in applying *Kingsley* to a pretrial detainees' Fourteenth Amendment medical claims. The Court recognized that "[g]iven *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable." *Id.* at 598.  This Court ruled that henceforth a pretrial detainee need only present evidence that the defendant acted "recklessly in the face of an unjustifiably high risk of harm that is either known *or so obvious that it should be known*." *Id.*, quoting *Farmer*, 511 U.S. at 836 (emphasis added, internal quotation marks omitted).

*Brawner*'s "recklessness" requirement is problematic. *Kingsley* said that "recklessness" need not be an element of the test applied to a pretrial detainee's claim, at least in the context of the use of excessive force. If evidence of recklessness is not required in a case involving the use of excessive force against a pretrial detainee, it should not be required in the instance of a pretrial detainee's medical claim either, because a prisoner's excessive force claim under §1983 has always

been subjected to a heavier burden than a medical claim.  In *Farmer*, the Supreme Court said that the deliberate indifference standard was inappropriate in cases involving excessive force, and that a plaintiff must instead meet the heavier burden of showing that officials applied the force *maliciously and sadistically* for the very purpose of causing harm. 511 U.S. at 835-36.  Again, according to the Supreme Court, "pretrial detainees ... cannot be punished at all, *much less* maliciously and sadistically."  *Kingsley,* 135 S. Ct. at 2475.

*Brawner* was a majority decision accompanied by a spirited dissent, and a petition for rehearing soon followed.  This Court denied the petition, but the Hon. Chad A. Readler wrote an eight-page dissent.  *Brawner v. Scott County, Tennessee*, 14 F.4th 551 (6th Cir. 2021).  Judge Readler's primary objection was that under the *Brawner* test, "we ask only whether a risk was so obvious that the prison official should have known it presented a substantial risk of serious harm to the detainee – regardless of what the official actually knew."  *Id*. at 553.  The defendants in *Brawner* have now petitioned the Supreme Court for a writ of certiorari. RE 59, *Brawner v. Scott County, Tennessee*, Case No. 19-5623 (6th Cir. Mar. 7, 2022).

In *Greene v. Crawford County*, 22 F.4th 593 (6th Cir. 2022), a panel composed of the Hons. David W. McKeague, Richard Allen Griffin, and Raymond M. Kethledge applied the *Brawner* test in the case of a pretrial detainee who died after his untreated alcohol withdrawal had progressed to *delirium tremens*.  The panel

acknowledged that under *Brawner*, a plaintiff could prove his case with evidence that the risk "was so obvious that it should be known." *Id.* at 606. With that in mind, the panel concluded that the detainee's continued sleeplessness and hallucinations signaled a need for some medical attention that was so obvious that defendants' inaction – beyond their mere observations of his condition -- constituted a violation of the detainee's Fourteenth Amendment rights. *Id.* at 608-09.

**C.    *Trozzi* Attempts to Insert a Requirement for Evidence of Actual Knowledge Back into the *Brawner* Test.**

In *Trozzi v. Lake County, Ohio*, 29 F.4th 745 (6th Cir. 2022), this Court confronted yet another medical claim by a pretrial detainee that was dismissed on summary judgment. Judge Readler was on the panel and wrote an opinion joined by the Hons. Alice M. Batchelder and John B. Nalbandian.  In his opinion, Judge Readler held that, read together, *Farmer*, *Kingsley*, *Brawner,* and *Greene* still required proof of the official's actual knowledge, saying that the appropriate test should be that of "a reasonable officer at the scene (*knowing what the particular jail official knew at the time of the incident*)." *Id.* at 757 (emphasis added; parenthesis in original).  In this formulation, however, the *Brawner* test is indistinguishable from that of deliberate indifference.  Judge Readler hinged his opinion on *Brawner*'s continued requirement of proof of recklessness, interpreting that to mean that "simple inaction in the face of an objectively serious medical need [is] insufficient

to demonstrate deliberate indifference in violation of the Fourteenth Amendment."
*Id.*

A reformulation of the *Brawner* test was unnecessary to absolve the *Trozzi* jailers of liability, because they placed the detainee in medical observation, informed the on-site nurse of the detainee's condition, and administered an over-the-counter antacid the nurse ordered. But Judge Readler's opinion, relying on pre-*Brawner* authority, went on to grant qualified immunity to the nurse for doing nothing more, despite evidence that she knew the detainee was being treated for ulcers, was complaining of severe stomach pain, and was covered in urine, feces, and bloody vomit. When the detainee was finally transported to a hospital, it was discovered she had a perforated ulcer and needed surgery. *Id.* at 750. *Compare Blackmore v. Kalamazoo County,* 390 F.3d 890 (6th Cir. 2004) (inaction in face of plaintiff's complaints of stomach pain and vomiting not only supports a claim of deliberate indifference but recovery of damages for mere delay in obtaining requisite medical attention).

### D.    The District Court Cited *Trozzi* and pre-*Brawner* Deliberate Indifference Cases to Support its Decision, not *Brawner* or *Greene*.

In its decision below, the District Court first cited *Trozzi* and held that Plaintiff had to produce evidence of Defendants' actual knowledge of the risk to Helphenstine to avoid the summary dismissal of her claims. RE 133, *Memorandum Opinion and Order,* Page ID #1826-55, at 13, 14. The District Court then relied upon pre-

*Brawner* deliberate indifference cases to "address the subjective component of Plaintiff's deliberate indifference claim for each officer individually." RE 133*, Memorandum Opinion and Order,* Page ID #1826-55, at 13-16.   *Brawner* is cited solely for its requirement of "recklessness," and the District Court appears unaware that in *Greene*, this Court applied the *Brawner* test and found for the plaintiff in circumstances comparable to those in this case.  RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 12, fn. 3; 16.

Absent an admission, it is literally impossible for a plaintiff to prove what a defendant actually knew.  This Court has acknowledged that "[o]fficials, of course, do not readily admit [the] subjective component ...." *Phillips v. Roane County*, 534 F.3d 531, 540 (6th Cir. 2008) (emphasis added). Therefore, "[w]hether [Defendants] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ...." *Id*. The question on summary judgment is whether Defendants "could have perceived a substantial risk of serious harm to [the plaintiff]. Whether in fact they perceived, inferred or disregarded that risk is an issue for trial." *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006).  Because so much depends on the credibility of the defendants testifying as to their own states of mind, a jury should be given an opportunity to observe their demeanor during direct and cross-examination. *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir. 1970).

For this reason, evidence that the risk was sufficiently obvious that it should have been known by defendants should be sufficient for a pretrial detainee to overcome summary judgment, particularly when there is evidence that a defendant violated a written policy that would have mitigated the risk. Whether or not a pretrial detainee, like a convicted prisoner, should be saddled with the burden of proving a defendant's actual knowledge appears to be a matter of ongoing debate in this Court. But if such a burden must be borne by a pretrial detainee, a defendant's actual knowledge is inappropriate for resolution on summary judgment and should be resolved by a jury trial.

### III. Whether Defendants Violated Helphenstine's Constitutional Rights is a Genuine Issue of Material Fact that Must Be Resolved by a Jury.

#### A. Defendants' Self-Serving Testimony Warrants a Heightened Degree of Skepticism.

Plaintiff's only witness to the events in this case who is or was not a Defendant – Chris Helphenstine -- is dead. In such circumstances, the Court must apply a heightened degree of skepticism to Defendants' self-serving testimony in determining whether there exists sufficient evidence, including circumstantial evidence, on which a reasonable jury could base its rejection of one or more Defendants' testimony at trial. *Williams v. Deal*, 659 Fed. Appx. 580, 586 (11th Cir. 2016); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014); *Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006); *Estate of O'Bert v. Vargo,* 331 F.3d 29,

37 (2nd Cir. 2003); *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994).

"[I]f the credibility of the movant[] is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied." 10A Wright & Miller, Fed. Prac. & Proc. Civ. §2726 (3d ed.); *see also Typeright Keyboard Corp. v. Microsoft Corp.,* 374 F.3d 1151, 1158–59 (Fed. Cir. 2004); *U.S. v. Real Property Located at 3234 Washington Ave. North, Minneapolis, Minn.,* 480 F.3d 841, 845 (8th Cir. 2007). In this case, there are numerous instances in which Defendants' credibility can be challenged with record evidence, whether it be Defendants' claims that they saw nothing to indicate that Helphenstine needed medical attention on April 18, or their refusal to acknowledge that Helphenstine's signs and symptoms of severe withdrawal indicated his condition was emergent, or Von Luhrte's unsubstantiated and self-serving claim that he told the Jail to take Helphenstine to the hospital on April 18, or the Jail Defendants' claim that he didn't. But, instead, to use one example, the District Court appeared to credit the self-serving testimony of Defendant Lucas that Helphenstine said he was "feeling pretty good now," of Defendant McGinnis' that Helphenstine appeared to be "doing better," and of Defendant Carver's that Helphenstine "looked pretty good" and "like he felt good", just hours before McGinnis and Defendant Ruark had to struggle to get Helphenstine to sip some Ensure through a straw, and his death from withdrawal-

induced dehydration. RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 7, 17-18.

In *Kanawha & Michigan R. Co. v. Kerse,* 239 U.S. 576 (1916), the Supreme Court said that where a witness' testimony "is so inconsistent with the material part of the testimony of others ... the jury may reasonably ... conclude[] that their testimony should be rejected *in toto*" under the principle of *falsus in uno, falsus in omnibus*.[63] *Id.* at 581. That principle remains in full force to this day.  In *Pryor v. Seyfarth Shaw, Fairweather & Geraldson*, 212 F.3d 976, 979 (7th Cir. 2000), Judge Posner wrote that "[d]isbelieving a witness's testimony about one of the material facts in a case can justify the trier of fact in disbelieving the witness's contested testimony on other material facts."  The conflicting testimony of the witnesses in this case offers precisely the circumstances in which such a rule should apply, and required that Defendants' motions for summary judgment be denied.

### B.    Helphenstine Had an Obviously Serious Medical Need.

It is undisputed that Helphenstine was withdrawing from alcohol and/or drugs. He was not just lethargic or "feeling bad."  He was nauseated and vomiting, was sweating, was disoriented, and had diarrhea.  He was refusing food and water.  He would not get out of bed for extended periods of time.  The Jail's staff believed he needed medical attention, and the Jail's doctor believed he needed to be hospitalized.

---

[63] "Everything is corrupt that comes from a corrupted source."

The District Court properly concluded that Helphenstine exhibited an obviously serious medical need. RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 13-14. The District Court appeared to criticize Plaintiff for "contend[ing] that withdrawal from any substance at any stage and for every detainee, qualifies as a "sufficiently serious medical need." RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 13.[64] It certainly does when there is no one – not even the Jail's off-site doctor --who has the training or qualifications to recognize or respond to signs and symptoms indicating that potentially-fatal withdrawal has become a medical emergency. When the District Court stated in its opinion that "symptoms of withdrawal do not always warrant hospitalization," it was relying on the pre-*Brawner* decision in *Speers v. County of Berrien*, 196 Fed. Appx. 390 (6th Cir. 2006). RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 14. That case involved a jail with an on-site medical staff, an inmate that had been examined by the Jail's doctor who had prescribed a variety of medications to ease his withdrawal symptoms, and a jail policy that did *not* instruct the deputy jailers to treat withdrawal as a medical emergency. Even then this Court found genuine issues of material fact that precluded summary judgment for two officers who may have

---

[64] The District Court went on to state that "Helphenstine's condition .... fluctuated." RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 13. The District Court here is relying upon the self-serving testimony of Defendants that Helphenstine seemed fine just hours before his death.

witnessed signs that the inmate's withdrawal had progressed to a serious condition and did nothing more than continue to check on him.

Defendants cannot challenge Plaintiff on this issue when the Jail's own policies deemed withdrawal a medical emergency, and none attempted to do so in their dispositive motions below.

### C.    Defendant Lewis County.

The Defendant most responsible for Helphenstine's foreseeable and preventable death is Defendant Lewis County. A county can be liable under 42 U.S.C. §1983 when it tolerates a custom or practice which causes a constitutional violation. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 386 (1989) (citing *Monell v. New York City Dep't of Soc. Serves.,* 436 U.S. 658 (1978)). A county can also be held liable under 42 U.S.C. §1983 when it has "failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738-39 (6th Cir. 2015) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

The County failed to meet its core responsibility for attending to the medical needs of the inmates experiencing withdrawal in its Jail. It failed to train its employees to respond competently to an inmate's withdrawal when it knew its failure to do so risked violating an inmate's constitutional rights. It exercised no

supervision over its Jailer or its Jail's doctor, and it violated applicable Kentucky law and administrative regulations.  The evidence in this case shows that:

- The County has a statutory responsibility to attend to the medical needs of inmates in its Jail.  KRS 71.040, 441.025.

- Kentucky law requires that inmates in county jails be provided "[e]mergency medical, vision, and dental care ... commensurate with the level of care available to the community," and further states that "[i]f emergency medical care is needed, it *shall* be provided."  501 KAR 3:090(13) and (21) (emphasis added).

- To that end, the County had written policies and procedures in place that addressed the medical needs of inmates in its Jail.

- Drug addiction is a problem in the area served by the Jail, and it was not unusual to have an inmate in the Jail in withdrawal.

- The Jail's policies and procedures specifically identified drug and alcohol withdrawal as a medical emergency, and said that "[a]ll deputies are *trained* to respond to medical emergencies since an inmate's life may depend on appropriate first aid."[65]

- Neither the Jailer nor the deputy jailers knew that the Jail's policies required them to respond to an inmate's signs and symptoms of withdrawal as if it were

---

[65] RE 124-3, *EMS Policy*, Page ID #1742.

Case: 22-5407   Document: 16   Filed: 06/22/2022   Page: 41

a medical emergency, and none were trained to spot the signs and symptoms indicating that a detainee's withdrawal was life-threatening.

- Instead, the practice in the Jail was that an inmate's signs and symptoms of withdrawal did not have to be treated as an emergency until the inmate had a heart attack or a seizure, or became unresponsive.[66]

- Defendants knew Helphenstine was experiencing severe drug and/or alcohol withdrawal for 2½ days before he became unresponsive and never took his vital signs or had him seen by a medical professional, much less took him to the hospital.

- For the entire day preceding Helphenstine's death, Defendants knew Helphenstine needed medical attention but failed to obtain it for him.

- Even after Helphenstine's death, no one told the deputy jailers that they were supposed to treat withdrawal as a medical emergency.

The County also failed to provide the inmates of its Jail with regular access to the skills of a qualified medical professional, who could have stepped in when the County's employees failed to act in the manner its policies required.

- It appears to have hired as a doctor for the Jail's inmates a doctor with a blemished record who appeared to be the only individual it could find to do

---

[66] RE 103, *Lykins depo.*, Page ID #1014-59, at 15-16.

the job for $600 month.[67]

- Von Luhrte was, at most, competent to treat urinary tract infections, sore throats, and sinus infections, and was permitted to do so over the phone without examining the patient or knowing anything about their medical history.[68]

- Von Luhrte never read the Jail's policies or any Kentucky regulations that specified the medical care an inmate in the Jail was supposed to receive.[69]

- The County required Von Luhrte to visit the Jail only once a week, and he rarely did that, a violation of the Kentucky administrative regulations that required the Jail to conduct at least two sick calls a week, at a minimum. 501 KAR 3:090(10)(a), 3:170.

- Defendant deputy jailer Anthony Ruark testified that it was common knowledge in the Jail that Von Luhrte did not provide the inmates the medical care they needed.[70]

- The County made no effort to supervise Von Luhrte's performance,[71] and knowingly acquiesced in his practice of conducting virtually no sick calls at the Jail at all.

---

[67] *Id*. at 105-06.
[68] RE 102, *Von Luhrte depo*., Page ID #956-1013, at 72-74, 94-98.
[69] *Id*. at 40-41.
[70] RE 100, *Ruark depo*., Page ID #899-929, at 14-18, 71-72, 75-76.
[71] RE 103, *Lykins depo*., Page ID #1014-59, at 31.

- Von Luhrte had no qualifications or experience to treat an inmate in withdrawal.[72]

As a consequence, the County, in violation of its statutory and administrative duties to its residents in the Jail, had put nothing in place to protect an inmate in withdrawal from the ignorance and misconduct of the untrained staff at the Jail and the Jail's medical professional.

Members of the County's Fiscal Court never visited the Jail, and the County did not require that the Jailer meet the policy requirement that he make a quarterly report on the Jail's medical services.[73]  It clearly delegated to its Jailer final and absolute decision-making authority regarding the treatment of inmates exhibiting medical emergencies, and therefore cannot claim it was ignorant of the resulting conditions or consequences. *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986); *St. Louis v. Praprotnik*, 485 U.S. 112 (1988). The Defendant deputy jailers were unaware that they were supposed to treat withdrawal as a medical emergency, and had no training to treat withdrawal as anything *but* a medical emergency. Defendant Jailer Lykins admitted that no one supervised Von Luhrte's performance; in fact, Lykins had never even seen Von Luhrte in the Jail.[74]

---

[72] RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 37, 69.
[73] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 80; RE 101, *Carver depo.*, Page ID #930-55, at 33; RE 103, *Lykins depo.*, Page ID #1014-59, at 36; RE 100, *Ruark depo.*, Page ID #899-929, at 72.
[74] RE 103, *Lykins depo.*, Page ID #1014-59, at 23-29, 31, 37, 45.

State law and regulations, and the Jail's own Emergency Medical Services ("EMS") Policy, make clear that identifying and responding to medical emergencies are among a deputy jailer's most important duties, if not *the* most important. Lewis County has a drug problem, it was not unusual for an inmate in its Jail to be experiencing withdrawal, the Jail had a policy that said withdrawal was a medical emergency, and the Jail's practice was to send all inmates with medical emergencies to the hospital. But the Jailer's and deputy jailers' ignorance of the policy, and their practice of not treating withdrawal as a medical emergency until an inmate had a heart attack or a seizure, or became unresponsive, rendered the Jail's written EMS Policy a nullity, and caused Helphenstine's death.

Finally, the County exhibited no concern or interest in what had happened to Helphenstine or why. A supervisory defendant's conduct both before and *after* the event is relevant to whether its failure to train and supervise its subordinates reflected "a deliberate or conscious choice" for which it can be held liable under §1983. *Shadrick v. Southern Health Partners, Inc.*, 805 F.3d 724, 743 (6th Cir. 2015).

Defendant Lewis County's motion for summary judgment should therefore have been denied.

### D.    Defendant Jailer Lykins.

Lykins has been at the Jail 28 years, and has been the elected Jailer since

2012.[75] He had a statutory responsibility to attend to the medical needs of inmates in his Jail pursuant to KRS 71.040.  It was Lykins' job to make sure his deputies had the training they needed to respond to medical emergencies.[76] But not only did his deputy jailers not know they were supposed to consider withdrawal a medical emergency and act accordingly, Lykins didn't know it either.[77]  He signed the contract with Von Luhrte, and then didn't even require that Von Luhrte visit the Jail at least once a week as he had promised.

To succeed on a failure to train or supervise claim against an individual supervisor, a plaintiff must show that the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it." *Comstock v. McCrary*, 273 F.3d 693, 712-13 (6th Cir. 2001). But Lykins' misconduct was individual as well as supervisory.  He knew Helphenstine was going through withdrawal in his Jail and did nothing to help him.  He also knew that no one else was getting Helphenstine the help he needed, and thus participated in and/or "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)).  The evidence in this case shows that:

---

[75] *Id*. at 7-8.
[76] *Id*. at 101, 104 113-16.
[77] *Id*. at 15-16.

- Lykins was at the Jail Monday through Friday, from 7 am to 3 or 4 pm.[78]

- Lykins personally knew Helphenstine was in withdrawal when he saw on April 17 Riley's report that Helphenstine had been moved to the detox cell and why.[79]

- If an inmate was in withdrawal and Von Luhrte couldn't be reached, EMS was supposed to be called.[80]

- Von Luhrte was not "reached" until sometime the afternoon of April 18, and EMS was never called for Helphenstine until he was found unresponsive.

- Lykins arguably failed to effect Von Luhrte's order that Helphsenstine be taken to the hospital.

- Lykins did not check on Helphenstine before leaving the Jail on April 18 because simply because Von Luhrte had been faxed a medical request.[81]

- Lykins conducted no investigation at all into what had happened to Helphenstine, or the performance of his staff or Von Luhrte.[82]

With regard to Lykins' supervisory liability, the District Court erred in concluding that: (a) Lykins did not "authorize[], directly or implicitly, ... any deputy

---

[78] *Id.* at 16-17.

[79] *Id.* at 58, 62.

[80] *Id.* at 50.

[81] *Id.* at 79-80.

[82] *Id.* at 84.

jailers' alleged deprivation of proper medical care (*Id.*); and there was no evidence of "a breakdown in the proper workings" of the Jail or of Lykins' knowledge of such a breakdown (*Id.* at 24-25). Moreover, the District Court erred in concluding that Lykins did not "personally participate[] in any deputy jailer's alleged failures" (RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 24), and that the facts bearing on Lykins' individual liability were limited to his one interaction with Helphenstine the morning of his arraignment and Lykins self-serving, disputed testimony that Helphenstine at that time looked "OK." RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 22-23.

The District Court did not appear to recognize the significance of the factual dispute over whether Von Luhrte spoke to the Jailer over the phone about Helphenstine. If the jury believes Von Luhrte, then Lykins was aware that the Jail's doctor believed Helphenstine's condition to be emergent and had ordered his transport to the hospital. In light of such knowledge, Lykins' failure to obtain for Helphenstine the medical attention he needed, by either calling an ambulance or taking Helphenstine to the hospital himself, was reckless.

The District Court also appears to credit the notion that Helphenstine would be permitted to refuse emergent care. RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 28. In a carceral environment, the idea that an inmate would be asked permission to receive – much less allowed to refuse -- emergent care that

has been ordered by the Jail's doctor is absurd on its face.  *See, e.g., In re Grand Jury Subpoena John Doe,* 150 F.3d 170, 173 (2nd Cir. 1998) (allowing hunger-striking prisoner to be force-fed because "the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline, outweigh the constitutional rights asserted by" the prisoner); *Laurie v. Senecal,* 666 A.2nd 806, 809 (R.I. 1995) ("In respect to an incarcerated prisoner, we believe there is no right under either the State or the Federal Constitution to override the compelling interest of the state in the preservation of his or her life and the prevention of suicide.").

### E.    Defendant Von Luhrte.

The evidence in this case show that:

- Von Luhrte knew by the afternoon of April 18 that Helphenstine's condition was a medical emergency requiring treatment that only a hospital could provide.

- There is nothing to support Von Luhrte's self-serving and uncorroborated testimony that he told anyone at the Jail that Helphenstine needed to be taken to the hospital.

- If Von Luhrte did inform the Jail that Helphenstine needed to be taken to the hospital and was told Helphenstine refused, he did not to speak to Helphenstine personally, or order that Helphenstine be brought to his office,

or go to the Jail to personally observe Helphenstine's condition or talk to him.[83]

- His attempt to "treat" Helphenstine's condition without seeing him or talking to him, and while ignorant of Helphenstine's medical history and vital signs, was a violation of the standard of care.[84]

- Von Luhrte's attempts to treat Helphenstine's condition were so cursory as to amount to no treatment at all.[85]

- He failed to provide the Jail's staff any orders to avoid the overlapping administration of anti-emetics he had prescribed for Helphenstine, or to monitor Helphenstine for particular signs and symptoms indicating his condition was becoming life-threatening.[86]

- He failed to follow-up on the emergent condition of a patient under his care, or to even go to the Jail on his regularly-scheduled night to see and speak to Helphenstine.

- Plaintiff's medical expert characterized Von Luhrte's conduct as grossly incompetent.[87]

---

[83] *Id.*

[84] *Id.*; RE 118, *Blondell depo.*, Page ID #1206-1421, at 88-90, 103-04, 141-42.

[85] RE 71-1, *Expert Report of Richard Blondell, MD*, Page ID #pp. 4-5; RE 118, *Blondell depo.*, Page ID #1206-1421, at 115.

[86] RE 71-1, *Expert Report of Richard Blondell, MD*, Page ID #348-53, pp. 3-4.

[87] *Id.* at 6.

This is not a situation in which a doctor merely misdiagnosed a medical condition, or a dispute over the adequacy of an inmate's medical treatment. Von Luhrte knew Helphenstine was in withdrawal and needed medical care that only a hospital could provide. He not only failed to effect Helphenstine's transport to the hospital, he didn't even bother to go see Helphenstine himself.

Again, the District Court did not appear to recognize the significance of the factual dispute over whether Von Luhrte spoke to anyone at the Jail over the phone about Helphenstine.  Von Luhrte's admission that that Helphenstine needed to go to the hospital at least by the afternoon of April 18 evidences his actual knowledge of the risk. A reasonable jury could find that Von Luhrte did not call the Jail or do anything else to effect Helphenstine's hospitalization.

### F.     The Defendant Deputy Jailers.

Every deputy jailer who knew Helphenstine was in withdrawal and did not send him to the hospital can be faulted for his death.  That said, Plaintiff does not oppose the dismissal of her federal claims against Defendants Carver and Thoroughman.  But the other deputy jailers in this case knew more than just that Helphenstine was in withdrawal, and knew or should have known more than they were willing to admit. Their inaction in the face of what they knew or should have known about Helphenstine's condition was reckless and directly analogous to that of the deputy jailers in *Greene*.

### 1.    Defendant Lucas.

- Lucas was second-in-command at the Jail, and was the Jail's director of security and training.[88]

- He also supervised the Jail's two captains and shift supervisors, Defendants Riley and Bloomfield.[89]

- As such, Lucas' duty to train the deputy jailers on the Jail's policies and to handle medical emergencies was commensurate with Lykins', and was equally deficient.

- Lucas, like Lykins, was ignorant of the fact that the Jail's policies said that withdrawal was a medical emergency.[90]

- Lucas worked the 3-11 pm shift at the Jail on April 18.[91]

- Lucas knew Helphenstine was in a detox cell and was going through withdrawal on April 18.[92]

- Lucas admitted that had he known the Jail's policies said that withdrawal was a medical emergency, he would have called an ambulance for Helphenstine

---

[88] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 124; RE 99, *Lucas depo.*, Page ID #879-98, at 7, 15-16; RE 103, *Lykins depo.*, Page ID #1014-59, at 17.

[89] RE 107, *Riley depo.*, Page ID #1121-36, at 18-19, 23; RE 103, *Lykins depo.*, Page ID #1014-59, at 18.

[90] RE 99, *Lucas depo.*, Page ID #879-98, at 18-21, 23.

[91] *Id.* at 11.

[92] *Id.* at 25, 31.

that afternoon.[93]

### 2.    Defendant Riley.

- Riley worked 7 am to 11 pm on Sunday, April 16.[94]

- Riley was one of the two captains at the Jail and supervised his shift.[95]

- It was Riley who moved Helphenstine to the detox cell around 8:30 pm on April 16.[96]

- Riley knew Helphenstine was so sick that he had vomited on the floor in general population before he could get to the toilet, that Helphenstine believed he was "dope sick," and that Helphentine was going through withdrawal.[97]

- Riley testified that Von Luhrte should have been called then, and if he couldn't be reached, Helphenstine should have been taken to the hospital.[98]

- There is no evidence that anyone contacted Von Luhrte's office at or around the time Riley moved Helphenstine to the detox cell, and Helphenstine was not taken to the hospital.

---

[93] *Id*. at 9-11, 26.
[94] RE 107, *Riley depo*., Page ID #1121-36, at 19-20.
[95] *Id*. at 23; RE 103, *Lykins depo*., Page ID #1014-59, at 18.
[96] RE 124-5, *Riley Incident Report*, Page ID #1744; RE 107, *Riley depo*., Page ID #1121-36, at 8-10, 28.
[97] *Id*. at 29-30.
[98] *Id*. at 29.

### 3.    Defendant Bloomfield.

- Bloomfield was the other captain at the Jail, and supervised the 3 pm – 7 am shift on April 17-18 and April 18-19.[99]

- Bloomfield was told by Riley that he'd moved Helphenstine to the detox cell because he was "dope sick."[100]

- Bloomfield knew Helphenstine was in withdrawal.[101]

- Bloomfield knew that Helphenstine was vomiting, sweating, and experiencing diarrhea.[102]

- Bloomfield was present at the Jail and supervising Defendant McGinnis when, in the early morning hours of April 18, McGinnis filled out an "urgent" medical request form that said that Helphenstine was vomiting green and yellow emesis, soiling himself, refusing to eat or drink, and had not gotten out of bed for at least 24 hours.[103]

- Bloomfield was supervising the shift at the Jail that began at 3 pm on April 18, when Helphenstine was given his first dose of Reglan but continued to get

---

[99] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 14, 53, 88, 108.
[100] *Id*. at 40, 81.
[101] *Id*. at 97, 103, 127.
[102] *Id*. at 69.
[103] RE 124-6, *McGinnis Request*, Page ID #1745; RE 98, *McGinnis depo*., Page ID #846-78, at 40-41, 49-51, 55-56

worse.[104]

- Bloomfield personally observed Helphenstine's deterioration the early morning hours of April 19.[105]

- Despite the foregoing, Bloomfield never directed that a doctor be called for Helphenstine or that he be taken to the hospital.[106]

### 4.    Defendant McGinnis.

- McGinnis knew that Helphenstine was in withdrawal.[107]

- In the early morning hours of April 18, McGinnis filled out an "urgent" medical request form that said that Helphenstine was vomiting green and yellow emesis, soiling himself, refusing to eat or drink, and had not gotten out

---

[104] RE 124-13, *Medication Administration Record*, Page ID #1757; RE 102, *Von Luhrte depo.*, Page ID #956-1013, at 136.

[105] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 82-86, 108; RE 121, *Potter depo.*, Page ID #1584-1697, at 43-44, 48-49; RE 100, *Ruark depo.*, Page ID #899-929, at 20; RE 124-17, *04/19/2017 02:53 Log Entry*, Page ID #1767. The District Court disagreed with this characterization of Bloomfield's testimony. RE 133, *Memorandum Opinion and Order,* Page ID #1826-55, at 21. However, it is clear that, while referencing the observation log entries made by other deputies, Bloomfield was testifying to what she saw on the camera inside Helphenstine's cell from her post in the Jail's control center. Plaintiff disagrees with the District Court's conclusion that an inmate who was previously seen standing, and who then lays face-down to prevent himself from choking in the event he vomits, is not evidence of a deterioration in the inmate's condition.

[106] RE 108, *Bloomfield depo.*, Page ID #1137-87, at 112.

[107] RE 98, *McGinnis depo.*, Page ID #846-78, at 18.

of bed for at least 24 hours, all of which she had personally observed herself.[108]

- Later that morning, McGinnis knew that deputies had to clean up the vomit in Helphenstine's cell while he was in the shower.[109]

- McGinnis knew that "not eating or drinking, uncontrollable vomiting and diarrhea, [were] signs and symptoms that alcohol withdrawal is becoming a medical emergency" and that the inmate should be sent to the hospital.[110]

- But McGinnis did nothing else for Helphenstine the morning of April 18.

- McGinnis testified that had she known that the Jail's policies said withdrawal was a medical emergency, she would have sent Helphenstine to the hospital when she couldn't reach Von Luhrte during her shift the morning of April 18.[111]

- She was at the Jail the early morning hours of April 19 after Helphenstine's condition deteriorated further.

- A little before 3 am on April 19, McGinnis and Defendant deputy jailer Anthony Ruark entered Helphenstine's cell, and while Ruark lifted

---

[108] RE 124-6, *McGinnis Request*, Page ID #1745; RE 98, *McGinnis depo.*, Page ID #846-78, at 40-41, 49-51, 55-56.
[109] *Id*. at 22-23.
[110] *Id*. at 28-29.
[111] *Id*. at 75.

Helphenstine's head, McGinnis put a straw in his mouth and tried to get him to drink some Ensure.[112]

- Despite these events McGinnis never called a doctor or transported Helphenstine to a hospital.[113]

### 5. Defendant Ruark.

- Ruark knew that Helphenstine was in withdrawal.[114]

- Ruark observed Helphenstine numerous times in the hours leading up to his death.[115]

- Ruark was the deputy jailer who held up Helphenstine's head while McGinnis tried to get him to drink some Ensure just 30 minutes before his death.[116]

### F. Defendant Deputy Sheriff/Bailiff Byard. [117]

Byard knew the morning of April 18 that Helphenstine was in withdrawal, and was "acting like he's clear out of it," had "stuff coming out of his mouth," and was "really not coherent .... I mean, he don't even know – we had to tell him three times where to turn to go into the cell."[118]  Despite the fact that the Sheriff's Office

---

[112] *Id*. at 34-37.

[113] *Id*. at 38, 52, 83.

[114] RE 100, *Ruark depo*., Page ID #899-929, at 27-28, 36-39, 55, 66, 69.

[115] *Id*. at 45-47.

[116] RE 98, *McGinnis depo*., Page ID #846-78, at 34-37.

[117] Plaintiff did not oppose the dismissal of her 42 U.S.C. §1983 claims against Defendant Lewis County Sheriff Johnny Bivens.

[118] RE 124-8, *Transcript of Arraignment*, Page ID #1747-51; RE 105, *Byard depo*., Page ID #1087-1105, at 23.

had a policy that required its deputies to seek medical attention immediately for sick prisoners, and to call 911 in the event of a medical emergency, Byard did nothing more than take Helphenstine back to the Jail after his arraignment was cancelled due to his medical condition.[119]  Like the deputy jailers, Byard didn't know what his own department's policies said he was supposed to do for someone in Helphenstine's condition and hadn't bothered to learn.[120] A layperson would know that a person in Helphenstine's condition needed *some* medical attention, but Byard got him none.

The District Court dismissed Plaintiff's claims against Byard, citing this Court's pre-*Brawner* decision in *Griffith v. Franklin County*, 975 F.3d 544, 578 (6th Cir. 2020) for the proposition "that a failure to follow policies, without more, does not establish deliberate indifference."  RE 133, *Memorandum Opinion and Order*, Page ID #1826-55, at 22.  But the standard in this case is no longer deliberate indifference, and Byard's misconduct – and that of the deputy jailers discussed above -- went well beyond a mere failure to follow policy.

### G.    Defendants Are Not Entitled to Qualified Immunity.

What the Sixth Circuit said in *Fitzke v. Shappell*, 468 F.2d 1072 (6th Cir. 1972) could not be clearer or more *apropos* to the claims before this Court:

…. An individual incarcerated, whether for a term of life for the

---

[119] RE 124-9, *Sheriff's Office Policy on Sick Prisoners*, Page ID #1752; RE 124-10, *Bailiff Medical Policy*, Page ID #1753-54; RE 106, *Bivens depo.*, Page ID #1106-20, at 13; RE 105, *Byard depo.*, Page ID #1087-1105, at 29.
[120] *Id*. at 24.

commission of some heinous crime, or merely for the night to "dry out" in the local drunk tank, becomes both vulnerable *and* dependent upon the state to provide certain simple and basic human needs. …. Medical care is … such [a] need. Denial of necessary medical attention may well result in disabilities beyond that contemplated by the incarceration itself. The result may be … the very deprivation of life itself, since, *restrained by the authority of the state,* the individual cannot himself seek medical aid or provide the other necessities for sustaining life and health.

Thus it is that fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury. …. [W]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.

*Id.*, at 1076 (emphasis added).

In *Pryor v. Dearborn Police Department*, 452 F. Supp. 2d 714 (E.D.Mich. 2006), the court rejected the defendants' qualified immunity arguments because the law prohibiting the neglect of an inmate's serious medical needs had been clearly established by the Sixth Circuit in 1972 in *Fitzke, supra*.  *Pryor*, at 722; *see also Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009); *Phillips v. Roane County, Tenn.*, 534 F.3d 431 (6th Cir. 2008).

## IV.   Plaintiff's State Claims.[121]

For all the reasons set forth above, Plaintiff's state claims that were dismissed by the District Court without prejudice should be restored and remanded for

---

[121] Plaintiff conceded below that Defendant Lewis County was entitled to sovereign immunity from Plaintiff's state claims.

resolution with her federal claims, because they are all based on the same underlying facts and to promote judicial economy and the interests of justice.

## CONCLUSION

**FOR THE FOREGOING REASONS**, Plaintiff respectfully requests that the summary dismissal of her federal claims under 42 U.S.C. §1983 be reversed, that the Court reinstate her state claims, and that the Court remand her federal and state claims for trial in the District Court below.

Respectfully submitted,

/s/ Gregory A. Belzley
Gregory A. Belzley
Belzley, Bathurst & Bentley
P.O. Box 278
Prospect, KY 40059
(502) 292-2452
gbelzley3b@gmail.com

James L. Thomerson
Rose Grasch Camenisch Mains PLLC
326 South Broadway
Lexington, KY 40508-2592
(859) 721-2100
jim.thomerson@rgcmlaw.com

***Counsel for Plaintiff – Appellant***

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(B)(i)

Pursuant to FRAP 32(g)(1), I hereby certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B)(i), in that it contains 12,608 words exclusive of the table of contents, the table of authorities, the statement

regarding oral argument and certificates of counsel, and inclusive of headings, footnotes and quotations.

/s/ Gregory A. Belzley
**_Counsel for Plaintiff – Appellant_**

## CERTIFICATE OF SERVICE

A copy of this Corrected Appellant's Brief was served via email on June 22, 2022, on all counsel of record.

/s/ Gregory A. Belzley
**_Counsel for Plaintiff – Appellant_**

## APPENDIX

| Record Entry | Description of Document | Page ID No. |
|---|---|---|
| 1 | Plaintiffs' Complaint | 1-8 |
| 71-1 | Blondell Report | 348-53 |
| 71-5 | Pfalzgraf Report | 384-85 |
| 98 | McGinnis Deposition | 846-78 |
| 99 | Lucas Deposition | 879-98 |
| 100 | Ruark Deposition | 899-929 |
| 101 | Carver Deposition | 930-55 |
| 102 | Von Luhrte Deposition | 956-1013 |
| 103 | Lykins Deposition | 1014-59 |
| 104 | Thoroughman Deposition | 1060-86 |
| 105 | Byard Deposition | 1087-1105 |

| | | |
|---|---|---|
| 106 | Bivens Deposition | 1106-20 |
| 107 | Riley Deposition | 1121-36 |
| 108 | Bloomfield Deposition | 1137-87 |
| 118 | Blondell Deposition | 1206-1421 |
| 121 | Potter Deposition | 1584-1697 |
| 124-1 | Von Luhrte Attendance Schedule | 1740 |
| 124-2 | County Contract with Von Luhrte | 1741 |
| 124-3 | EMS Policy | 1742 |
| 124-4 | Admission Sheet | 1743 |
| 124-5 | Riley Incident Report | 1744 |
| 124-6 | McGinnis Request | 1745 |
| 124-7 | Withdrawal Monitoring Sheet | 1746 |
| 124-8 | Transcript of Arraignment | 1747-51 |
| 124-9 | Sheriff's Policy on Sick Prisoners | 1752 |
| 124-10 | Bailiff Medical Policy | 1753-54 |
| 124-11 | Monroe Request | 1755 |
| 124-12 | Von Luhrte Orders | 1756 |
| 124-13 | Medication Administration Record | 1757 |
| 124-14 | 04/17/17 Sick Call List | 1758 |
| 124-15 | Observation Logs | 1759-61 |

124-16          Video Summary                          1762-66

124-17          04/19/17 Log Entry                      1767

124-18          EMT Run Report                          1768

124-19          CAD Incident Detail                     1769-70

126             Full Video Filed Conventionally
                **(CAUTION: This video contains images that some viewers may find disturbing)**

133             Memorandum Opinion and Order            1826-55

134             Judgment                                1856-57

135             Notice of Appeal                        1858-59