No. 22-5407

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

JULIE HELPHENSTINE, Adminstratrix of the Estate of
Christopher Dale Helphenstine and Guardian of B.D.H., minor son
*Plaintiff-Appellant*

v.

LEWIS COUNTY, KY, *et al.*
*Defendants-Appellees*

On appeal from the United States District Court
for the Eastern District of Kentucky at Ashland
Case No. 0:18-CV-00093-HRW

---

## BRIEF OF LEWIS COUNTY APPELLEES

---

Respectfully submitted,

***/s/ Jeffrey C. Mando***
Jeffrey C. Mando, Esq. (#43548)
Jennifer L. Langen, Esq. (#87690)
ADAMS, STEPNER,
WOLTERMANN & DUSING, PLLC
40 West Pike Street
Covington, KY  41011
859.394.6200 | 859.392.7200 – Fax
jmando@adamsattorneys.com
jlangen@adamsattorneys.com

*Attorneys for Lewis County Appellees-
Defendants*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26, Appellees, Lewis County, KY; Johnny Bivens, Sandy Bloomfield, John Byard, Ben Carver, Andy Lucas, Jeff Lykins, Amanda McGinnis, Mark Riley, Anthony Ruark, and, Jeffrey Thoroughman, make the following disclosures:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation? **NO**

> If answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

2.     Is there a publicly owned corporation, not a party to the appeal, which has a financial interest in the outcome? **NO**

> If the answer is YES, list the identity of such corporation and the nature of the financial interest.

_/s/ Jeffrey C. Mando_____      **August 5, 2022**_____
Jeffrey C. Mando, Esq.                              Date

i

## <u>TABLE OF CONTENTS</u>

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL
INTEREST..................................................................................................................i

TABLE OF CONTENTS.......................................................................................... ii

TABLE OF AUTHORITIES ....................................................................................v

STATEMENT REGARDING ORAL ARGUMENT ............................................... vi

ISSUES PRESENTED FOR REVIEW ..................................................................... 1

STATEMENT OF THE CASE.................................................................................. 3

I.      COUNTERSTATEMENT OF FACTS .......................................................... 3

II.     COUNTERSTATEMENT OF PROCEDURE ..............................................11

SUMMARY OF THE ARGUMENT .......................................................................14

ARGUMENT ...........................................................................................................17

I.      THE DISTRICT COURT CORRECTLY APPLIED BRAWNER AND ITS
        PROGENY ....................................................................................................17

II.     THE ESTATE'S CALL TO VIEW APPELLEES' TESTIMONY WITH A
        HEIGHTENED DEGREE OF SKEPTICISM IS UNWARRANTED,
        AND IT NONETHELESS WAIVED THE ARGUMENT..........................20

III.    REGARDLESS OF THE MODIFICATION OF THE DELIBERATE
        INDIFFERENCE STANDARD, THE DISTRICT COURT CORRECTLY
        GRANTED SUMMARY JUDGMENT TO INDIVIDUAL APPELLEES..............23

        A.      THE DISTRICT COURT PROPERLY GRANTED SUMMARY
                JUDGMENT TO RILEY.....................................................................26

                1.      Riley did not exhibit deliberate indifference to
                        Helphenstine's medical needs. .......................................................26

                2.      Riley is entitled to qualified immunity.......................................27

ii

B.      ANDY LUCAS ................................................................28

    1.      Lucas did not exhibit deliberate indifference to Helphenstine's medical needs. ........................................29

    2.      Lucas is entitled to qualified immunity. ......................................30

C.      JOHN BYARD ................................................................32

    1.      Byard did not exhibit deliberate indifference to Helphenstine's medical needs. ........................................33

    2.      Byard is entitled to qualified immunity......................................33

D.      SANDY BLOOMFIELD ................................................................35

    1.      Bloomfield did not exhibit deliberate indifference to Helphenstine's medical needs. ........................................37

    2.      Bloomfield is entitled to qualified immunity............................38

E.      Amanda MCGINNIS ................................................................39

    1.      McGinnis did not exhibit deliberate indifference to Helphenstine's medical needs. ........................................42

    2.      McGinnis is entitled to qualified immunity. ..............................43

F.      ANTHONY RUARK ................................................................44

    1.      Ruark did not exhibit deliberate indifference to Helphenstine's medical needs. ........................................46

    2.      Ruark is entitled to qualified immunity......................................48

IV.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO JAILER JEFF LYKINS ........................................................49

A.      LYKINS WAS NOT DELIBERATELY INDIFFERENT ............................50

B.      LYKINS IS ENTITLED TO QUALIFIED IMMUNITY ..............................51

C.      LYKINS IS NOT LIABLE IN HIS SUPERVISORY CAPACITY................52

V.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO LEWIS COUNTY ................................................................... 54

CONCLUSION ............................................................................................................ 57

CERTIFICATE OF COMPLIANCE ......................................................................... 58

CERTIFICATE OF SERVICE .................................................................................... 58

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............................. A

# TABLE OF AUTHORITIES

## Cases

*Anthony v. Swanson*, 701 Fed. Appx. 460 (6th Cir. 2017) .................... 23, 25, 40, 48

*Barnett v. Smithwick*, 835 Fed. Appx. 31 (6th Cir. 2020) ........................................ 23

*Bauman v. Millisor*, 2022 U.S. App. LEXIS 349 (6th Cir.) ..................................... 23, 24

*Bd. of County Commrs. v. Brown*, 520 U.S. 397 (1997) ................................................ 51

*Brawner v. Scott*, 14 F.4th 585 (6th Cir. 2021) .................................................... 11, 16, 18

*Brown v. Chapman*, 814 F.3d 447 (6th Cir. 2016) .................................................... 51

*Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013) .................................................... 52

*City of Canton v. Harris*, 489 U.S. 378 (1989) ........................................................ 51

*Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001) ................................................ 23

*Connick v. Thompson*, 563 U.S. 51 (2011) .............................................................. 52

*Crawford v. Tilley*, 15 F.4th 752 (6th Cir. 2021) ..................................................... 49

*Greene v. Crawford County*, 22 F.4th 593 (6th Cir. 2022) ...................................... 16, 18

*Grider Drugs, LLC v. Express Scripts, Inc.*, 500 Fed. Appx. 402 (6th Cir. 2012) ... 19

*Griffith v. Franklin County*, 975 F.3d 554 (6th Cir. 2020) ..................................... 26

*Harvey v. Campbell County*, 453 Fed. Appx. 557 (6th Cir. 2011) .................... 50, 52

*Heyerman v. County of Calhoun*, 680 F.3d 642 (6th Cir. 2012) ............................ 50

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ...................................................... 11

*Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005) ...................................... 52

*O'Donnell v. Yezzo*, 2022 U.S. App. LEXIS 1135 (6th Cir.) ................................. 22, 24

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................ 22

*Phillips v. Roane County*, 534 F.3d 531, 543 (6th Cir. 2008) ............................... 50

*Reed v. Speck*, 508 Fed. Appx. 415 (6th Cir. 2012) ............................................. 49, 50

*Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002) ........................................... 20

*Speers v. County of Berrien*, 196 Fed. Appx. 390 (6th Cir. 2006) .................... 32, 48

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ............................. 51

*Trozzi v. Lake County*, 29 F.4th 745, 752 (6th Cir. 2022) ............................. 17, 18, 22

*Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001) ............................. 23

*Williams v. Deal*, 659 Fed. Appx. 580 (11th Cir. 2016) ....................................... 20

*Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018) .......................... 29, 32, 48

*Wood v. Eubanks*, 2022 U.S. App. LEXIS 3427 (6th Cir.) .................................... 22, 24

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellees request oral argument because they believe it will be beneficial to the Court in deciding the legal issues on appeal. This case involves an allegation that Appellees provided inadequate medical care to a pretrial detainee causing his death. The law in this area continues to develop following this Court's recent decision in *Brawner*, and a robust discussion of the impact of recent 6th Circuit decisions on the undisputed material facts would be a productive and valuable exercise.

## <u>ISSUES PRESENTED FOR REVIEW</u>

1.    Whether the District Court correctly applied the *Brawner* standard as clarified in *Greene* and *Trozzi*, to the Estate's Fourteenth Amendment deliberate indifference to medical needs claims.

2.    Whether the Estate waived the argument that the Court was required to view Appellees' testimony skeptically in light of the fact that Helphenstine is deceased when the Estate failed to raise it before the District Court.

3.    Assuming *arguendo* that the Estate has not waived the argument, whether the District Court was required to view Appellees' testimony skeptically in light of the fact that Helphenstine is deceased, where the circumstantial evidence does not otherwise contradict any specific aspect of Appellees' testimony.

4.    Whether the District Court correctly concluded that each of the deputy jailers in their individual capacities was not deliberately indifferent to Helphenstine's medical needs.

5.    Whether the deputy jailers in their individual capacities were otherwise entitled to qualified immunity.

6.    Whether the District Court correctly concluded that Jailer Jeff Lykins was not deliberately indifferent to Helphenstine's medical needs and

that there was no evidence to support a theory of supervisory liability against him.

7.    Whether the District Court correctly granted summary judgment to Lewis County where there was no evidence of a custom, policy or practice of failing to provide inmates with medical care.

## STATEMENT OF THE CASE

### I.    COUNTERSTATEMENT OF FACTS

On February 12, 2017, Christopher Helphenstine ("Helphenstine") sold three bins of heroin to a person who was cooperating with the Lewis County Sheriff's Office. (R.96-1, Warrant, PageID 817; R.106, Bivens, PageID 1109) Then, on March 7, Helphenstine sold more heroin to another person who was cooperating with Lewis County Sheriff's deputies. (*Id.*) These events prompted a warrant to issue for Helphenstine's arrest on charges of trafficking in a controlled substance. (*Id.*)

Armed with the warrant, a police officer arrested Helphenstine on Friday, April 14. (R.96-2, Citation, PageID 818) When he was arrested, Helphenstine had Xanax in his possession without indicia that it had been prescribed to him; thus, the arresting officer also charged Helphenstine with possession of a controlled substance. (R.96-3, Citation, PageID 819) The arresting officer took Helphenstine to Lewis County Detention Center ("LCDC"). (R.96-4, Report, PageID 820)

Helphenstine remained lodged at LCDC without incident until approximately 8:30 p.m. on Sunday, April 16, 2017. (R.96-5, Report, PageID 821) Around that time, Deputy Jailer Mark Riley was conducting rounds when another inmate called out to him about someone being sick in the cell. (R.107,

Riley, PageID 1124) Riley entered the cell to investigate and saw vomit on the floor. (R.107, Riley, PageID 1124) Riley asked Helphenstine if he wanted to see the doctor or go to the hospital, but Helphenstine said no. (R.107, Riley, PageID 1125) Instead, Helphenstine told Riley that he was "dope sick" and "just wanted to be in a cell by hisself so he can get over it." (R.96-5, Report, PageID 821; R.107, Riley, PageID 1125) Riley moved Helphenstine to an isolation cell where he could be monitored, and created an Incident Report to advise other jail personnel about the reasons for the move. (R.96-5, Report, PageID 821) Helphenstine was placed in the isolation cell at approximately 9:00 p.m. (R.96-6, Watch Sheet, PageID 822)

Beginning at 9:20 p.m. on Sunday, April 16, deputies Sandy Bloomfield, Jeffrey Thoroughman, Ben Carver, Anthony Ruark, and Amanda McGinnis took turns, during their respective shifts, checking on Helphenstine approximately every 20 minutes. (R.96-6, Watch Sheet, PageID 822 - 824) Typically, they checked on him by opening a flap in the cell door, looking into the cell, and talking to Helphenstine. (R.108, Bloomfield, PageID 1148) As they did, they noted their observations on a log sheet that hung on the cell door. (R.96-6, Watch Sheet, PageID 822 - 824) When a log sheet became completely filled, that sheet was removed from the door and placed in an inmate's file. (R.101, Carver, PageID 935) A new log sheet was then placed on the door of the cell for deputies

4

to continue documenting their observations. (*Id.*) At various times through the early morning of April 18, deputy jailers noted that Helphenstine was laying down, sitting up, eating, talking, moving, or, occasionally, vomiting. (R.96-6, Watch Sheet, PageID 822 - 824)

Shortly after midnight on April 18, McGinnis completed a Medical Request Form and faxed it to Dr. Tommy Von Luhrte, a local physician under contract with the Lewis County Fiscal Court to provide medical services to inmates at LCDC. (R.96-7, Form, PageID 825; R.96-8, Agreement, PageID 826 - 827; R.98, McGinnis, PageID 856) That form indicated Helphenstine was soiling himself, vomiting and refusing to eat or drink due to an upset stomach from withdrawals. (R.96-7, Form, PageID 825)

Later that morning, Helphenstine was due in court for his arraignment. Because he had vomited, deputy jailers took him down the hall so he could shower. (R.98, McGinnis, PageID 852) While he showered, other deputy jailers cleaned the medical observation cell, and McGinnis retrieved a new set of clothes and bedding for him. (R.98, McGinnis, PageID 852 - 854) After showering, at 5:45 a.m., Helphenstine drank some juice; at 6:00 a.m. he drank some water; and at 7:50 a.m. he ate part of a breakfast tray. (R.96-6, Watch Sheet, PageID 823; R.98, McGinnis, PageID 854)

5

A few minutes later, jail staff began gathering inmates who were due in court for arraignments, including Helphenstine. Lewis County Jailer Jeffrey Lykins called Helphenstine's name to get him to come to the door of his cell. Lykins opened the cell door, handcuffed Helphenstine, and walked with him and other inmates to the back door of LCDC to meet the bailiffs who would take the inmates approximately 20 feet to the courthouse. (R.105, Byard, PageID 1091; R.103, Lykins, PageID 1029)

Among the bailiffs who received the group of inmates was Lewis County Deputy Sheriff John Byard. (R.105, Byard, PageID 1091) Byard led the group and Helphenstine happened to be near the front walking to the courtroom for arraignment. (*Id.*) Byard noted that Helphenstine was lethargic in his movement and speech. (R.105, Byard, PageID 1093) After escorting the inmates, to the courtroom, Byard approached Lewis County District Judge McCloud. After Byard told him that Helphenstine was "out of it" and appeared to be withdrawing from some substance, Judge McCloud told Byard to return Helphenstine to LCDC. (R.96-9, Video, PageID 828) Immediately thereafter, Byard returned Helphenstine to LCDC. (R.105, Byard, PageID 1093) A deputy was present at LCDC to receive Helphenstine, but Deputy Byard cannot recall who that was. (R.105, Byard, PageID 1090, 1093) Byard told the deputy jailer that Helphenstine's arraignment had been canceled by the judge, but did not

6

specify the basis for the cancellation. (R.105, Byard, PageID 1093) Eleven minutes elapsed between the time Byard received Helphenstine at LCDC's rear door until the time he returned Helphenstine to LCDC following the cancellation of Helphenstine's arraignment. (R.105, Byard, PageID 1094)

Meanwhile, at some point during the day on April 18, Dr. Von Lurhte received the Medical Request Form that Deputy McGinnis had completed. (R.102, Von Luhrte, PageID 977) Dr. Von Luhrte contacted the jail and spoke with someone whose identity he does not know. He told the person to take Helphenstine to the emergency room, but when the person went to the cell to get Helphenstine, he refused to go. (R.102, Von Luhrte, PageID 978) Since Helphenstine would not go to the emergency room, Dr. Von Luhrte completed the "Doctor's Orders" section of the form and returned it to jail staff, advising them to encourage Helphenstine to sip Kool Aid and eat popsicles, to administer Reglan, and to rest Helphenstine's bowel by giving him bland foods such as saltine crackers, bread or chicken noodle soup. (R.96-10, Form, PageID 829; R.102, Von Luhrte, PageID 977 - 978)

Beginning at 3:00 p.m. on April 18, jail staff followed Dr. Von Luhrte's orders by giving Helphenstine Metoclopram – which is a generic form of

Reglan[1] – and Ondansetron, which is used to treat nausea,[2] (R.96-11, Medication, PageID 830) and continued to monitor him every 20 minutes. (R.96-6, Watch Sheet, PageID 824)

At various times between 3:00 p.m., and midnight, deputy jailers noted - and video[3] that starts toward the end of that period demonstrates - that Helphenstine was sitting up, talking, lying down, or standing in the medical observation cell. (R.96-6, Watch Sheet, PageID 824; R.96-12, Video, PageID 831 (time stamp 22:00:00 – 23:00:00))

Shortly after midnight on April 19, Helphenstine began lying face down on the bunk in the medical observation cell. His legs were in near-constant motion until approximately 2:40 a.m., when he became relatively still. (R.96-13, Video, PageID 832)

Around 2:42 a.m. on April 19, Deputy Ruark entered the medical observation cell to manually check on Helphenstine. (R.96-13, Video, PageID 832 (time stamp 2:22:00)) After doing so, Ruark left the cell briefly to retrieve a pair of gloves and a drink, which he offered to Helphenstine. While Helphenstine turned his head to the left to interact with Ruark, he refused the

---

[1] https://www.webmd.com/drugs/2/drug-6177/reglan-oral/details.
[2] https://www.webmd.com/drugs/2/drug-16910-8296/ondansetron-oral/ondansetron-disintegrating-tablet-oral/details.
[3] The jail videos cited are time-stamped, but the time-stamps are off by one hour due to the inadvertent failure to update the clock on the recording system to reflect Daylight Savings Time. The clocks are additionally off by 10 minutes. (R.98, McGinnis, PageID 848)

drink. (R.96-14, Video, PageID 833) He laid his head down again, and Ruark exited the cell at around 2:45 a.m. (R.96-14, Video, PageID 833 (time stamp 1:44:56))

At approximately 2:46 a.m. on April 19, Ruark re-entered the cell, leaned down close to Helphenstine, and offered him something to drink from a white bottle. (R.96-14, Video, PageID 833 (time stamp 1:46:08)) Ruark spoke with Helphenstine, and, on video, Helphenstine shakes his head indicating "no." (R.96-14, Video, PageID 833) At 2:50 a.m., Deputy McGinnis entered the cell, and within seconds, a third deputy jailer appears - from the shadow and shoe that are visible in the camera frame - to be standing in the doorway to the cell. (R.96-14, Video, PageID 833 (time stamp 1:49:56-1:50:04); R.98, McGinnis, PageID 855 – 856) McGinnis left the cell briefly to retrieve a bottle of Ensure, and, upon returning to the cell, knelt down beside Helphenstine, spoke to him, and offered him a drink through a straw. Helphenstine consumed a small amount of Ensure. (R.96-6, Watch Sheet, PageID 824; R.96-14, Video, PageID 833 (time stamp 1:50:04 – 1:53:15); R.98, McGinnis, PageID 855 – 856) The deputies left the cell at around 2:53 a.m. (R.96-14, Video, PageID 833 (time stamp 1:53:15))

At approximately 2:56 a.m., Deputy McGinnis re-entered the cell, knelt down next to Helphenstine, and he took a drink through a straw from a white bottle. (R.96-14, Video, PageID 833 (time stamp 1:56:09))

At 3:13 a.m., McGinnis went to the cell door and looked through the window to check on Helphenstine, noting that he had consumed some Ensure. (R.96-6, Watch Sheet, PageID 824)

At approximately 3:30 a.m., Deputy Ruark asked Deputy Thoroughman to open the cell door and try to get Helphenstine to respond to him. (R.96-15, Report, PageID 834; R.96-16, Report, PageID 835; R.96-17, Report, PageID 836; R.96-18, Report, PageID 837; R.96-19, Note, PageID 838) Thoroughman stood in the doorway and yelled "Chris" four or five times while Ruark and McGinnis made their way to the cell. (*Id.*) Ruark and McGinnis met Thoroughman in the cell at approximately 3:29 a.m. (R.96-13, Video, PageID 832 (time stamp 2:29:30)) Thoroughman reported that he did not get a response. (R.96-15, Report, PageID 834; R.96-16, Report, PageID 835; R.96-17, Report, PageID 836; R.96-18, Report, PageID 837; R.96-19, Note, PageID 838) Ruark told Thoroughman to relieve Bloomfield from the Control Room, so that Bloomfield could enter the cell to try and get a response from Helphenstine. (*Id.*) When Bloomfield could not, she returned to the Control Room to relieve Thoroughman so he could go back to the cell. (*Id.*)

10

Because Helphenstine was not responsive, Ruark, McGinnis and Thoroughman called an ambulance and performed CPR on Helphenstine until it arrived at approximately 3:40 a.m. (*Id*; R.96-13, Video, PageID 832 (time stamp 2:29:30 – 2:44:28)) Unfortunately, Helphenstine died in the ambulance on the way to the emergency room. (R.96-21, Death Certificate, PageID 840) His death certificate attributes his death to "acute (fentanyl) and chronic drug abuse." (*Id*.)

## II.    COUNTERSTATEMENT OF PROCEDURE

Julie Helphenstine, Administratrix of Helphenstine's Estate and Guardian of Helphenstine's minor son ("The Estate"), filed suit against Lewis County and a number of its officials and employees in their individual capacities, including Jailer Jeff Lykins; Deputy Jailers Ruark, Lucas, Carver, McGinnis, Bloomfield, Riley and Thoroughman; Sheriff Johnny Bivens; and Deputy Sheriff Byard (collectively "Appellees"). Pursuant to 42 U.S.C. § 1983, the Estate averred that the individual Appellees had been deliberately indifferent to Helphenstine's medical needs, thereby violating his rights under the Fourteenth Amendment, and that Lewis County was liable for such deliberate indifference under a *Monell* theory. (R.1, Complaint, PageID 6 - 7) In addition, the Estate asserted a state-law claim for negligence against Appellees. (*Id*.)

11

After the completion of discovery, Appellees moved the District Court for summary judgment. (R.96, MSJ, PageID 767 - 816) Briefing of Appellees' motion was complete when they filed their Reply on April 26, 2021. (R.129, Reply, PageID 1797 – 1820)

The District Court had not ruled on Appellees' motion by September 22, 2021, when this Court decided *Brawner v. Scott*, 14 F.4th 585 (6th Cir. 2021). In *Brawner*, this Court ruled for the first time that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), required a modification of the deliberate indifference standard applicable to § 1983 claims alleging that deputy jailers had provided inadequate medical care to pretrial detainees. *Brawner*, *supra* at 596. Thereafter, the District Court permitted the parties to file supplemental memoranda relating to the impact of *Brawner* on Appellees' motion. (R.131, Estate's Memo, PageID 1822 -1823; R.132, Appellees' Memo, PageID 1824 - 1825)

With the benefit of the parties' initial briefs, supplemental memoranda, *Brawner*, and this Court's rulings subsequent to *Brawner*, the District Court issued a sound and well-reasoned Opinion granting summary judgment to Appellees on the Estate's § 1983 claim and declining to exercise supplemental jurisdiction over the Estate's negligence claim. (R.133, Opinion, PageID 1826 - 1855)

This appeal followed.

## SUMMARY OF THE ARGUMENT

1.     The District Court correctly applied the *Brawner* standard as that standard was clarified in *Greene* and *Trozzi*. The Estate's argument to the contrary is just a thinly veiled attack on the propriety of this Court's decisions in *Greene* and *Trozzi*, because the Estate wishes to revisit an argument that this Court has now thrice rejected – that the subjective component of deliberate indifference should be eliminated altogether. Because this issue is settled, the Estate's argument for the reconsideration of this Court's recent precedents and for the elimination of the subjective prong of deliberate indifference must be rejected.

2.     The Estate waived the argument that the District Court was required, in light of Helphenstine's death, to view Appellees' testimony skeptically, because the Estate failed to raise this argument below. *Grider Drugs, LLC v. Express Scripts, Inc.*, 500 Fed. Appx. 402 (6th Cir. 2012).

3.     Assuming *arguendo* that the Estate has not waived the argument, the District Court was not required to view Appellees' testimony skeptically simply because of Helphenstine's death, since the circumstantial evidence does not otherwise contradict any specific aspect of Appellees' testimony.

4.     Deputy jailers Riley, Lucas, Byard, Bloomfield, McGinnis, and Ruark were not deliberately indifferent to Helphenstine's medical needs because a

reasonable officer knowing what they knew when they knew it would not have understood that Helphenstine's medical needs subjected him to an excessive risk of harm.

5.      Riley, Lucas, Byard, Bloomfield, McGinnis, and Ruark were each entitled to qualified immunity. Helphenstine's rights as they were defined in April 2017 required jail officials not to disregard a risk to his medical needs if the officials (a) subjectively perceived facts from which they could infer that Helphenstine faced a substantial risk and (b) actually drew the inference that Helphenstine faced a substantial risk. *Anthony v. Swanson*, 701 Fed. Appx. 460 (6th Cir. 2017). Riley, Lucas, Byard, and Bloomfield were not subjectively aware of any facts from which they could have inferred that Helphenstine was at substantial risk of harm, nor did any of them actually draw such an inference. To the extent that McGinnis and Ruark were aware of facts from which they could have inferred that Helphenstine was at risk of harm, they responded reasonably to that risk. McGinnis requested assistance from the jail's doctor, Dr. Von Luhrte, and Ruark was aware she had done so. Both reasonably relied upon Dr. Von Luhrte, as a trained medical professional, to give appropriate instructions for Helphenstine's care, and they did as he instructed.

6.      Lewis County Jailer Jeff Lykins did not exhibit deliberate indifference to Helphenstine's medical needs because a reasonable officer

15

knowing what Lykins knew between April 16 and 19 would not have understood that Helphenstine's medical needs subjected him to an excessive risk of harm. In the alternative, Lykins is entitled to qualified immunity. He did not subjectively perceive facts from which he could infer that Helphenstine faced a substantial risk and (b) did not actually draw such an inference. Finally, Lykins cannot be liable as a supervisor for any alleged deprivation committed by a deputy jailer because Lykins did not personally participate in that deprivation.

7.     The Estate failed to present any evidence of liability on the part of Lewis County. There has been no showing of any prior unconstitutional actions by employees of Lewis County with respect to the medical care provided to inmates at LCDC. For liability to attach to the County in the instance of a single violation, the record must show a complete failure to train the jail's force, training that is so reckless or grossly negligent that future deputy jailer misconduct is almost inevitable or would properly be characterized as substantially certain to result. That is not the case here. On the whole, Lewis County deputy jailers demonstrated an understanding of what to look for to determine when an inmate who is experiencing withdrawals presents a medical emergency, and an understanding about what to do in that situation.

16

**ARGUMENT**

## I.   THE DISTRICT COURT CORRECTLY APPLIED *BRAWNER* AND ITS PROGENY

Contrary to the Estate's argument, the District Court applied the correct law in dismissing its claims.

It is undisputed that *Brawner* applies. It is likewise undisputed that, under *Brawner*, a plaintiff must prove that "a defendant ... acted ... recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known" to establish deliberate indifference on the part of that defendant. *Brawner*, *supra* at 596. Here, the District Court clearly applied that test to the undisputed material facts, as evidenced by the multiple references to the test in its Opinion. But, the District Court ultimately concluded that under the *Brawner* test none of the individual Appellees had been deliberately indifferent to Helphenstine's serious medical needs. (R.133, Opinion, PageID 1839, 1842, 1843, 1844, 1845, 1847, 1848)

The District Court also appropriately incorporated this Court's subsequent interpretations of *Brawner* into its analysis. This Court interpreted *Brawner* in *Greene v. Crawford County*, 22 F.4th 593 (6th Cir. 2022) and more recently, this Court synthesized the emerging case law relating to the application of the deliberate indifference standard to claims of pretrial detainees in *Trozzi*, wherein this Court said:  "Reading *Farmer*, *Kingsley*,

17

*Brawner*, and *Greene* together, a plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment:   (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and, (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi v. Lake County*, 29 F.4th 745, 752 (6th Cir. 2022). Having noted the language in *Greene* and *Trozzi* that required consideration of "what the particular jail official knew at the time of the incident," the District Court wisely and appropriately considered what each of the individual Appellees knew when it assessed whether that Appellee had been deliberately indifferent to Helphenstine's medical needs. (R.133, Opinion, PageID 1838 - 1848) Without question, and despite the Estate's protestation to the contrary, the District Court *did* apply the *Brawner* test as refined by *Greene* and *Trozzi* and adhered to is precedent.

The Estate's argument that the District Court erred in considering the actual knowledge of each individual Appellee is nothing more than a camouflaged attack on the propriety of this Court's decisions in *Greene* and *Trozzi*, because the Estate wishes to revisit an argument that this Court soundly

18

rejected in *Brawner* - that the subjective component of deliberate indifference should be eliminated altogether. The Estate advocates - as did the plaintiff in *Brawner* - that it should survive summary judgment if it can establish that Appellees failed to act in the face of an "obvious" medical risk. (Appellant's Brief, p. 30 - 31) In addition, based on its representation that the District Court held the risk Helphenstine faced to be "obvious," the Estate contends it should survive summary judgment. (Appellant's Brief, p. 38) The Estates arguments are faulty.

First, the District Court *did not* hold that the risk Helphenstine faced was "obvious." Rather, despite questioning whether "withdrawal, from any substance, at any stage and for every detainee, qualifies as a *sufficiently serious* medical need," the District Court nevertheless assumed that the risk Helphenstine faced was "sufficiently serious" to satisfy the objective prong of the deliberate indifference test. (R.133, Opinion, PageID 1838) The conclusion that a condition is "sufficiently serious" (the requirement to satisfy the objective prong of deliberate indifference) is a far cry indeed from concluding that the condition was so "obvious" that a reasonable officer would have known of an excessive risk to the detainee's health absent appropriate intervention (the requirement to satisfy the subjective prong of deliberate indifference).

19

Moreover, the emerging case law on the new deliberate indifference standard is settled:  This Court has consistently considered whether the deliberate indifference standard should continue to have a subjective component, and it has thrice answered that question in the affirmative. *See Brawner*, *supra*; *Greene*, *supra*; *Trozzi*, *supra*. Revisiting that question for a fourth time would only yield confusion and uncertainty when litigants need clarity and certainty on what it takes for a pretrial detainee to establish deliberate indifference.

Because this matter is settled, the Estate's argument for reconsideration of this Court's recent precedents and for the elimination of the subjective prong of deliberate indifference must be rejected.

## II.    THE ESTATE'S CALL TO VIEW APPELLEES' TESTIMONY WITH A HEIGHTENED DEGREE OF SKEPTICISM IS UNWARRANTED, AND IT NONETHELESS WAIVED THE ARGUMENT

The Estate argues that Appellees' testimony should be met with a "heightened degree of skepticism" because Helphenstine is not alive to testify (Appellant's Brief, p. 35-36), an argument the Estate did *not* raise below. Issues not raised before the trial court are waived on appeal, *Grider Drugs, LLC v. Express Scripts, Inc.*, 500 Fed. Appx. 402 (6th Cir. 2012). For this cogent reason, the Estate should be precluded from making that argument now.

In any event, the Estate's argument relies exclusively on extra-jurisdictional cases that are distinguishable because they were decided in another context – the use of deadly force by police officers.

Moreover, to the extent the Court finds that the cases cited by the Estate apply here, those cases do not affect the District Court's decision to grant summary judgment to Appellees. Those cases only require that the Court look at the circumstantial evidence and determine whether, if believed, it tends to discredit an officer's testimony. If the circumstantial evidence does not contradict the officer's testimony, conjecture cannot create a genuine issue of material fact. *Williams v. Deal*, 659 Fed. Appx. 580 (11th Cir. 2016), citing *Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002).

The Estate contends the District Court erred in "credit[ing]" Lucas' testimony that Helphenstine said he was "feeling pretty good now," which Lucas said occurred on April 18, 2017, after Lucas gave Helphenstine a cold Mountain Dew at Helphenstine's request. (Appellee's Brief, p. 36; R.99, Lucas, PageID 882 - 883) The Estate, however, does not point to any circumstantial evidence that suggests Helphenstine did not make that statement in that context.

Similarly, the Estate contends the District Court erred in "credit[ing]" McGinnis' testimony that Helphenstine "appeared to be doing better."

21

(Appellant's Brief, p. 36) That contention misstates McGinnis' testimony. McGinnis actually testified that "Sandy" Bloomfield told her Helphenstine was "doing much better now that he's not vomiting all the time," a conversation McGinnis said occurred when she came on duty at 11 p.m. on April 18. (R.98, McGinnis, PageID 861 - 862) Again, the Estate does not point to any circumstantial evidence that Bloomfield did not make such a statement.

The Estate also contends the District Court erred in "credit[ing]" Carver's testimony that "Helphenstine looked pretty good and like he felt good," statements Carver made in testifying about his observation of Helphenstine at 11:20 a.m. on April 18. (Appellant's Brief, p. 36; R.101, Carver Depo., PageID 934 - 935) But, since the Estate has agreed to the dismissal of its claim against Carver, its argument is moot.

In sum, assuming *arguendo* that, as a general principle, government officials' testimony is to be met with a "heightened degree of skepticism" when the claimant is deceased, the principle does not apply in this case because Appellees' testimony is not contradicted by any circumstantial evidence.

### III.   REGARDLESS OF THE MODIFICATION OF THE DELIBERATE INDIFFERENCE STANDARD, THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO INDIVIDUAL APPELLEES[4]

Regardless of *Brawner's* modification of the deliberate indifference standard, the District Court correctly granted summary judgment to Appellees for two reasons.

First, Appellees did not violate Helphenstine's constitutional rights because they did not exhibit deliberate indifference as that standard is now formulated. Following *Brawner*, *supra*, a pretrial detainee must satisfy three elements to prevail on an inadequate-medical-care claim under the Fourteenth Amendment:  (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and, (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk. *Trozzi*, *supra* at 752. Because the Estate did not create a triable issue of fact on the second and third elements, the District Court correctly granted summary judgment to the individual Appellees.

---

[4] Appellees do not address the Estate's claims against Carver, Thoroughman or Bivens because the Estate does not oppose the dismissal of its federal claims against Carver or Thoroughman (Appellant's Brief, p. 50), and the Estate makes no argument in its Brief regarding the liability of Bivens.

Second, Appellees did not violate Helphenstine's constitutional rights as those rights were clearly established as of April 2017. Appellees are, therefore, entitled to qualified immunity.

Qualified immunity shields government officials from liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223 (2009). Central to this case, the individual Appellees are entitled to qualified immunity unless the constitutional right they are alleged to have violated was clearly established *at the time they acted in this case*, i.e., on April 16-19, 2017. *O'Donnell v. Yezzo*, 2022 U.S. App. LEXIS 1135 (6th Cir.) (to determine whether defendants are entitled to qualified immunity, a court must ask whether the right at issue was clearly established at the time of the defendant's alleged misconduct); *Wood v. Eubanks*, 2022 U.S. App. LEXIS 3427 (6th Cir.) (officers are entitled to qualified immunity unless the constitutional right they violated "was clearly established at the time of the challenged conduct"); *Bauman v. Millisor*, 2022 U.S. App. LEXIS 349 (6th Cir.) ("the court assesses whether the right was clearly established at the time of the incident"). A right is "clearly established" when it has been defined with sufficient specificity that every reasonable official would know that a particular action violates that right. *Barnett v. Smithwick*, 835 Fed. Appx. 31 (6th Cir. 2020).

A pretrial detainee has a right to adequate medical care during his incarceration. But, In April 2017 - when Appellees acted in this case - deliberate indifference required actual knowledge on the part of a jail official that the detainee faced a substantial risk of serious harm and a decision on the part of the jail official to disregard that risk by failing to take reasonable measures to abate it. *Farmer*, *supra*. To be deemed deliberately indifferent, the official in question had to (1) subjectively perceive facts from which to infer substantial risk to the inmate; (2) actually draw the inference that a substantial risk to the inmate existed; and, (3) disregard that risk. *Anthony v. Swanson*, 701 Fed. Appx. 460 (6th Cir. 2017). A plaintiff bore the burden of proving the official's subjective knowledge, *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), and it was not enough for a plaintiff to demonstrate a question of fact whether the defendant should have known that there was a substantial risk of harm. *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001).

Given that qualified immunity is evaluated with respect to the law *as it existed at the time of an official's conduct*, the standard as it existed in April 2017 applies in assessing the individual Appellees' entitlement to qualified immunity. *O'Donnell*, *supra*; *Wood*, *supra*; *Bauman*, *supra*.

## A.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO RILEY

Due to his work schedule, Riley only encountered Helphenstine once. (R.107, Riley, PageID 1126 - 1127) At 8:30 p.m. on Sunday, April 16, Deputy Riley was conducting rounds when another inmate called out about someone being sick in the cell. (R.107, Riley, PageID 1124) Riley entered the cell to investigate and saw vomit on the floor of the cell. (*Id.*) Riley asked Helphenstine if he wanted to see the doctor or go to the hospital, but Helphenstine said no. (R.107, Riley, PageID 1125) Instead, Helphenstine told Riley that he was "dope sick" and "just wanted to be in a cell by hisself so he can get over it." (*Id.*; R.96-5, Report, PageID 821) In accordance with Helphenstine's wishes, Riley moved Helphenstine to an isolation cell at approximately 9:00 p.m. on Sunday, April 16, where Helphenstine could be monitored. (R.96-6, Watch Sheet, PageID 822) A few hours later, Riley finished his shift and did not return to LCDC until his next scheduled shift began, at 11:00 p.m. on Wednesday, April 19, 2017 - *after* Helphenstine's death. (R.107, Riley, PageID 1126)

### 1.    Riley did not exhibit deliberate indifference to Helphenstine's medical needs.

Riley did not exhibit deliberate indifference to Helphenstine's medical needs because a reasonable officer knowing what Riley knew on April 16 would not have understood that Helphenstine's medical needs subjected him to an

26

excessive risk of harm. Riley knew Helphenstine was sick enough to vomit and that the cause of the illness was being "dope sick." Knowledge that a detainee is vomiting due to being "dope sick" would not cause a reasonable officer to understand that the detainee faced an excessive risk of harm. The Estate cites no cases to the contrary.

Consequently, Riley was not deliberately indifferent to Helphenstine's medical needs, as deliberate indifference is currently formulated under *Brawner* as refined by *Trozzi*. That being so, the District Court appropriately granted Riley summary judgment.

### 2.    Riley is entitled to qualified immunity.

In the alternative, Riley is entitled to qualified immunity. Helphenstine's rights as they were defined in April 2017 required a deputy not to disregard a risk to Helphenstine's medical needs if the deputy (a) subjectively perceived facts from which the deputy could infer that Helphenstine faced a substantial risk and (b) actually draw the inference that Helphenstine faced a substantial risk. *Anthony*, *supra*.

Under that governing standard, this Court ruled that a jail nurse had not been deliberately indifferent to an inmate's medical needs even though the nurse knew the inmate had been vomiting and generally had stomach issues, that he had been unable to urinate, and had used marijuana daily and Xanax

27

occasionally. *Griffith v. Franklin County*, 975 F.3d 554 (6th Cir. 2020) ("There is no evidence that [Nurse] Trivette should have recognized, based only on Griffith's complaint of stomach/vomiting, inability to urinate, and reported daily use of marijuana and weekend use of Xanax, that he would suffer significant withdrawal symptoms, leading to dehydration and multiple seizures.").

If a nurse - who presumably had more medical training than did a deputy jailer - was not deemed deliberately indifferent for failing to better monitor an inmate who reported vomiting, inability to urinate and habitual drug use, then a deputy jailer who has been told only that an inmate has been vomiting because he is "dope sick" cannot be deemed deliberately indifferent for having failed to better monitor the inmate.

Because he was not aware of any facts from which he could have concluded that Helphenstine had serious medical needs, Riley was not deliberately indifferent under the law as it existed in April 2017. Therefore, he is entitled to qualified immunity, and the District Court correctly granted him summary judgment.

### B.    ANDY LUCAS

Lucas always works the area of LCDC where state inmates reside, which is physically separated from the side of LCDC where Helphenstine was housed.

(R.99, Lucas, PageID 882) For that reason, Lucas had heard nothing about Helphenstine and had very few contacts with Helphenstine during his confinement in LCDC. (R.99, Lucas, PageID 883 - 884, 886)

At approximately 9:00 p.m. on April 18, Deputy Lucas saw Helphenstine in the isolation cell. (R.96-22, Note, PageID 841) Helphenstine was sitting up and alert, but told Deputy Lucas that he was "not going to drink anymore whiskey again." (*Id.*)

Two hours later, at 11:00 p.m. on Tuesday, April 18, Lucas was going off shift for the evening. (R.99, Lucas, PageID 882) As he walked past the isolation cell on his way out of the facility, Lucas saw Helphenstine standing near the cell door talking with Ruark. (*Id.*) Lucas asked Helphenstine how he was feeling, and Helphenstine said he was "feeling a whole lot better. And he said he'd like to have something cold to drink. And I brought him a Mountain Dew. And he took – he drank some of that, and he said, 'I'm feeling pretty good now.' And I said, 'Okay.' And I think [Ruark] told him and that he would get him out and get showered and stuff and I went home." (R.99, Lucas, PageID 882 - 883)

### 1. Lucas did not exhibit deliberate indifference to Helphenstine's medical needs.

Lucas did not exhibit deliberate indifference to Helphenstine's medical needs because a reasonable officer knowing what Lucas knew on April 18

would not have understood that Helphenstine's medical needs subjected Helphenstine to an excessive risk of harm. When Lucas saw Helphenstine the night before he died, Helphenstine was sitting up in his cell and swearing off whiskey. Two hours later, Lucas saw Helphenstine standing at the cell door talking with another deputy. Helphenstine relayed that he was feeling better and asked for a cold drink, which Lucas provided. These observations would not cause a reasonable officer to understand that the detainee faced an excessive risk of harm.

Because Lucas was not deliberately indifferent to Helphenstine's medical needs, as deliberate indifference is currently formulated under *Brawner* as refined by *Trozzi*, the District Court appropriately granted Lucas summary judgment.

### 2.    Lucas is entitled to qualified immunity.

In the alternative, Lucas is entitled to qualified immunity. Helphenstine's rights as they were defined in April 2017 required a deputy not to disregard a risk to his medical needs if the deputy (a) subjectively perceived facts from which the deputy could infer that Helphenstine faced a substantial risk and (b) actually draw the inference that Helphenstine faced a substantial risk. *Anthony*, *supra*.

Under that standard, this Court granted summary judgment to another deputy jailer who had similar knowledge. *Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018). There, Captain Trickler had one contact with the inmate during a medication pass. The inmate was sitting on a table in his cell and told Captain Trickler that his stomach was upset and that he was experiencing withdrawal. After being told that the inmate was scheduled to see the nurse later in the morning, Captain Trickler moved on to other duties. On those facts, this Court ruled that Captain Trickler was not deliberately indifferent for failing to take any measures to examine the inmate or seek guidance from any medical authority.

Likewise, Lucas had very limited interactions with Helphenstine, and those interactions were much like Captain Trickler's. As did the inmate in *Winkler*, Helphenstine told Lucas that he was sick enough from whiskey that he was not going to drink it anymore, thus leading Lucas to believe that Helphenstine's stomach issues were due to having consumed too much alcohol. When Lucas encountered Helphenstine, he was standing up in the cell talking with Ruark, said he was feeling better, and was not in any obvious distress. Helphenstine asked for a cold drink, which Lucas provided. Nothing about either of the interactions Lucas had with Helphenstine suggested that Helphenstine was in distress or had any serious need for medical attention.

Because he was not aware of any facts from which he could have concluded that Helphenstine had serious medical needs, Lucas was not deliberately indifferent under the law as it existed in April 2017. Therefore, he is entitled to qualified immunity, and the District Court correctly granted him summary judgment.

### C.    JOHN BYARD

Deputy Byard is employed by the Lewis County Deputy Sheriff as a bailiff. On April the morning of April 18, Byard walked several inmates, including Helphenstine, from the rear door of LCDC to the Courthouse, a distance of 20 feet; then, once inside the Courthouse, walked with them to the courtroom for their arraignments. (R.105, Byard, PageID 1091) After spending six minutes with Helphenstine in this context, Byard approached Lewis County District Judge McCloud and told him Helphenstine was "out of it" and probably detoxing from some drug, prompting Judge McCloud to instruct Byard to return Helphenstine to LCDC. (R.96-9, Video, PageID 828; R.105, Byard, PageID 1094) Immediately thereafter, Byard spent approximately five minutes walking Helphenstine back to LCDC, where an unknown deputy jailer received Helphenstine. (R.105, Byard, PageID 1093 - 1094)

### 1. Byard did not exhibit deliberate indifference to Helphenstine's medical needs.

Byard did not exhibit deliberate indifference to Helphenstine's medical needs because a reasonable officer knowing what Byard knew on April 18 would not have understood that Helphenstine's medical needs subjected him to an excessive risk of harm. Byard knew only that Helphenstine was "out of it" and probably detoxing from a drug. These observations would not cause a reasonable officer to understand that the detainee faced an excessive risk of harm.

Consequently, Byard was not deliberately indifferent to Helphenstine's medical needs, as deliberate indifference is currently formulated under *Brawner* as clarified by *Trozzi*. That being so, the District Court appropriately granted Byard summary judgment.

### 2. Byard is entitled to qualified immunity.

In the alternative, Byard is entitled to qualified immunity. Helphenstine's rights as they were defined in April 2017 required a deputy not to disregard a risk to his medical needs if the deputy (a) subjectively perceived facts from which the deputy could infer that Helphenstine faced a substantial risk and (b) actually draw the inference that Helphenstine faced a substantial risk. *Anthony*, *supra*.

During his limited interaction with Helphenstine, Byard formed the impression that Helphenstine was "out of it" and probably detoxing from some drug. (R.96-9, Video, PageID 828) However, Byard did not witness any nausea, vomiting, diarrhea, shakiness, loss of coordination, sweating, foul odor, or any other physical manifestation of illness in Helphenstine. (R.105, Byard Depo., PageID 1092 - 1095) As a matter of law, that is simply not enough to support a conclusion that Byard was subjectively aware of facts from which he could have inferred that Helphenstine had a serious medical condition, nor is it enough to support a conclusion that Byard actually drew such an inference. Indeed, cases decided under the pre-*Brawner* deliberate indifference standard hold that knowledge that an inmate is experiencing drug withdrawals does not, in and of itself, demand that a government official send the inmate to the hospital, which is what the Estate advocates Byard (and others) should have done. *Speers v. County of Berrien*, 196 Fed. Appx. 390 (6th Cir. 2006) (withdrawal typically may be managed in a prison setting and indeed frequently is managed there); *Winkler*, *supra* (sending an inmate to the hospital is not the only way withdrawal may be treated within constitutional boundaries).

Because he was not aware of any facts from which he could have inferred that Helphenstine had serious medical needs, and because he did not actually draw any such inference, Byard was not deliberately indifferent under the law

as it existed in April 2017. Therefore, he is entitled to qualified immunity, and the District Court correctly granted him summary judgment.

### D.   SANDY BLOOMFIELD

Bloomfield knew Helphenstine had told Riley he was "dope sick" and that he had reportedly been experiencing vomiting and diarrhea. (R.108, Bloomfield, PageID 1154)

In addition, Bloomfield encountered Helphenstine during observation checks on on April 16 and 17. Specifically, Bloomfield saw Helphenstine at 11:37 a.m. on Sunday, April 16, at which time he was lying down in the cell. (R.96-6 Watch Sheet, PageID 822 - 824; R.108, Bloomfield, PageID 1151) She saw him again at 6:47 a.m. and 6:57 a.m. on Monday, April 17, at which time she saw him lying down in the cell. (*Id*.) She saw him at 9:15 p.m., 9:23 p.m., 9:36 p.m., 9:43 p.m., and 10:00 p.m. on Monday, April 17; on most of those occasions, Helphenstine was lying down, but on one of the occasions, he was in an upright position talking with her. (R.96-6 Watch Sheet, PageID 822 - 824; R.108, Bloomfield, PageID 1151 - 1152)

Each time Bloomfield checked on Helphenstine, she opened the flap in the cell door, looked into the cell, and talked to him. (R.108, Bloomfield, PageID 1148) She called into the cell and asked if Helphenstine was "okay" or "feeling better." Each time, she received a brief acknowledgement from Helphenstine

(i.e., he either answered her or looked up at her) that she believed indicated he did not want to be bothered. (R.108, Bloomfield, PageID 1151 - 1152)

Also, Bloomfield occasionally went into the control room on April 16 or April 17, and when she did, she glanced into the observation cell through the open door flap. (R.108, Bloomfield, PageID 1151) On those occasions, Helphenstine was either sitting down or on his feet walking around in the cell. (R.108, Bloomfield, PageID 1152) She spoke with him on several occasions and he was "coherent, and he knew what you were saying to him, and he could talk to you with perfect sense." (*Id.*)

Bloomfield left her shift at LCDC prior to Helphenstine's arraignment on the morning of April 18. (R.108, Bloomfield, PageID 1155) She returned to LCDC at 3:00 p.m. on April 18 for a sixteen-hour shift that was scheduled to end at 7:00 a.m. on April 19, 2017. (R.108, Bloomfield, PageID 1158) During that shift, she did not have any personal interactions with Helphenstine until sometime after 3:30 a.m., when other deputies – who had found Helphenstine unresponsive in his cell – summoned her to help in eliciting a response from him. (R.96-15, Report, PageID 834; R.96-16, Report, PageID 835; R.96-17, Report, PageID 836; R.96-18, Report, PageID 837; R.96-19, Report, PageID 838; R.108, Bloomfield Depo., PageID 1157) Unfortunately, she was unable to do so,

prompting staff to call an ambulance while other deputies began to perform CPR on Helphenstine. (*Id.*)

### 1. Bloomfield did not exhibit deliberate indifference to Helphenstine's medical needs.

Bloomfield did not exhibit deliberate indifference to Helphenstine's medical needs because a reasonable officer knowing what she knew between April 16 and April 19 would not have understood that Helphenstine's medical needs subjected him to an excessive risk of harm. Bloomfield saw Helphenstine during observation checks on April 16 and 17, and, while she knew he was not feeling well, nothing happened to suggest he was at excessive risk of harm due to the withdrawal she believed he was experiencing. And, she did not have any personal contact with Helphenstine on her sixteen-hour April 18 to April 19 shift until after Helphenstine had already become unresponsive. At that point, she went to Helphenstine's cell and tried to get a response from him herself, knowing that others had already summoned an ambulance.

With this knowledge, a reasonable officer would not have concluded that Helphenstine's medical needs put him at an excessive risk of harm. Consequently, Bloomfield was not deliberately indifferent to Helphenstine's medical needs, as deliberate indifference is currently formulated under

*Brawner* as clarified by *Trozzi*. That being so, the District Court appropriately granted Bloomfield summary judgment.

## 2.    Bloomfield is entitled to qualified immunity.

In the alternative, Bloomfield is entitled to qualified immunity. Helphenstine's rights as they were defined in April 2017 required a deputy not to disregard a risk to his medical needs if the deputy (a) subjectively perceived facts from which the deputy could infer that Helphenstine faced a substantial risk and (b) actually draw the inference that Helphenstine faced a substantial risk. *Anthony*, *supra*.

Bloomfield was not aware of any facts from which she could have inferred that Helphenstine had serious medical needs, and did not actually draw any such inference, until around 3:30 a.m. on April 19, 2017. At that time, Bloomfield responded reasonably to the information known to her by going to Helphenstine's cell and trying to get a response from him herself, knowing that others had already summoned an ambulance. Having done so, Bloomfield was not deliberately indifferent under the law as it existed in April 2017. Therefore, she was entitled to qualified immunity, and the District Court correctly granted her summary judgment.

### E.    AMANDA MCGINNIS

McGinnis saw Helphenstine before he was in the isolation cell. She encountered him at breakfast pass on either Saturday, April 15 or Sunday, April 16. McGinnis noticed that other inmates had taken Helphenstine's breakfast tray because he had refused it. (R.98, McGinnis, PageID 849 - 850) McGinnis got Helphenstine's tray back, but she did not believe anything was amiss; inmates commonly decline their breakfast trays "because they want to sleep through breakfast." (*Id*.) During this shift, Helphenstine "just looked sleepy;" he was not complaining of nausea, vomiting, diarrhea or any other medical issues, and nothing about him seemed out of the ordinary. (R.98, McGinnis, PageID 850)

When McGinnis arrived for her next shift - which was 11:00 p.m. on Monday, April 17, until 7:00 a.m. on Tuesday, April 18 - Bloomfield told her Helphenstine was detoxing in the isolation cell. (R.98, McGinnis, PageID 849 - 850) McGinnis checked on Helphenstine during her shift. At 11:12 p.m. on Monday, April 17, she observed him without talking to him; Helphenstine was "moving," by tossing and turning in his bed. (*Id*.; R.96-6, Watch Sheet, PageID 822 - 824) At 11:23 p.m., she again observed him without talking to him; he was lying down. (R.98, McGinnis, PageID 851)

At around midnight on Tuesday, April 18, McGinnis completed a medical request form and faxed it to Dr. Von Luhtre. (R.96-7 Form at PageID 825; R.98,

McGinnis, PageID 856, 858) The form indicated Helphenstine was soiling himself, vomiting and refusing to eat or drink due to an upset stomach from withdrawals. (*Id.*)

McGinnis checked on Helphenstine again at 2:24 a.m., 2:47 a.m., 4:15 a.m., and 5:03 a.m. on Tuesday, April 18, at which times he was lying down and sleeping. (R.96-6, Watch Sheet, PageID 822 - 824; R.98, McGinnis, PageID 851 - 852) In addition, as Helphenstine was getting ready to shower for his arraignment on April 18, McGinnis spoke with him. He told her he did not feel well. She also knew he had been vomiting, because when Helphenstine left the isolation cell to go to the shower, she cleaned up his cell. But, she also knew he had consumed some juice and some water that morning. (R.98, McGinnis, PageID 852, 854)

McGinnis returned to work on Tuesday, April 18 from 11:00 p.m. to 7:00 a.m. on Wednesday, April 19. (R.98, McGinnis, PageID 854) When she arrived, she was told Dr. Von Luhrte had prescribed Helphenstine anti-nausea and anti-vomiting medicine, and that he seemed to be doing better. (R.98, McGinnis, PageID 861 - 862) Based on her observations, she, too, perceived that Helphenstine was getting better because he was up and about the cell more frequently than he had been the previous night. (*Id.*)

At 11:08 p.m. on April 18, McGinnis saw that Helphenstine was using the bathroom in the isolation cell. (R.96-6, Watch Sheet, PageID 822 - 824; R.98, McGinnis, PageID 854)

At 11:57 p.m. on April 18, McGinnis saw Helphenstine walking around the cell. (Id.)

At 1:25 a.m. and 1:53 a.m. on April 19, 2017, McGinnis observed Helphenstine "moving," which she meant as an indication that he was "tossing and turning or making big moves, more than just general sleep movements." (Id.; R.98, McGinnis, PageID 855)

At approximately 3:13 a.m. on April 19, 2017, McGinnis entered the cell and helped Helphenstine drink some Ensure. (R.96-14, Video, PageID 833; R.96-23, Log, PageID 842; R.98, McGinnis, PageID 855)

At 3:30 a.m., she began to administer first aid when she learned that Ruark and Thoroughman had been unable to elicit a response from Helphenstine and that an ambulance had been called. (R.96-15, Report, PageID 834; R.96-16, Report, PageID 835; R.96-17, Report, PageID 836; R.96-18, Report, PageID 837; R.96-19, Report, PageID 838)

### 1.  McGinnis did not exhibit deliberate indifference to Helphenstine's medical needs.

McGinnis did not exhibit deliberate indifference to Helphenstine's medical needs because a reasonable officer knowing what McGinnis knew between April 16 and 19 would not have understood that Helphenstine's medical needs subjected him to an excessive risk of harm, such that he required more medical care than what she had arranged for him.

McGinnis knew Helphenstine had been vomiting and experiencing diarrhea. However, she faxed a request for medical attention to Dr. Von Luhrte, and she knew Dr. Von Luhrte had responded by prescribing medications and a specific diet for Helphenstine. Once Helphenstine started receiving those medications and that diet, McGinnis was told by others, and it was her own impression, that Helphenstine was improving. After all, she knew he had consumed some liquids and saw him walking around in the cell, taking care of his bathroom needs, and moving as he slept.

A reasonable official, knowing what McGinnis knew, would not have understood that Helphenstine required medical attention beyond what she had already arranged for him. Consequently, McGinnis was not deliberately indifferent to Helphenstine's medical needs, as deliberate indifference is

42

currently formulated under *Brawner* as refined by *Trozzi*. For this reason, the District Court appropriately granted Bloomfield summary judgment.

### 2. McGinnis is entitled to qualified immunity.

In the alternative, McGinnis is entitled to qualified immunity. Helphenstine's rights as they were defined in April 2017 required a deputy not to disregard a risk to his medical needs if the deputy (a) subjectively perceived facts from which the deputy could infer that Helphenstine faced a substantial risk and (b) actually draw the inference that Helphenstine faced a substantial risk. *Anthony*, *supra*.

To the extent McGinnis perceived any facts from which she could have inferred that Helphenstine required medical attention, she responded reasonably to that risk by completing the Medical Request Form and sending it to Dr. Von Luhrte. The facts as McGinnis perceived them after Dr. Von Luhrte responded to that form with prescriptions and diet specifications were not such that McGinnis could have inferred that Helphenstine faced a substantial risk. And, assuming *arguendo* they were sufficient to allow that inference, it is clear that McGinnis did not actually draw that inference.

Because McGinnis was not deliberately indifferent under the law as it existed in April 2017, she was entitled to qualified immunity. The District Court correctly granted her summary judgment.

43

### F.   ANTHONY RUARK

Ruark worked three shifts during Helphenstine's incarceration, i.e., 11:00 p.m. on Sunday, April 16, until 7:00 a.m. on Monday, April 17; 3:00 p.m. on Monday, April 17, until 7:00 a.m. on Tuesday, April 18; and, 3:00 p.m. on Tuesday, April 18, until 7:00 a.m. on Wednesday, April 19. During these shifts, Ruark was one of several deputies who checked on Helphenstine every 20 minutes, writing their observations on a log sheet on the isolation cell door. (R.96-6, Watch Sheet, PageID 822 - 824) When Ruark checked on Helphenstine, he looked into the cell, observed Helphenstine, and made an effort to get a physical or verbal response from him: "… I always get them to acknowledge me, I mean, whether it's a grunt or … . I'll just do whatever I can to get their attention. I mean, especially if I look in and I think they may be sleeping. I mean, I'll bang on the door a little bit just to get them to look up at me or something, I mean." (R.100, Ruark, PageID 909)

Ruark checked on Helphenstine 21 times during his shift that started at 11 p.m. on Sunday, April 16 and ended at 7:00 a.m. on Monday, April 17. (R.96-6, Watch Sheet, PageID 822 - 824) At 12:17 a.m. and at 2:44 a.m. on Monday, April 17, Helphenstine was vomiting over the toilet in the cell. (R.100, Ruark, PageID 909) Before, between, and after those checks, however, Helphenstine

was lying down, which was not necessarily unusual, given the hour. (R.96-6, Watch Sheet, PageID 822 - 824; R.100, Ruark, PageID 909 - 910)

Ruark checked on Helphenstine 39 times during his shift that started at 3:00 p.m. on Monday April 17 and ended at 7:00 a.m. on Tuesday, April 18. (*Id.*; R.100, Ruark, PageID 910 - 911) During the earlier checks on that shift, Helphenstine was lying down. (*Id.*) At 12:22 a.m. on Tuesday, April 18, Helphenstine was moving around. (*Id.*) For several more checks after that, Helphenstine was again lying down. (*Id.*) But, at 5:45 a.m., Helphenstine drank some juice and, at 6:00 a.m., he drank some water. (*Id.*) From 6:10 a.m. until the end of Ruark's shift, Helphenstine was in the shower. (*Id.*) While Ruark was leaving the premises at the end of his shift with other deputy jailers, McGinnis mentioned that she had completed a medical request form and sent it to Dr. Von Luhrte. (R.100, Ruark, PageID 907; R.104, Thoroughman, PageID 1069)

Deputy Ruark checked on Helphenstine 22 times during his shift that started at 3:00 p.m. on Tuesday, April 18, and ended at 7:00 a.m. the next morning. (R.96-6, Watch Sheet, PageID 822 - 824; R.100, Ruark, PageID 911 - 914) At various times during that shift, Ruark – and other deputies – noted that Helphenstine was talking, sitting, lying down, standing, using the bathroom, drinking, and walking around the cell, until Ruark's 12:15 a.m. check, when Helphenstine began lying down again. (*Id.*)

45

At approximately 2:40 a.m., Ruark entered the isolation cell to check on Helphenstine, left the cell briefly, and returned to the cell with a drink, which he offered to Helphenstine. (R.96-14, Video, PageID 833)

Just a few minutes later, Ruark checked on Helphenstine again, assisted by McGinnis. Ruark and McGinnis, took turns leaning down to talk to Helphenstine and helping him drink some Ensure. (Id.; R,96-23, Log, PageID 842; R.100, Ruark, PageID 912)

Ruark next checked on Helphenstine at 3:30 a.m. When he could not elicit a response, Ruark asked Thoroughman – who was in the Control Room with the key to the cell door – to open the door and check on Helphenstine. (R.96-15, Report, PageID 834; R.96-16, Report, PageID 835; R.96-17, Report, PageID 836; R.96-18, Report, PageID 837; R.96-19, Report, PageID 838; R.100, Ruark Depo., PageID 913) When Thoroughman was also unable to get a response from Helphenstine, an ambulance was called and Ruark, McGinnis, Thoroughman and Bloomfield administered emergency first aid until the ambulance arrived. (*Id.*)

### 1.    Ruark did not exhibit deliberate indifference to Helphenstine's medical needs.

Ruark did not exhibit deliberate indifference to Helphenstine's medical needs because a reasonable officer knowing what Ruark knew between April

16 and 19 would not have understood that Helphenstine's medical needs subjected him to an excessive risk of harm, such that he required more medical care than what Ruark knew had already been arranged and provided to Helphenstine.

Ruark saw Helphenstine vomit twice in the early morning hours of April 17, but Helphenstine was otherwise lying down when Ruark saw him during his April 16 to April 17 overnight shift. Seeing inmates lie down was not unusual at that hour, or for an inmate who did not feel well.

When Ruark saw Helphenstine during his sixteen-hour April 17 to April 18 mid-afternoon to late morning shift, Helphenstine was initially lying down, then began moving around, went back to lying down, and began drinking some juice and some water. At the end of Ruark's shift, McGinnis told him that she had requested medical attention from Dr. Von Luhrte for Helphenstine.

During his April 18 to April 19 overnight shift, Ruark noted that Helphenstine was, at various times, talking, sitting down, standing, using the bathroom, drinking, and walking around the cell – none of which suggested he had an unmet serious medical need. Then, at 12:15 a.m., Ruark noted that Helphenstine was lying down again, which, again, was not unusual for the hour. As the morning progressed, Ruark twice brought Helphenstine liquids.

47

None of these observations would have caused a reasonable officer to conclude that Helphenstine's medical needs subjected him to an excessive risk of harm, such that he required more medical care than what Ruark knew had already been arranged and provided to Helphenstine.

Then, at 3:30 a.m. on April 19, Helphenstine became unresponsive. At that point, a reasonable officer would have concluded that Helphenstine's medical needs subjected him to an excessive risk of harm. But, Ruark responded to that need by ensuring that an ambulance was called as he and others provided emergency first aid to Helphenstine.

Consequently, Ruark was not deliberately indifferent to Helphenstine's medical needs, as deliberate indifference is currently formulated under *Brawner* as refined by *Trozzi*. For this reason, the District Court appropriately granted Ruark summary judgment.

### 2.    Ruark is entitled to qualified immunity.

In the alternative, Ruark is entitled to qualified immunity. Helphenstine's rights as they were defined in April 2017 required a deputy not to disregard a risk to his medical needs if the deputy (a) subjectively perceived facts from which the deputy could infer that Helphenstine faced a substantial risk and (b) actually draw the inference that Helphenstine faced a substantial risk. *Anthony*, *supra*.

48

To the extent Ruark perceived any facts from which he could have inferred that Helphenstine required medical attention, he knew McGinnis had completed the Medical Request Form and sent it to Dr. Von Luhrte, and that Helphenstine would receive medical attention. The facts as Ruark perceived them after Dr. Von Luhrte responded to that form with prescriptions and diet specifications were not such that Ruark could have inferred that Helphenstine faced a substantial risk. And, assuming *arguendo* they were sufficient to allow that inference, Ruark did not actually draw that inference.

Because Ruark was not deliberately indifferent under the law as it existed in April 2017, he was entitled to qualified immunity, and the District Court correctly granted him summary judgment.

## IV.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO JAILER JEFF LYKINS

Having read Riley's April 16 report, Jailer Lykins knew generally that Helphenstine was "dope sick," had vomited on April 16, and had been moved to the isolation cell for monitoring. (R.103, Lykins, PageID 1030) Lykins was also present on the morning of April 18 when Helphenstine was retrieved from his cell for arraignment. (R.103, Lykins, PageID 1029) At that time, Helphenstine was freshly showered and his cell had been cleaned. (*Id.*) According to Lykins, "I asked him if he could come to the door. He walked to the door. We opened

49

the door, put handcuffs on him. He stood there until we got him handcuffed, and I directed him, pointed towards the back door where the bailiffs was at, and told him to go in that direction." (*Id*.) Lykins and Helphenstine did not otherwise speak to each other. (*Id*.) Lykins perceived that Helphenstine "looked okay. I mean, he looked fine where he was in his jumpsuit. Nothing noticeable about how he was walking." (R.103, Lykins, PageID 1030)

## A.    LYKINS WAS NOT DELIBERATELY INDIFFERENT

Lykins did not exhibit deliberate indifference to Helphenstine's medical needs because a reasonable officer knowing what Lykins knew between April 16 and 19 would not have understood that Helphenstine's medical needs subjected him to an excessive risk of harm. Lykins knew generally that Helphenstine was "dope sick," that Helphenstine had vomited on April 16, and that Helphenstine was in an isolation cell so staff could monitor his condition. Lykins had one brief encounter with Helphenstine, which occurred when Helphenstine was freshly showered and after his cell had been cleaned, and which lasted just long enough to retrieve Helphenstine from his cell and handcuff him in preparation for arraignment. On that occasion, there was nothing amiss about Helphenstine.

With this knowledge, a reasonable official in Lykins' position would not have understood that Helphenstine's medical needs subjected him to an

excessive risk of harm. Consequently, Lykins was not deliberately indifferent to Helphenstine's medical needs, as deliberate indifference is currently formulated under *Brawner* and clarified by *Trozzi*. The District Court, therefore, appropriately granted Lykins summary judgment.

### B.    LYKINS IS ENTITLED TO QUALIFIED IMMUNITY

In the alternative, Lykins is entitled to qualified immunity. Helphenstine's rights as they were defined in April 2017 required jail officials not to disregard a risk to his medical needs if the officials (a) subjectively perceived facts from which they could infer that Helphenstine faced a substantial risk and (b) actually drew the inference that Helphenstine faced a substantial risk. *Anthony*, *supra*.

Lykins knew only that Helphenstine had vomited on April 16, and that Helphenstine had been placed in an isolation cell for monitoring because he had reporting being "dope sick." But, when Lykins saw Helphenstine for the one and only time on the morning of April 18, Helphenstine was freshly showered and in a clean cell, and nothing seemed amiss about Helphenstine. As a matter of law, that is simply not enough to support a conclusion that Lykins was subjectively aware of facts from which he could have inferred that Helphenstine had a serious medical condition, nor is it enough to support a conclusion that Lykins actually drew such an inference. Indeed, cases decided under the pre-

*Brawner* deliberate indifference standard hold that knowledge that an inmate is experiencing drug withdrawals does not, in and of itself, demand that a government official send the inmate to the hospital, which is what the Estate advocates Lykins (and others) should have done. *Speers*, *supra*; *Winkler*, *supra*.

Because he was not aware of any facts from which he could have inferred that Helphenstine had serious medical needs, and because he did not actually draw any such inference, Lykins was not deliberately indifferent under the law as it existed in April 2017. He is entitled to qualified immunity, and the District Court correctly granted Lykins summary judgment.

### C.   LYKINS IS NOT LIABLE IN HIS SUPERVISORY CAPACITY

Assuming *arguendo* that a deputy under Lykins' supervision deprived Helphenstine of his constitutional rights by being deliberately indifferent to his medical needs, Lykins cannot be liable because he did not personally participate in that deprivation.

As the District Court noted, supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. *Crawford v. Tilley*, 15 F.4th 752 (6th Cir. 2021); *Reed v. Speck*, 508 Fed. Appx. 415 (6th Cir. 2012). Rather, to prove liability, the plaintiff must show that the supervisor's role went beyond failing to exercise his right to control

subordinates and extended to active encouragement or direct participation in the specific incident of the subordinates' unconstitutional conduct. *Id.*

As evidence of Lykins' direct participation in the alleged deprivation, the Estate points to Lykins' failure to personally check on Helphenstine or take him to the hospital. (Appellant's Brief, p. 46) But, as demonstrated herein, based on Lykins' limited knowledge of Helphenstine's condition, a reasonable officer in Lykins' position would not have concluded that those steps were constitutionally required.

The Estate also points to Lykins' alleged failure to promulgate adequate jail policies and alleged failure to properly train jail staff as evidence of his personal participation. (Appellant's Brief, p. 46) But, alleged failures in hiring, retaining, supervising, or training a subordinate who engages in unconstitutional conduct is not enough to establish individual liability on the part of a supervisor for the unconstitutional conduct of a subordinate. *Reed v. Speck*, 508 Fed. Appx. 415 (6th Cir. 2012); *Heyerman v. County of Calhoun*, 680 F.3d 642 (6th Cir. 2012); *Harvey v. Campbell County*, 453 Fed. Appx. 557 (6th Cir. 2011). In fact, such theories – alleged failures in hiring, retaining, supervising, training and investigating – "improperly conflate a § 1983 claim of individual supervisory liability with one of municipal liability." *Heyerman, supra*; *Phillips v. Roane County*, 534 F.3d 531, 543 (6th Cir. 2008).

For example, in *Harvey, supra*, a man was shot and killed by Deputy Lowe during a traffic stop. The man's wife filed suit against Deputy Lowe and two of his supervisors. She alleged that the supervisors failed to adequately train Lowe. Noting the lack of personal involvement of either of the supervisors in the traffic stop, this Court ruled that neither could be found liable on a failure to train theory. *Id.* at 563.

In light of this governing case law, the theory that Lykins can be individually liable solely because he has the authority to train LCDC employees and allegedly failed to adequately exercise that authority cannot establish individual liability on his part under § 1983.

## V.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO LEWIS COUNTY

To prevail in a § 1983 action against a governmental entity, a plaintiff cannot simply demonstrate that the entity's employee engaged in unconstitutional conduct. Instead, a plaintiff must show that the alleged violation occurred because of a governmental policy, practice or custom. *Brown v. Chapman*, 814 F.3d 447 (6th Cir. 2016). The plaintiff must prove that the government's deliberate conduct was the moving force behind the injury alleged. *Bd. of County Commrs. v. Brown*, 520 U.S. 397 (1997). One way a plaintiff can show the existence of a governmental policy, practice or custom is to

identify a policy of inadequate training or supervision. *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005). Thus, the Estate contends that Lewis County failed to train or supervise its deputies with respect to the provision of medical care to inmates experiencing drug withdrawals. (Appellant's Brief, p. 39 - 40)

A plaintiff asserting a failure-to-train-or-supervise claim must show deliberate indifference to the rights of persons with whom its employees come into contact. *City of Canton v. Harris*, 489 U.S. 378 (1989). Proving deliberate indifference typically requires proof that the governmental entity was aware of prior unconstitutional actions by its employees and failed to take corrective measures. *Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005); *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013); *Connick v. Thompson*, 563 U.S. 51 (2011). Here, there has been no showing of any prior unconstitutional actions by employees of Lewis County with respect to the medical care provided to inmates at LCDC.

In a "narrow range of circumstances," a plaintiff may be able to establish deliberate indifference without evidence of a pattern of similar violations. *Connick*, *supra*. However, deliberate indifference is a stringent standard of fault, requiring proof that a government actor disregarded a known or obvious consequence of his action. *Id*. For liability to attach in the instance of a single

violation, the record must show a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result. *Harvey v. Campbell County*, 453 Fed. Appx. 557 (6th Cir. 2011).

That is not the case here. On the whole, Lewis County deputy jailers received all state mandated training and demonstrated an understanding of what to look for to determine when an inmate who is experiencing withdrawals presents a medical emergency. The also demonstrated an understanding about what to do in that situation. For example, McGinnis testified that she would look for uncontrollable vomiting, uncontrollable diarrhea, unresponsiveness, "talking out of their head," and not eating or drinking as an indication that an inmate experiencing withdrawals had a medical emergency, and that such an inmate should be transported to the hospital. (R.98, McGinnis, PageID 852 - 853) Ruark testified that he knew to perform observation checks on inmates in the isolation cell (which is usually used for inmates going through withdrawal) every twenty minutes, "keep a close eye on them," and watch for signs such as vomiting severely or not responding to know whether the inmate presented a medical emergency, and, if so, to call Dr. Von Luhrte or paramedics. (R.100, Ruark, PageID 905 - 907) Thoroughman testified that he knew to watch a withdrawing inmate for excessive vomiting, diarrhea, any kind of indication

56

that their withdrawal was becoming life-threatening, "and they don't want to really eat or do nothing. They just kind of want to lay around." He knew to take such an inmate to the hospital. (R.104, Thoroughman, PageID 1064 - 1065) Carver knew to make sure a withdrawing inmate was not laying on his back, and to watch such an inmate for shaking, sweats and vomiting; if an inmate exhibited such symptoms, Deputy Carver knew to either call Dr. Von Luhrte, call EMS, or take the inmate to the hospital, depending on how bad the inmate's symptoms appeared to be. (R.101, Carver, PageID 936 - 937)

Under these circumstances, no reasonable jury could conclude that Lewis County's training exhibits deliberate indifference for inmates' rights to constitutionally adequate medical care. Accordingly, the District Court properly granted summary judgment to Lewis County.

## CONCLUSION

For all of these reasons, Appellees respectfully request that this Court affirm the decision of the District Court in all respects.

Respectfully submitted,

**/s/ Jeffrey C. Mando**

Jeffrey C. Mando, Esq. (#43548)
ADAMS, STEPNER,
WOLTERMANN & DUSING, PLLC
40 West Pike Street
Covington, KY  41011
859.394.6200 | 859.392.7200 – Fax
jmando@adamsattorneys.com

*Attorney for Appellees-Defendants,*
*Lewis County, KY; Johnny Bivens,*
*Sandy Bloomfield, John Byard, Ben*
*Carver, Andy Lucas, Jeff Lykins,*
*Amanda McGinnis, Mark Riley,*
*Anthony Ruark, and, Jeffrey*
*Thoroughman*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation provided in Fed.R.App.P.32(a)(7)(B). The foregoing brief contains 11,780 words of 14 point proportional type. The word processing software used to prepare this brief was Word 2010 for Microsoft Office.

**/s/ Jeffrey C. Mando**
Jeffrey C. Mando, Esq.

## CERTIFICATE OF SERVICE

This is to certify that on the **5th** day of August, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to: Gregory A. Belzley, Esq.; Camille A. Bathurst, Esq.; James L. Thomerson, Esq.; Clayton L. Robinson, Esq. and Devon M. Hendricks, Esq.

**/s/ Jeffrey C. Mando**
Jeffrey C. Mando, Esq.

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

Appellees, Lewis County, KY; Johnny Bivens, Sandy Bloomfield, John Byard, Ben Carver, Andy Lucas, Jeff Lykins, Amanda McGinnis, Mark Riley, Anthony Ruark, and, Jeffrey Thoroughman, pursuant to Sixth Circuit Rule 28(d), hereby designate the following filings in the district court's record as items to be included in the joint appendix:

| Description of Document: | Date Filed in District Court | Record Entry Number: |
|---|---|---|
| Complaint<br>PageID 6 – 7 | 09.11.18 | 1 |
| Motion for Summary Judgment<br>PageID 767 – 816 | 02.26.21 | 96 |
| Warrant – MSJ Exhibit 1<br>PageID 817 | 02.26.21 | 96-1 |
| Citation – MSJ Exhibit 2<br>PageID 818 | 02.26.21 | 96-2 |
| Citation – MSJ Exhibit 3<br>PageID 819 | 02.26.21 | 96-3 |
| Report – MSJ Exhibit 4<br>PageID 820 | 02.26.21 | 96-4 |
| Report – MSJ Exhibit 5<br>PageID 821 | 02.26.21 | 96-5 |
| Watch Sheet – MSJ Exhibit 6<br>PageID 822 – 824 | 02.26.21 | 96-6 |
| Form – MSJ Exhibit 7<br>PageID 825 | 02.26.21 | 96-7 |
| Agreement – MSJ Exhibit 8<br>PageID 826 – 827 | 02.26.21 | 96-8 |

A

| Description of Document: | Date Filed in District Court | Record Entry Number: |
|---|---|---|
| Video – MSJ Exhibit 9<br>PageID 828 | 02.26.21 | 96-9 |
| Form – MSJ Exhibit 10<br>PageID 829 | 02.26.21 | 96-10 |
| Mediation – MSJ Exhibit 11<br>PageID 830 | 02.26.21 | 96-11 |
| Video – MSJ Exhibit 13<br>PageID 832 | 02.26.21 | 96-13 |
| Video – MSJ Exhibit 14<br>PageID 833 | 02.26.21 | 96-14 |
| Report – MSJ Exhibit 15<br>PageID 834 | 02.26.21 | 96-15 |
| Report – MSJ Exhibit 16<br>PageID 835 | 02.26.21 | 96-16 |
| Report – MSJ Exhibit 17<br>PageID 836 | 02.26.21 | 96-17 |
| Report – MSJ Exhibit 18<br>PageID 837 | 02.26.21 | 96-18 |
| Note – MSJ Exhibit 19<br>PageID 838 | 02.26.21 | 96-19 |
| Death Certificate – MSJ Exhibit 21<br>PageID 840 | 02.26.21 | 96-21 |
| Note – MSJ Exhibit 22<br>pageID 841 | 02.26.21 | 96-22 |
| Log – MSJ Exhibit 23<br>PageID 842 | 02.26.21 | 96-23 |
| Amanda McGinnis Deposition Transcript<br>PageID 848 – 856, 858, 861 – 862 | 02.26.21 | 98 |
| Andy Lucas Deposition Transcript<br>PageID 882 – 884, 886 | 02.26.21 | 99 |

B

| Description of Document: | Date Filed in District Court | Record Entry Number: |
|---|---|---|
| Anthony Ruark Deposition Transcript PageID 909 – 914 | 02.26.21 | 100 |
| Ben Carver Deposition Transcript PageID 934 – 937 | 02.26.21 | 101 |
| Dr. Tommy Von Luhrte Deposition Transcript PageID 977 – 978 | 02.26.21 | 102 |
| Jeff Lykins Deposition Transcript PageID 1029, 1030 | 02.26.21 | 103 |
| Jeff Thoroughman Deposition Transcript PageID 1064 – 1065 | 02.26.21 | 104 |
| John Byard Deposition Transcript PageID 1090 – 1095 | 02.26.21 | 105 |
| Johnny Bivens Deposition Transcript PageID 1109 | 02.26.21 | 106 |
| Mark Riley Deposition Transcript PageID 1124 – 1127 | 02.26.21 | 107 |
| Sandy Bloomfield Deposition Transcript PageID 1148, 1151 – 1152, 1155, 1157, 1158 | 02.26.21 | 108 |
| Reply in Support of Motion for Summary Judgment PageID 1797 – 1820 | 04.26.21 | 129 |
| Plaintiff's Supplement to Response to Motion for Summary Judgment PageID 1822 – 1823 | 01.08.22 | 131 |
| Supplemental Reply to Plaintiff's Supplemental Response PageID 1824 - 1825 | 01.12.22 | 132 |
| Memorandum Opinion & Order | 05.05.22 | 133 |

| Description of Document: | Date Filed in District Court | Record Entry Number: |
|---|---|---|
| PageID 1826 – 1855 | | |

D