RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JULIE HELPHENSTINE, Administratrix of the Estate of
Christopher Dale Helphenstine and Guardian of
B.D.H., the minor son of Christopher Dale
Helphenstine,

*Plaintiff-Appellant,*

*v.*

LEWIS COUNTY, KENTUCKY; JEFF LYKINS, ANTHONY
RUARK, ANDY LUCAS, BEN CARVER, AMANDA
MCGINNIS, SANDY BLOOMFIELD, MARK RILEY,
MELINDA MONROE, JEFFERY THOROUGHMAN, TOMMY
VON LUHRTE, D.O., JOHNNY BIVENS, and JOHN
BYARD, individually,

*Defendants-Appellees.*

No. 22-5407

_____

Appeal from the United States District Court for the Eastern District of Kentucky at Ashland.
No. 0:18-cv-00093—Henry R. Wilhoit, Jr., District Judge.

Argued: December 7, 2022

Decided and Filed: February 9, 2023

Before: SUTTON, Chief Judge, COLE and GRIFFIN, Circuit Judges.
_____

### COUNSEL

**ARGUED:** Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky,
for Appellant. Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC,
Covington, Kentucky, for Lewis County Appellees. Clayton L. Robinson, ROBINSON &
HAVENS, PSC, Lexington, Kentucky, for Appellee Tommy von Luhrte, D.O. **ON BRIEF:**
Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, James L.
Thomerson, ROSE GRASCH CAMENISCH MAINS PLLC, Lexington, Kentucky, for
Appellant. Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC,
Covington, Kentucky, for Lewis County Appellees. Clayton L. Robinson, Courtney L. Soltis,
ROBINSON & HAVENS, PSC, Lexington, Kentucky, for Appellee Tommy von Luhrte, D.O.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.

Christopher Helphenstine was arrested and charged with drug crimes in Lewis County, Kentucky. While detained, he began to withdraw from alcohol or drugs. Despite severe vomiting and diarrhea, the only medical care he received was two doses of antiemetics, prescribed via fax machine by a doctor who never saw him. He died five days after his arrest. His estate sued several jail employees, the doctor contracted to provide medical care at the jail, and Lewis County for deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment, and for negligence in violation of state law. The district court ruled that no defendant violated Helphenstine's constitutional rights, declined to exercise jurisdiction over the state-law negligence claim, and granted summary judgment in favor of all defendants. We affirm in part, reverse in part, and remand for further proceedings.

I.

Christopher Helphenstine was arrested and charged with drug offenses on April 14, 2017 and taken to the Lewis County Detention Center (the "jail"). He was detained there until he died en route to the hospital on April 19.

*April 16, 2017.* Around 8:30 p.m. on Sunday, April 16, Helphenstine "vomit[ed] all over the floor" in general population, so defendant Deputy Jailer Mark Riley moved him to a single-man "detox" cell. Helphenstine told Riley that he was "dope sick" and "wanted to be by hisself [sic] so he can get over it." Riley testified that he asked Helphenstine if he wanted to see a doctor or go to the hospital, but Helphenstine responded that he did not.

At the time of Helphenstine's detention, no jail employee had medical training beyond first aid and CPR. Instead, the jail contracted with local doctor Tommy von Luhrte, D.O., to provide medical care to inmates. Dr. von Luhrte was contractually obligated to visit the jail at least once a week, but he did not always do so if the jail did not report that any inmates were

sick. When he visited, he came on Tuesday nights. So when Helphenstine began feeling ill on Sunday evening, the jailers knew he would not receive any medical care for at least two days unless someone reached out to Dr. von Luhrte.

Beginning at 9:20 p.m., the jailers took turns checking on Helphenstine about every twenty minutes by opening a flap in the door to the isolation cell, looking into the cell, and occasionally talking to him. They recorded their observations on a log sheet that hung on the door of the cell. Helphenstine vomited again at 10:34 p.m.

*April 17, 2017.* According to the log sheet, Helphenstine was observed vomiting at 12:17 a.m. and 2:44 a.m. by defendant Deputy Jailer Anthony Ruark, and again at 5:42 a.m. by defendant Deputy Jailer Melinda Monroe.[1] He was "sitting up" for a brief period between 10:23 a.m. and 11:30 a.m., "talking" at 9:23 p.m., and "moving" at 11:12 p.m., but the log sheet otherwise notes him as "laying down" all day.

By midnight, Helphenstine's condition had deteriorated. Defendant Deputy Jailer Amanda McGinnis prepared a non-emergency but "urgent" medical request for Helphenstine, stating that he was in withdrawal (though she did not know from what), vomiting and soiling himself, refusing to eat or drink, and had not gotten out of bed for twenty-four hours. McGinnis faxed this request to Dr. von Luhrte's office, even though she knew the office was closed due to the late hour.

*April 18, 2017.* Between 6:00 a.m. and 7:00 a.m., Helphenstine was sweaty and smelled of vomit and feces, so he showered for almost an hour while jail staff cleaned his cell.

Helphenstine was scheduled to be arraigned that morning, so at about 9:15 a.m., defendant Deputy Sheriff John Byard escorted Helphenstine on the short walk from the jail to the courthouse. Byard noticed that Helphenstine was lethargic and drooling. Before the arraignment began, Byard approached the bench and told the judge that Helphenstine was "acting like he's just clear out of it," had "[s]tuff coming out of his mouth," and was "really not coherent."

---

[1]Apparently, Monroe has not been located, and thus not deposed.

The judge postponed the arraignment after speaking with deputies about his condition. Byard walked Helphenstine back to the jail, apparently without incident.

McGinnis's overnight fax was brought to Dr. von Luhrte's attention by mid-morning. Dr. von Luhrte testified that he called the jail and directed that Helphenstine be taken to a hospital to receive IV fluids, but he was told that Helphenstine refused to go to the hospital. Dr. von Luhrte could not remember with whom he spoke, and he did not document the call. There is no record of this call at the jail, and no defendant recalls taking a call from Dr. von Luhrte. Further, no jailer recalls Helphenstine ever refusing treatment (with the exception of Riley's question on April 16, after Helphenstine first vomited).

Regardless, Dr. von Luhrte testified that, because he believed Helphenstine had refused to go to the hospital, he faxed a prescription to the jail for Reglan (an antiemetic), and he encouraged Helphenstine to rest, sip liquids, and eat bland food. Dr. von Luhrte was concerned Helphenstine "might be getting dehydrated," but he did not instruct the jailers to monitor Helphenstine's food or fluid intake.

Around 3:00 p.m., Helphenstine received a dose of Reglan. Dr. von Luhrte testified that he received a call around that time from someone who identified themself only as "the jailer," whom Dr. von Luhrte thought might be defendant Jailer Jeff Lykins. Dr. von Luhrte testified that he again informed the jailer that Helphenstine needed to go to the hospital, but was told that Helphenstine refused again. Dr. von Luhrte told the jailer to try again, but Helphenstine purportedly refused a third time. As with the first call from Dr. von Luhrte, there is no record of this call taking place, and Lykins specifically denies ever speaking with Dr. von Luhrte. Dr. von Luhrte then prescribed Zofran, a stronger antiemetic, for Helphenstine.

Although April 18 was a Tuesday (his normal night to visit the jail) and although he knew of Helphenstine's condition, Dr. von Luhrte did not visit the jail that evening. There is a dispute over whether the jail sent a "Sick Call List" to Dr. von Luhrte's office. The doctor claims he did not receive one. But the jail produced a Sick Call List dated April 17, 2017, listing three inmates that needed medical attention. Nonetheless, Dr. von Luhrte failed to go to the jail to treat Helphenstine.

At 9:00 p.m., Helphenstine received doses of both Reglan and Zofran. About that time, defendant Deputy Jailer Andy Lucas checked on Helphenstine, who told Lucas "that he was not going to drink any more whiskey again." Lucas testified that Helphenstine was standing and alert at that time. Around 11:00 p.m., Helphenstine asked for something cold to drink, so Lucas brought him a Mountain Dew. Helphenstine drank some of the soda and then said, "I'm feeling all right now."

*April 19, 2017.* At about midnight, Helphenstine laid face-down on his mat. For the next few hours, he remained there, largely motionless. Video shows him occasionally twitching and raising or shaking his feet.

At 2:42 a.m., a deputy entered Helphenstine's cell to check on him. McGinnis testified that this was Ruark, but Ruark was unsure whether he did this. The jailer twice offered Helphenstine a drink, but he refused. At 2:50 a.m., McGinnis also entered Helphenstine's cell. While the first deputy lifted Helphenstine's head, McGinnis put a straw to his mouth and encouraged him to drink. At about 2:56 a.m., McGinnis helped Helphenstine drink a small amount again. And at 3:13 a.m., McGinnis observed Helphenstine through the window and noted that he had consumed some liquid. Defendant Deputy Jailer Sandy Bloomfield, the shift supervisor, watched this entire interaction on video from the control room.

Around 3:30 a.m., Ruark looked through the window into Helphenstine's cell, where it "appeared to [him] that something may be wrong[.]" Helphenstine did not respond to his name, so Ruark asked another jailer to get Bloomfield from the control room and see if she could get Helphenstine to respond. McGinnis also came to help; she could not locate Helphenstine's pulse. They observed Helphenstine as cold, blue, and unresponsive, and began CPR while Bloomfield called 911. EMTs described Helphenstine as "warm and drenched in sweat" when they arrived. They took over CPR and transported Helphenstine to the hospital. He was pronounced dead en route.

Plaintiff's experts testified that Helphenstine died either from withdrawal or from severe dehydration caused by withdrawal. But Helphenstine's death certificate lists his cause of death as "acute (fentanyl) and chronic drug abuse," with the interval between onset and death listed as

minutes. The medical examiner who performed the autopsy, Dr. Meredith Frame, testified that fentanyl was present in Helphenstine's blood at a level of 1.8 ng/ml. This was within her understanding of the therapeutic levels of fentanyl (1 to 3 ng/ml). However, there is no evidence that Helphenstine took fentanyl at any time while at the jail.

Plaintiff Julie Helphenstine, the decedent's wife and administratrix of his estate,[2] sued, bringing a deliberate indifference claim under 42 U.S.C. § 1983 against all defendants and a negligence claim under Kentucky law against the individual defendants. In addressing defendants' motion for summary judgment, the district court analyzed plaintiff's § 1983 claim against each defendant individually, concluded that none were deliberately indifferent, and declined to exercise jurisdiction over the state-law negligence claim. Accordingly, the court granted summary judgment in favor of all defendants. Plaintiff timely appealed.[3]

## II.

We review the district court's summary judgment rulings de novo. *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017). "Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," when ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The parties quibble regarding our standard of review. Plaintiff argues that we must view defendants' "self-serving testimony" with "a heightened degree of skepticism." The Lewis County defendants respond that we need not do so because plaintiff forfeited this argument and because she relies on nonbinding out-of-circuit precedent for this proposition.

---

[2]Because the couple shares a surname, we refer to decedent Chris Helphenstine as Helphenstine, and Julie Helphenstine as plaintiff.

[3]Plaintiff has not appealed the district court's grant of summary judgment in favor of defendant Johnny Bivens, and on appeal, she has waived any opposition to the grant of summary judgment in favor of defendants Ben Carver and Jeffrey Thoroughman.

While plaintiff did not characterize the Lewis County defendants' testimony as "self-serving" before the district court, the thrust of her argument was the same:  because all reasonable inferences must be drawn in her favor, we need not accept defendants' statements or arguments as true if there is conflicting evidence to the contrary.  Thus, she has not forfeited this argument.  But the Lewis County defendants are correct when they note that, in our circuit, we do not "disregard evidence merely because it serves the interests of the party introducing it." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010).  True, we may disregard self-serving statements when they are "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  But we need not apply any special scrutiny to defendants' statements simply because they are self-serving. *See, e.g.*, *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 589 (6th Cir. 2022).  Of course, the general rules—that we must take all reasonable inferences in plaintiff's favor and may not make any credibility determinations—still apply. *Liberty Lobby*, 477 U.S. at 255.

A.

Plaintiff claims that defendants were deliberately indifferent to a serious risk of harm to Helphenstine, in violation of his constitutional rights.

1.

Until recently, we analyzed both pretrial detainees' and prisoners' claims of deliberate indifference "under the same rubric." *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021) (citation omitted).  A prisoner's deliberate indifference claim arises from the Eighth Amendment and has objective and subjective components. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The "objective component" addresses the conditions leading to the alleged violation:  it "requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Constitution." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020) (citation and brackets omitted).  The "subjective" component, meanwhile, addresses the officials' state of mind and requires a plaintiff to show that a defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 550 U.S. at 837.

But in *Brawner*, we considered whether the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), required "modification of the subjective prong of the deliberate-indifference test for pretrial detainees," like Helphenstine. 14 F.4th at 596. In *Kingsley*, the Court addressed the standard for excessive force claims brought by both pretrial detainees and convicted prisoners. 576 U.S. at 400–02. The Court concluded that a pretrial detainee need demonstrate "only that the force purposely or knowingly used against him was objectively unreasonable," rather than *both* objectively and subjectively unreasonable, like a prisoner must. *Id.* at 396–97, 400–02. It based its decision largely on the difference between the Due Process Clause of the Fourteenth Amendment (from which a pretrial detainee's claim arises) and the Cruel and Unusual Punishments Clause of the Eighth Amendment (from which a prisoner's claim arises). *Id.* at 398–402. The Court did not, however, address whether an objective-only standard applies to other pretrial-detainee claims, such as deliberate indifference. *See Brawner*, 14 F.4th at 592.

*Brawner* answered the question left open by *Kingsley*, holding that *Kingsley* required modification of the subjective component of a pretrial detainee's deliberate indifference claim: "Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable." *Id.* at 596. We modified the subjective prong as follows: "A pretrial detainee must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (internal quotation marks omitted). In other words, a plaintiff must prove that a defendant "acted deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (quoting *Farmer*, 511 U.S. at 836).

Recently, however, a panel of this court called this reading of *Brawner* into question. *See Trozzi v. Lake Cnty.*, 29 F.4th 745 (6th Cir. 2022). In *Trozzi*, the panel agreed that *Brawner* modified the subjective element. *Id.* at 753–54. But based on the *Brawner* opinion itself,

"post-*Brawner* decisions, and background principles," *id.* at 754, it concluded that the subjective inquiry "still requires consideration of an official's actual knowledge of the relevant circumstances." *Id.* at 755. It then framed the test this way: "Reading *Farmer*, *Kingsley*, *Brawner*, and *Greene* [*v. Crawford Cnty.*, 22 F.4th 593 (6th Cir. 2022)] together, a plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official *knew* that his failure to respond would pose a serious risk to the pretrial detainee and *ignored* that risk." *Id.* at 757–58 (emphasis added).

We hold that this framing of the elements is irreconcilable with *Brawner*. We appreciate that our sister circuits are all over the map on this issue. As an initial matter, four circuits have rejected the extension of *Kingsley* to deliberate indifference claims. *See Cope v. Cogdill*, 3 F.4th 198, 207 n.7 (5th Cir. 2021); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Strain v. Regalado*, 977 F.3d 984, 989–93 (10th Cir. 2020); *Dang by & through Dang v. Sheriff*, *Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017). Three more circuits continue applying the pre-*Kingsley* framework, though without ruling out a future switch. *See Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 74 (1st Cir. 2016); *Moore v. Luffley*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019); *Mays v. Sprinkle*, 992 F.3d 295, 300–01 (4th Cir. 2021). As to the circuits that extend *Kingsley*'s objective inquiry to deliberate indifference, they disagree on the question to ask. One circuit asks what "a reasonable official in the [defendant's] circumstances would have appreciated" about the risks facing a detainee. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). One circuit asks what the defendant himself knew or should have known about the risks. *Darnell v. Pinerio*, 849 F.3d 17, 34–35 (2d Cir. 2017). And a third circuit asks if the defendant displayed "purposeful, knowing, or reckless disregard of the consequences." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018); *Pittman by & through Hamilton v. Cnty. of Madison*, 970 F.3d 823, 827 (7th Cir. 2020) (same).

Whatever the merits of these approaches to *Kingsley*, we do not think that *Brawner* leaves the question open. Simply put, *Brawner* held that *Kingsley* required us to lower the subjective

component from actual knowledge to recklessness. Indeed, several panels of our court have interpreted *Brawner* in this way. *See Greene*, 22 F.4th at 610 ("A jury could find that Greene's need for immediate medical attention was 'known or so obvious that it should [have been] known to [defendant.]'" (first alteration in original)); *Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *2 (6th Cir. Feb. 10, 2022) ("The key question in this case goes to deliberate indifference: Did the officers act 'recklessly in the face of an unjustifiably high risk' that is either 'known or so obvious that it should be known'?" (quoting *Brawner*, 14 F.4th at 596–97)).

Because *Brawner* was decided before *Trozzi*, *Brawner* controls. *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017); *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). Accordingly, plaintiff must show (1) that Helphenstine had a sufficiently serious medical need and (2) that each defendant "acted deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).

2.

Defendants do not challenge the district court's finding that Helphenstine suffered an objectively serious medical need. Thus, our focus rests exclusively on the subjective prong.

*Greene v. Crawford County* is instructive for the subjective analysis. There, Dwayne Greene was booked into the county jail. 22 F.4th at 601. He was drunk, and the booking staff suspected he would experience alcohol withdrawal. *Id.* But by the time Greene was booked, the jail nurse had left and would not return to the jail for four days. *Id.* Greene was detained without incident for a few days until jailers observed him hallucinating. *Id.* at 601–02. A jailer requested a mental health evaluation for Greene, so a mental health counselor evaluated Greene and determined he was experiencing delirium tremens (a severe form of alcohol withdrawal). *Id.* at 602–03. The counselor did not encourage jail staff to seek medical treatment. *Id.* at 603. By the end of that day, "Greene had been in the jail for three days and had not received any basic medical care. He had not seen a medical professional, had not received any medication, had not had his blood pressure, temperature, or any vitals checked, had not received an IV, and had not

been offered any fluids beyond water." *Id.* Greene was found unresponsive in his cell at 7:38 a.m. the next morning and taken to the hospital, where he later died. *Id.* at 603–04.

Greene's estate brought deliberate indifference claims against several jailers. *Id.* at 604. The district court granted summary judgment in favor of some and denied as to others. *Id.* at 607–08. On appeal, we held that "a jury could find that Greene was in 'obvious' need of *some* medical attention in the hours following [the] evaluation." *Id.* at 608–09 (quoting *Brawner*, 14 F.4th at 597). Despite Greene's hallucinations and the fact that he "had not slept in over 24 hours prior to his incapacitation[,]" the "County Defendants nonetheless failed to seek any basic medical assistance." *Id.* at 609. "At a certain point, [that] bare minimum observation ceases to be constitutionally adequate." *Id.* We left the question of when that point occurred "for the jury to determine." *Id.* We then applied these principles to each defendant and held that a jury could find that several defendants recklessly failed to act reasonably by not seeking medical assistance for Greene. *Id.* at 609–13.

3.

With this framing in mind, we review each defendant's actions individually. *Id.* at 607.

*Mark Riley*. Riley moved Helphenstine from general population to the detox cell on April 16, knew that Helphenstine was "dope sick," and knew that he vomited at least once. Riley admitted that "somebody needed to call Dr. [v]on Luhrte" at that time. Because he neither placed that call nor asked another defendant to call Dr. von Luhrte on April 16, a reasonable jury could find that Riley acted with deliberate indifference.

Riley resists, arguing that during his shift, no reasonable officer would understand that Helphenstine was experiencing an objectively serious medical need. "A sufficiently serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Griffith*, 975 F.3d at 567 (internal quotation marks removed). Vomiting is "a clear manifestation of internal physical disorder." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). Further, that jailers "deem[] [a detainee]'s condition sufficiently serious to place him in an observation cell" tends to show a sufficiently serious medical need. *Id.*

When Helphenstine began to fall ill on April 16, Riley knew he needed medical attention: Riley knew he had vomited, moved him to an observation cell, and testified that someone needed to call a doctor. Thus, a reasonable jury could conclude that Helphenstine's medical need was, at this point, so obvious that a lay person like Riley should—and did—recognize the need for medical attention. *See id.*

Because Riley, a lay person, recognized that Helphenstine's condition was serious enough that he needed medical attention, a jury could also reasonably conclude that Riley recklessly disregarded that known risk to Helphenstine's health via his inaction. Accordingly, we reverse the district court's grant of summary judgment in favor of Riley.

*Amanda McGinnis*. Defendant McGinnis had, comparatively, a large amount of contact with Helphenstine. Late in the evening on April 17, she knew he was going through withdrawal, and she sent the initial fax to Dr. von Luhrte early on April 18, noting that Helphenstine was vomiting and soiling himself, refusing to eat or drink, and had not gotten out of bed for 24 hours. She knew that other deputies cleaned Helphenstine's cell of vomit and feces while he showered that morning and that he was not feeling well at that point. In the early morning hours of April 19, another jailer had to help McGinnis hold Helphenstine's head up for him to drink. McGinnis even admitted that she consciously treated Helphenstine's medical needs differently on account of his being detained:

> Q: If—and I understand that you were constrained by your employment and the things—the way things worked at the jail but if you'd come home one night and seen a family member or a loved one in Mr. Helphenstine's condition that you saw the night of the 17th when you sent the medical request form to Dr. [von Luhrte], would you have taken them to the hospital?
>
> A: Yes.

A reasonable jury could find that McGinnis acted with deliberate indifference.

Despite McGinnis's admission that she would have taken "a family member or a loved one" in Helphenstine's condition to the hospital, she took no action to help him beyond faxing Dr. von Luhrte—which she knew would not result in a response for at least several hours. The district court concluded that McGinnis had done enough, relying on the general principle that it is often sufficient for a jailer to contact a medical professional when they perceive a medical

issue with an inmate or detainee. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018). But that general rule applies when a jailer contemporaneously contacts a medical professional who can provide *near-immediate* treatment. Indeed, we have found that as little as a one-hour delay in treatment could be enough for a jury to conclude that a jailer was indifferent to an inmate's medical needs. *See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 845 (6th Cir. 2002) (holding that "although she knew about the decedent's serious medical condition, [the defendant] chose to wait [almost an hour] for Dr. Said instead of immediately contacting another physician or the emergency team," from which a jury could impose liability). The same is true here: A jury could conclude that McGinnis's choice to send a fax in the middle of the night, when no one would be present at Dr. von Luhrte's office and no one would respond for several hours, was deliberately indifferent to Helphenstine's medical needs.

Moreover, McGinnis was with Helphenstine shortly before his death and observed that he was effectively unresponsive. Around 3 a.m. on April 19, Helphenstine could not even lift his head to drink. McGinnis knew that Helphenstine had not received any medical attention or care beyond two doses of antiemetics. Despite this personal observation and knowledge, she did not seek medical attention for him.

We have held that similar facts were enough to establish a constitutional violation under the pre-*Brawner* standard, so they are certainly enough to defeat summary judgment now. *See Smith v. Cnty. of Lenawee*, 505 F. App'x 526 (6th Cir. 2012). In *Smith*, a defendant shift commander was only present at the jail for a detainee's final hours of life before the detainee died of delirium tremens. *Id.* at 534–35. The commander knew that the detainee was medicated, and that she was "resting more quietly . . . than she had during the previous day." *Id.* at 535. However, when he went into the detainee's cell, he did not check the detainee's vitals, and she was largely unresponsive. *Id.* at 534–35. We found that the commander "was on notice that [the detainee] was very ill and yet did nothing to make sure that [the detainee] had not taken a turn for the worse." *Id.* at 535.

We cited *Smith* approvingly in *Greene*: "[A defendant] did not observe Greene in a near-lifeless state like [the] officer in *Smith* observed. However, worse than the officer in *Smith*, [that defendant] knew on December 8 that Greene had not received any medication—or any basic

medical assistance—in four days." 22 F.4th at 611. Given this information, which the defendant actually knew, a jury could infer that the defendant was on notice of Greene's serious illness and yet did nothing—enough to satisfy *Brawner* and defeat summary judgment. *Id.*

The same is true here: McGinnis observed Helphenstine in a near-lifeless state, knowing that Helphenstine had not received even basic medical observation or assistance. A jury could reasonably conclude that she recklessly failed to act reasonably by not seeking medical assistance for Helphenstine. The district court erred in concluding otherwise.

*Anthony Ruark and Sandy Bloomfield.* The *Smith*/*Greene* analysis is equally applicable to Ruark and Bloomfield, and a reasonable jury could conclude that they acted with deliberate indifference.

Ruark knew that Helphenstine was in withdrawal and observed him vomiting at least twice in the early morning hours of April 17. Ruark testified that he could not recall if Helphenstine could "hold[] anything down" at the time. And a jury could conclude that around 3 a.m. on April 19, Ruark saw Helphenstine lying face down, barely moving, and had to physically lift his head for McGinnis to help him to drink. But Ruark did not seek medical attention for Helphenstine.

Similarly, Bloomfield knew Helphenstine was in the observation cell because he was "dope sick," and she knew he was going through withdrawal. Bloomfield was aware that he had diarrhea and had been vomiting and sweating. She saw Helphenstine lie face-down on his mat via the jail cameras on the morning of April 19. And she watched McGinnis and the other officer try to get Helphenstine to drink some liquid, but instead observed him lying down without moving. Yet Bloomfield did not seek medical attention for Helphenstine.

As in *Smith* and *Greene*, these defendants observed Helphenstine in a near-lifeless state after days of illness. A jury could reasonably conclude that they recklessly failed to act reasonably by not seeking medical assistance for Helphenstine.

To avoid this conclusion, Bloomfield argues that she believed Helphenstine was, at various times, "coherent," responsive, and improving. Thus, she argues, she did not *know* of any

risk, so she could not disregard that risk and she is not liable.  But these observations are of no moment when we apply *Brawner*.  Although Bloomfield observed Helphenstine's condition fluctuate, the record demonstrates that she should have known that he was urgently in need of medical care—at the very least, when she observed Helphenstine unmoving and unable to lift his own head to drink, she *should* have recognized a serious need for medical care.  Reckless inaction in the face of that obvious need is enough to proceed to a jury under *Brawner*.  The district court erred in concluding otherwise.

*Jeff Lykins*.  Lykins is Lewis County's elected Jailer.  Plaintiff brings a deliberate indifference claim against Lykins both in his individual and supervisory capacities, which we address in turn.

Lykins first learned of Helphenstine's condition on April 17, when he reviewed Riley's report (dated April 16) that Helphenstine had vomited and was moved to an observation cell.  He interacted with Helphenstine on April 18 around the time of the scheduled arraignment, when he thought Helphenstine "looked okay."  And Lykins agreed that at that time, there was no one at the jail "who could determine whether Mr. Helphenstine's condition was a medical emergency, other than Dr. [v]on Luhrte."

Further, Dr. von Luhrte testified that he called the jail on the afternoon of April 18 and spoke with someone who identified himself only as "the jailer," whom Dr. von Luhrte believed to be Lykins.  The doctor testified that he instructed the jailer to take Helphenstine to the hospital twice, which Helphenstine refused.  But Lykins testified that he did not speak to Dr. von Luhrte that day (as did all other Lewis County defendants).  And no defendant ever heard Helphenstine refuse treatment.  This leaves a material dispute of fact, from which a jury could conclude that Dr. von Luhrte told Lykins to take Helphenstine to the hospital, but Lykins did not act on that advice.  If the jury believed Dr. von Luhrte, it could also reasonably conclude that Lykins knew Helphenstine's condition needed hospital care.  Under such circumstances, a trier of fact could reasonably conclude that Lykins acted at least recklessly by disregarding that advice.[4]

---

[4]True, Lykins would have been entitled to *rely* on Dr. von Luhrte's medical advice.  *See Winkler*, 893 F.3d at 895.  However, he is not entitled to ignore or reject Dr. von Luhrte's advice.

Accordingly, the district court erred when it granted summary judgment in favor of Lykins in his individual capacity.

However, for plaintiff's supervisory-liability claim to succeed, she must show that Lykins was actively involved in offensive conduct, and that his conduct caused Helphenstine's injuries. *Crawford v. Tilley*, 15 F.4th 752, 761–62 (6th Cir. 2021). She has not done so.

We begin and end with active involvement. "To succeed on a supervisory liability claim, a plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* at 761 (brackets and quotation marks omitted). This requires active unconstitutional conduct by the supervisor because supervisory liability will not attach for a failure to act. *Id.* But plaintiff's claim rests entirely on Lykins's purported failure to act: she argues that Lykins "failed to effect [Dr. v]on Luhrte's order that Helphenstine be taken to the hospital"; "did not check on Helphenstine"; and "conducted no investigation at all into what had happened to Helphenstine, or the performance of his staff or [Dr. v]on Luhrte." There is no evidence that he directed any subordinate to act in a way that violated Helphenstine's rights, nor is there evidence that he authorized or acquiesced in any unconstitutional conduct. Thus, the district court properly granted summary judgment in Lykins's favor on the supervisory-liability claim against him.

*John Byard and Andy Lucas*. The two remaining individual Lewis County defendants had no reason to know that Helphenstine was suffering a serious medical need. Accordingly, the district court properly granted summary judgment in their favor.

Byard merely walked Helphenstine from the jail to the courthouse on April 18; informed the judge that Helphenstine was "acting like he's just clear out of it," had "[s]tuff coming out of his mouth," and was "really not coherent"; and walked Helphenstine back to the jail.

Lucas had only two brief contacts with Helphenstine. Around 9:00 p.m. on April 18, he saw Helphenstine in the isolation cell, when Helphenstine told Lucas he "was not going to drink anymore whiskey again." Around 11:30 p.m., he brought Helphenstine a Mountain Dew to drink. There is no evidence that Lucas was aware of Helphenstine's medical condition over the

previous days, particularly since Lucas spent most of his shift physically separated from the part of the jail where Helphenstine was housed.

Neither Byard nor Lucas observed vomiting, diarrhea, shaking, sweating, or any other manifestation of illness.  Neither had any "reason to appreciate the seriousness of [Helphenstine's] condition."  *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 396 (6th Cir. 2006).  Although both Byard and Lucas knew that Helphenstine was going through withdrawal, that knowledge alone did not require either of them to seek medical care for Helphenstine, particularly since withdrawal "typically may be managed in a prison setting and indeed frequently is managed there."  *Id.* at 395.  While it may have been prudent for Byard and Lucas to seek some medical care for Helphenstine, no reasonable jury could conclude that they were aware of a serious medical need, nor that they recklessly disregarded a known or obvious risk to Helphenstine's health.

In response, plaintiff highlights Lucas's admission that if he knew the jail's policy that classified withdrawal as a medical emergency, he would have called an ambulance for Helphenstine on April 18.  Unlike McGinnis's similar admission, though, this question was not premised on Lucas's personal knowledge of Helphenstine's condition.  It was based only on the jail's policy, which Lucas failed to follow.  Alone, the failure to follow an internal policy does not give rise to a deliberate indifference claim.  *Griffith*, 975 F.3d at 578.

For these reasons, we affirm the district court's grant of summary judgment in favor of Byard and Lucas.

*Dr. von Luhrte*.  Because Dr. von Luhrte is a physician, the subjective component of plaintiff's claim against him is slightly different than that of the other defendants.  Generally, "a patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983."  *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017).  But "a doctor's provision of 'grossly inadequate medical care' to an involuntary detainee may amount to deliberate indifference."  *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Terrance*, 286 F.3d at 844).  "Grossly inadequate medical care is medical care that is 'so grossly incompetent, inadequate, or excessive as to shock the

conscience or to be intolerable to fundamental fairness.'" *Id.* (quoting *Terrance*, 286 F.3d at 844). And when the medical need is obvious, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Terrance*, 286 F.3d at 843 (citation omitted).

Dr. von Luhrte was never physically present at the jail, but he received a fax explaining that Helphenstine was in withdrawal, "soiling himself and vomiting [and] refusing to eat and drink due to upset stomach." This led him to believe that Helphenstine "might be getting dehydrated." But in response, Dr. von Luhrte merely faxed two prescriptions to the jail and encouraged Helphenstine to rest, sip liquids, and eat bland food. He testified that by the afternoon of April 18, Helphenstine's condition may have been a medical emergency and he required treatment that only a hospital could provide. Nonetheless, Dr. von Luhrte neither visited the jail, nor provided medical care or direction for Helphenstine's treatment.

To be sure, Dr. von Luhrte maintains that he called the jail twice and advised that Helphenstine must be taken to the hospital immediately. However, the jail does not have record of either telephone call and no Lewis County defendant recalls ever speaking to Dr. von Luhrte. Thus, there is a genuine issue of material fact as to whether the phone calls occurred.

On this record, a reasonable jury could conclude that Dr. von Luhrte acted with deliberate indifference. Dr. von Luhrte knew that Helphenstine was in distress and knew that he needed treatment that only a hospital could provide. With this knowledge, a reasonable jury could conclude that he did not direct the jail staff to transport Helphenstine to the hospital, and thus find that this inaction in the face of Helphenstine's serious medical need was deliberately indifferent. *See Gibson v. Muskowitz*, 523 F.3d 657, 662–63 (6th Cir. 2008).

Moreover, a jury could conclude that the treatment Dr. von Luhrte *did* provide was "so cursory as to amount to no treatment at all[.]" *Terrance*, 286 F.3d at 843 (citation omitted). Despite acknowledging that Helphenstine needed IV fluid replacement and hospital-grade care, he only prescribed antiemetics and advised the jailers to help Helphenstine orally rehydrate. A reasonable jury could conclude that Dr. von Luhrte knew that treatment plan would be inadequate. *See id.*; *cf. Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014)

("Had [the defendant] been subjectively aware of the seriousness of [the inmate's] medical condition, her decision to treat him only with over-the-counter medication might have been so cursory as to amount to a conscious disregard of his needs."). Thus, the question of "whether that course of treatment constituted deliberate indifference is a question best suited for a jury." *Darrah*, 865 F.3d at 370. The district court erred when it granted summary judgment in Dr. von Luhrte's favor.

*Lewis County*. Plaintiff also seeks to impose municipal liability on Lewis County. "A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)). A municipality cannot be liable under a theory of respondeat superior; it can only be held liable for "its own wrongdoing." *Id.* This requires plaintiff to demonstrate that the alleged federal violation occurred because of a municipal "policy or custom." *Monell*, 436 U.S. at 694. A municipality may be held liable under one of four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Plaintiff argues that Lewis County failed to adequately train and supervise its jailers regarding medical emergencies. We agree.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). There are two ways to support a claim that a failure to train or supervise is the result of a municipality's deliberate indifference. Plaintiff may prove (1) a "pattern of similar constitutional violations by untrained employees" or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (internal quotation marks omitted). Plaintiff has not identified any other constitutional violations, so she must demonstrate that the single violation (Helphenstine's death)

was accompanied by Lewis County's failure to train the jailers to handle this potentially recurring situation.  This sort of claim is available only "in a narrow range of circumstances," where a federal rights violation "may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations."  *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997).

The question here is whether the County's failure to train its employees amounted to deliberate indifference, on behalf of the County, to the rights of detainees.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Such a claim has three elements.  Plaintiff must show (1) that the County's "training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury."  *Winkler*, 893 F.3d at 902 (citation omitted).  Here, a reasonable jury could conclude that she has met her burden.

First, the adequacy of the training program.  Drug and alcohol withdrawal was common among people housed at the jail.  The jail's written policies stated that "[d]rug or alcohol withdrawal" constituted an emergency.  But the written policies contained no instructions or guidelines for how staff should care for an inmate in withdrawal beyond contacting the "Jail Medical Coordinator and the Facility Physician[.]"**[5]**

The record is mixed on whether the jailers ever received any training or instruction regarding withdrawal or medical emergencies.  McGinnis testified that she had received training on what constituted an alcohol-withdrawal-related medical emergency, identifying uncontrollable vomiting, diarrhea, or unresponsiveness.  Most jailers agreed that an inmate experiencing a medical emergency should be sent to the hospital, but the deputy jailers also testified that they had not received any training regarding withdrawal or how to identify medical emergencies.  Indeed, Lykins agreed that no one at the jail had specific "training to determine whether someone going through alcohol or drug withdrawal was experiencing signs or symptoms that indicated that their withdrawal was about to be fatal."  And several Lewis County defendants

---

**[5]**The medical coordinator is not a medically trained position.  Rather, the medical coordinator is responsible for corresponding with Dr. von Luhrte, making appointments, and medical billing.

professed ignorance when asked if they knew that a jail policy identified drug or alcohol withdrawal as a medical emergency—some had never even seen the policy.

The Lewis County defendants argue (and the district court held) that they received sufficient training because some defendants testified that they knew what to look for to identify a medical emergency. We find this argument unpersuasive for two reasons. First, defendants testified that they did *not* receive training on how to identify a withdrawal-related medical emergency. The fact that they could identify some symptoms of medical emergencies likely came from some other source (perhaps experience or common sense). It did not come, on this record, from a training provided by the jail. And second, even if they were able to identify signs of a medical emergency in the abstract, they were unable to do so when one presented itself. For example, McGinnis and Ruark testified that severe vomiting could be an emergency. But these defendants observed Helphenstine vomiting—Ruark even testified that he was not sure that Helphenstine could hold anything down—and did not seek medical intervention. Given this, a reasonable jury could conclude that their training, to the extent they were trained, was insufficient.

Finally, the district court held that the fact that the jailers received only CPR and first aid training cannot create a question of fact on a failure-to-train claim in this circuit. That statement of the law is inaccurate. True, we have held that jailers trained in CPR and first aid received adequate training to respond to medical emergencies. *See Winkler*, 893 F.3d at 903; *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 864 (6th Cir. 2019). But in *Winkler*, the jail had trained medical staff on site forty hours per week, and medical staff was "available to jail personnel, either in person or by phone, for consultation about an inmate 24 hours a day, 7 days a week." 893 F.3d at 885, 903. And in *Berry*, the jail had "nursing coverage 24 hours a day, seven days a week," so the jailers' training was sufficient. 796 F. App'x at 864. Those jailers could immediately contact medically trained staff, so first aid and CPR training was sufficient to bridge the short gap between contacting a medical professional and medical treatment. Not so here, where a detainee was almost wholly reliant on the jailers for medical care.

At bottom, it appears that defendants were not trained on how to identify or address a medical emergency. A jury could easily conclude that this training program, to the extent that it existed, was insufficient.

Second, Lewis County's deliberate indifference. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (brackets and quotation marks omitted). If the "unconstitutional consequences of failing to train" employees are "patently obvious," the county "could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Asking employees to use professional judgment that lies outside their area of expertise may demonstrate deliberate indifference. *See Canton*, 489 U.S. at 390 & n.10. For example, absent specific training on the use of deadly force, armed police officers would not be "equipped with the tools" necessary to make the relevant legal determination. *Connick*, 563 U.S. at 70.

The inadequacy of the training and supervision at the jail demonstrates that it results from the County's deliberate indifference to the rights of its inmates because the possible unconstitutional consequences are patently obvious. This is particularly palpable when viewing Lewis County's woeful training policy against the backdrop of Dr. von Luhrte's performance and the County's lack of supervision.

Begin with the written policies: The County hired Dr. von Luhrte to provide medical care to inmates, but required him to visit the jail only once a week. This violates Kentucky's administrative regulations, which mandate that a jail conduct at least two sick calls per week. 501 Ky. Admin. Regs. 3:090(10)(a), 3:170. And the County had a policy that the elected jailer, Lykins, was to publish a quarterly report on the jail's medical services. But Lykins did not do so. Indeed, Lykins had *never actually seen* Dr. von Luhrte visit the jail, and explicitly testified that the County did not supervise Dr. von Luhrte's performance in any way.

Further, Dr. von Luhrte was unaware of the policies and regulations that did exist, including the ones regarding the standard of care he owed to the inmates. He agreed that he had no knowledge of the specific "medical services that are supposed to be provided to inmates in Kentucky jails." Dr. von Luhrte testified that he often treated minor ailments over the phone

without examining the patient.  And he admitted that he did not have the experience to treat an inmate in withdrawal.

The jail doctor was unable to deal with common medical conditions at the jail, and he was rarely present at the jail.  The deputy jailers did not have any medical training or medical knowledge, so often, no one at the jail could recognize or treat a medical emergency.  But with no medical professionals on site, the County effectively asked the jailers to make determinations about what constituted a medical emergency—a requirement well outside their area of expertise. And the County did not supervise the jailers or Dr. von Luhrte at all.  A reasonable jury could easily conclude that these policies were the result of the County's deliberate indifference to inmate health and safety.  *See Shadrick*, 805 F.3d at 742 ("Because it is so highly predictable that a poorly trained [County employee] working in the jail setting 'utterly lacks an ability to cope with constitutional situations,' a jury reasonably could find that [the County]'s failure to train reflects 'deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights.'" (quoting *Connick*, 563 U.S. at 64, 67 (brackets omitted))).

Third, relation to Helphenstine's death.  There is a dispute of material fact as to Helphenstine's cause of death.  It is not clear whether he died from fentanyl intoxication (as set forth on the death certificate), alcohol withdrawal (as asserted by one of plaintiff's experts), or severe dehydration due to alcohol withdrawal (as identified by another of plaintiff's experts).  On this record, a jury could conclude that he died from withdrawal (or related complications), which was mismanaged and ignored by defendants.

In sum, a jury could conclude that Helphenstine's death was the result of the County's deliberate indifference.  Helphenstine fell ill on April 16 and received no medical attention or care until his death three days later.  No Lewis County defendant tried to effect Dr. von Luhrte's advice that Helphenstine be provided with rehydrating food or drink.  County employees gave him two doses of antiemetics, but no County employee ever checked his vitals; provided him with rehydration beyond sips of Mountain Dew, water, Ensure, or juice; or sought hospital-level care.  The County offered little more to Helphenstine than observation, and "[a]t a certain point, bare minimum observation ceases to be constitutionally adequate."  *Greene*, 22 F.4th at 609. Plaintiff has demonstrated that a reasonable jury could conclude that the County's training and

supervision was inadequate, that the inadequacy was caused by Lewis County's indifference, and that the inadequacy caused Helphenstine's death. The district court improperly granted summary judgment in favor of Lewis County.

B.

The Lewis County Defendants also argue that they are entitled to qualified immunity on plaintiff's claims. Qualified immunity shields public officials from personal liability under § 1983 unless they "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether defendants are entitled to qualified immunity, we must ask two questions: (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted).

The inquiry is simple for defendants Byard and Lucas. Having concluded above that their conduct did not rise to the level of deliberate indifference, they are entitled to qualified immunity because they did not violate Helphenstine's constitutional rights. But for the remaining defendants, who may have violated a constitutional right, we must consider whether the right they allegedly violated was clearly established. *See, e.g.*, *Burwell v. City of Lansing*, 7 F.4th 456, 476 (6th Cir. 2021).

"For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (brackets and internal quotation marks omitted). "The unlawfulness must be apparent in the light of pre-existing law, but we need not find a case in which the very action in question has previously been held unlawful." *Id.* at 476–77 (brackets, ellipses, and citation omitted). In this case, we look to see how clearly the right to be free from deliberate indifference was established at the time Helphenstine died in 2017. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).

It has been true since 1972 that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Greene*, 22 F.4th at 615 (citation omitted); *see also Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972). "Furthermore, we reiterated in 2013 that it is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by a medical provider or an officer." *Greene*, 22 F.4th at 615 (brackets, ellipses, and citation omitted). For example, over a decade ago, we "denied qualified immunity to an officer who failed to seek medical assistance for an individual suffering from [severe alcohol withdrawal] in a situation of obvious illness even when the officer knew that the detainee was on withdrawal medication and being observed." *Id.* (citing *Smith*, 505 F. App'x at 535).

Just like in *Greene*, Helphenstine experienced a dangerous medical condition for at least a day before his death. The Lewis County defendants did not provide any medical assistance during that time beyond two doses of antiemetics. Helphenstine's right not to have his serious medical needs disregarded by the Lewis County defendants was clearly established in this scenario. *Id.* Accordingly, none of the remaining Lewis County defendants are entitled to qualified immunity.

C.

The district court declined to exercise supplemental jurisdiction over plaintiff's state-law negligence claim once it granted summary judgment in favor of defendants on plaintiff's § 1983 claim. Because we reverse the district court's grant of summary judgment as to the § 1983 claim in part, we also reverse the district court's dismissal of the state-law claim in part: on remand, the district court should reconsider whether it should now exercise supplemental jurisdiction over the negligence claim against the remaining defendants. *See, e.g.*, *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 538–39 (6th Cir. 2010).

III.

For these reasons, we reverse the district court's grant of summary judgment in favor of Riley, McGinnis, Ruark, Bloomfield, Lykins (in his individual capacity), Dr. von Luhrte, and Lewis County.  We affirm the district court's judgment as to Byard, Lucas, and Lykins (in his supervisory capacity), and remand for further proceedings consistent with this opinion.