RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0077p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

JULIE HELPHENSTINE, Administratrix of the Estate of Christopher Dale Helphenstine and Guardian of B.D.H., the minor son of Christopher Dale Helphenstine,

    *Plaintiff-Appellant*,

*v.*

LEWIS COUNTY, KENTUCKY; JEFF LYKINS, ANTHONY RUARK, ANDY LUCAS, BEN CARVER, AMANDA MCGINNIS, SANDY BLOOMFIELD, MARK RILEY, MELINDA MONROE, JEFFERY THOROUGHMAN, TOMMY VON LUHRTE, D.O., JOHNNY BIVENS, and JOHN BYARD, individually,

    *Defendants-Appellees*.

No. 22-5407

---

On Petitions for Rehearing En Banc.
United States District Court for the Eastern District of Kentucky at Ashland.
No. 0:18-cv-00093—Henry R. Wilhoit, Jr., District Judge.

Decided and Filed: April 18, 2023

Before: SUTTON, Chief Judge; COLE and GRIFFIN, Circuit Judges.

---

**COUNSEL**

**ON PETITION FOR REHEARING EN BANC:** Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Lewis County Appellees. Clayton L. Robinson, Courtney L. Soltis, ROBINSON & HAVENS, PSC, Lexington, Kentucky, for Appellee Tommy von Luhrte, D.O. **ON RESPONSE:** Gregory A. Belzley, Prospect, Kentucky, James L. Thomerson, ROSE GRASCH CAMENISCH MAINS PLLC, Lexington, Kentucky, for Appellant.

    The court issued an order denying the petitions for rehearing en banc. READLER, J. (pp. 3–12), delivered a separate statement respecting denial of rehearing en banc.

---

**ORDER**

---

The court received two petitions for rehearing en banc. The original panel has reviewed the petitions for rehearing and concludes that the issues raised in the petitions were fully considered upon the original submission and decision of the case. The petitions then were circulated to the full court. No judge has requested a vote on the suggestion for rehearing en banc.

Therefore, the petitions are denied.

---

# STATEMENT

---

READLER, Circuit Judge, statement respecting denial of rehearing en banc. As an inferior court, *see* U.S. Const. art. III, § 1, we must be attentive to the pronouncements of the Supreme Court. Sometimes, a fresh decision requires us to grapple with how broadly the opinion sweeps. But that was not the case for *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). In *Kingsley*, the Supreme Court told us it was deciding a narrow issue: whether federal courts should consider a defendant's subjective intent in "the context of excessive force claims brought by pretrial detainees." *Id.* at 402 (declining to address claims "not confront[ing]" this issue).

Yet rather than ending the legal debate, *Kingsley* marked just the beginning. In a classic example of mission creep, at least four circuit courts (arguably five, depending on who you ask) read *Kingsley* as requiring a change to the circuit's law for Fourteenth Amendment pre-trial conditions of confinement claims, otherwise known as deliberate indifference claims. *Compare Kemp v. Fulton County*, 27 F.4th 491, 495 (7th Cir. 2022) (counting five), *with Helphenstine v. Lewis County*, 60 F.4th 305, 316 (6th Cir. 2023) (counting four). An odd conclusion, one has to say, when excessive force by definition involves active misconduct while deliberate indifference concerns inaction. *Brawner v. Scott County*, 14 F.4th 585, 605, 608–09 (6th Cir. 2021) (Readler, J., dissenting); 18 F.4th 551, 551 (6th Cir. 2021) (*Brawner II*) (Readler, J., dissenting from denial of rehearing en banc). That is likely why the Supreme Court tailored *Kingsley* as it did. *See also Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (holding that the deliberate indifference standard utilized for a conditions of confinement claim "is inappropriate . . . when officials stand accused of using excessive physical force.")

This frolic led to even other detours. In the circuits that upended the law for deliberate indifference post-*Kingsley*, those courts have split internally across the board over how to apply these new standards. *Compare Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (framing the inquiry as "objective reasonableness"), *and Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) (similar), *with Fraihat v. ICE*, 16 F.4th 613, 636–37 (9th Cir. 2021) (requiring more than an "inadvertent failure to provide adequate medical care") (citation

omitted); *and Darby v. Greenman*, 14 F.4th 124, 129 (2d Cir. 2021) (requiring a "conscious disregard of a substantial risk of serious harm") (citation omitted); *Pittman ex rel. Hamilton v. County of Madison*, 970 F.3d 823, 827–28 (7th Cir. 2020) (Barrett, J.) (framing the post-*Kingsley* inquiry into the objective reasonableness of a prison official's action as separate from whether the defendant acted "purposefully, knowingly, or . . . recklessly," the latter of which is shown when a prison official "'strongly suspect[s]' that [her] actions would lead to harmful results"); *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (imposing a "reason to know" standard for non-medical jail staff) (citation omitted); *see also Helphenstine*, 60 F.4th at 317 (describing the split amongst the *Kingsley* circuits as adopting three distinct approaches). Still other circuits have rejected the idea that *Kingsley*'s resolution of excessive force claims has anything to say about deliberate indifference claims, given the obvious difference between the conduct underlying the two. *See Cope v. Cogdill*, 3 F.4th 198, 207 & n.7 (5th Cir. 2021) (rejecting that *Kingsley* changed the deliberate indifference standard); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (same); *Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) (same); *Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (same); *see also Brawner*, 14 F.4th at 601 (Readler, J., dissenting); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1086 (9th Cir. 2016) (en banc) (Ikuta, J., dissenting).

Our Court was one that took *Kingsley* as a veiled call to action to rewrite our deliberate indifference standard. *Brawner*, 14 F.4th at 597 (maj. op.). How to do so, however, has divided us once again. All agree that a deliberate indifference plaintiff must prove an objectively serious harm. But what about the claim's state of mind component? The *Brawner* majority opinion concluded that *Kingsley* "modifi[ed]" our former subjective standard so that the defendant's inaction had to be "deliberate[] (not accidental[])" and "reckless[] in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 596 (citation omitted). At least three of us understood that standard to require a plaintiff to prove an objectively serious harm and two states of mind—one with respect to the harm suffered by the plaintiff and one with respect to the defendant's response to that harm. *Trozzi v. Lake County*, 29 F.4th 745, 757–58 (6th Cir. 2022). Now, a separate panel of our Court reads *Trozzi* as in tension with *Brawner*, meaning *Brawner* controls. *See Helphenstine*, 60 F.4th at 317; *see also United States v. Abboud*, 438 F.3d 554, 567 (6th Cir. 2006) (observing that the prior panel rule governs

when "two lines of cases directly conflict and cannot be reconciled"). And still other members of our Court have confessed understandable confusion over the issue. *See Westmoreland v. Butler County*, 35 F.4th 1051, 1052 (6th Cir. 2022) (Bush, J., dissenting from denial of rehearing en banc) (listing the many struggles our Circuit has had with applying *Brawner*); *Britt v. Hamilton County*, No. 21-3424, 2022 WL 405847, at *6 (6th Cir. Feb. 10, 2022) (Clay, J., dissenting) (lamenting the majority for misapplying *Brawner* and arguing that post-*Brawner* all that is left of the "deliberate indifference test for pretrial detainees is . . . the objective test"); *see also Westmoreland*, 29 F.4th at 729 (maj. op.) (adopting for the analogous failure-to-protect claim an intentional state of mind requirement concerning the "decision" made by the officer separate and apart from the *Brawner* inquiry); *see also Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 945–46 (6th Cir. 2022) (same). Simply put, that so many have said so much in so little time is both an acknowledgement that *Brawner* has left ample room for debate over its holding as well as a recognition of the frequency with which these cases appear on our docket. *See Brawner II*, 18 F.4th at 556 (Readler, J., dissenting from denial of rehearing en banc).

In an area of law that deserves precision, our approach reflects more of a shotgun blast. The original sin in this legal drama, it bears noting, was not ours. It was the Supreme Court's decision to divine constitutional rights for inmates who have been harmed in prison. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *see also Brawner II*, 18 F.4th at 552–55 (Readler, J., dissenting from denial of rehearing en banc) (tracing how both our pre- and post-trial detainee deliberate indifference jurisprudence and the establishment of a "nebulous" reasonableness standard have their roots in *Estelle*). No one condones mistreating prisoners, no matter their underlying offense. But state law can easily account for that mistreatment, with both causes of action and remedies. *See Kingsley*, 576 U.S. at 408 (Scalia, J., dissenting). Yet for many years now, these garden variety tort claims have also been deemed matters of constitutional significance.

The Supreme Court could return all of these actions to state court. *See Hudson v. McMillian*, 503 U.S. 1, 28–29 (1992) (Thomas, J., dissenting). And there are grounds to do so. *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2486 (2018) (recognizing that a decision's poor reasoning, unworkability, inconsistency with other decisions, along with a lack of reliance

interests, provide "special justification" for overruling constitutional precedent). Start with *Estelle*'s reasoning, which leaves much to be desired. *Estelle* began by evaluating whether the Fourteenth Amendment's Due Process Clause, together with the incorporated Eighth Amendment's prohibition on cruel and unusual punishments, had any relevance to a prisoner's complaint that he received insufficient medical care after being injured on a prison work assignment. 429 U.S. at 98–102. The ensuing legal analysis made only passing references to those constitutional provisions, however, let alone the debate underlying their enactment. Instead, reflecting the period's atextual approach to constitutional interpretation, *Estelle* expressly eschewed any consideration of the Constitution's original meaning, today's touchstone for constitutional interpretation. 429 U.S. at 102–03. *Estelle* instead favored "more recent cases" that, in its view, better embodied the "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Id.* at 102 (citation omitted). From these preferred views of life and law, an affirmative constitutional right to medical care for the incarcerated was born. *Id.* at 104–05.

In the ensuing decades, the Supreme Court has largely repudiated this manner of constitutional interpretation. *Trozzi*, 29 F.4th at 751 (discussing how the Supreme Court has since rejected *Estelle*'s understanding of the Eighth Amendment and the notorious "evolving standards of decency" rubric). And as *Estelle*'s progeny (including the experiment in applying the *Kingsley* standard to deliberate indifference claims) has shown, this entire constitutional regime has proved wholly unworkable. *See Brawner II*, 18 F.4th at 552–55 (Readler, J., dissenting from denial of rehearing en banc) (discussing the extended and convoluted "efforts in this Circuit to tortify the Constitution" that all rest on the same amorphous approach). With precedents pointing in all directions, the disharmony in the case law in this setting is as extreme as any. Especially when the standard is more or less reduced to "reasonableness," this legal regime lacks any manner of predictability for officers and detainees alike. Given this state of affairs, and with state law as an adequate backdrop against which to litigate deliberate indifference claims, reliance interests are minimal at best. *See Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 637 (2007) (Scalia, J., concurring) (observing there is "no relying on the random and irrational").

Yet this flawed interpretative path continues. As backdrop for today's case, *Farmer v. Brennan* set the general standard for lower federal courts to follow in deliberate indifference claims. *Farmer* explained that a detainee pursuing a substantive due process claim for insufficient medical care must satisfy both an objective component (a sufficiently serious medical need) and a subjective component (a sufficiently culpable state of mind—specifically, that the "official knows of and disregards an excessive risk to inmate health or safety"). 511 U.S. at 834, 837. *Brawner*, however, concluded that *Kingsley* necessitated a "modification of the subjective prong of the deliberate indifference test" for pre-trial detainees. 14 F.4th at 596. Cobbling together a hodgepodge of legal terminology, the new test in our Circuit for finding liability requires that a defendant's:

> action (or lack of action) was intentional (not accidental) and . . . [the defendant] either acted intentionally to ignore [the detainee's] serious medical need [or] recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the detainee], even though a reasonable official in [the defendant's] position would have known that the serious medical need posed an excessive risk to [the detainee's] health or safety.

*Id.* at 597.

I dissented in *Brawner*. Setting aside the fact that *Kingsley* has no applicability in the deliberate indifference setting, *id.* at 605, 608–09 (Readler, J., dissenting), to the extent it is applicable, it was not "entirely clear" to me how *Brawner*'s new standard "differ[red] from our traditional subjective indifference test," *id.* at 610. Consider the following: although *Kingsley* adopted an objective standard for the *nature* of the force being used by the state officer, it expressly rejected the view that liability could be imposed without some intent by the officer to use force in the first place. 576 U.S. at 395–96. In *Kingsley*'s words, echoed in the new *Brawner* standard, a defendant must still act "deliberately (not accidentally)." 14 F.4th at 596 (maj. op.). In "terms of proof necessary to make out" the claim, I understood the majority opinion for its part, to be doing very little. *Id.* at 610 (Readler, J., dissenting). The *Brawner* majority opinion said nothing to contradict this observation.

More broadly, I recognized our circuit's tendency to water down deliberate indifference claims into a more general "right to be free from jailhouse . . . malpractice." *Id.* And an

aggressive reading of *Brawner*, I worried, would erode that standard even more, relinquishing "any serious inquiry into the subjective intentions of the sued government official" in favor of a nebulous inquiry into the reasonableness of the defendant's failure to take appropriate action. *Brawner II*, 18 F.4th at 555 (Readler, J., dissenting from denial of rehearing en banc). After all, once it is determined that a plaintiff had an "objectively, sufficiently serious" medical need under *Farmer*'s first prong, 511 U.S. at 834, if *Brawner* replaced all subjective inquiries with a civil recklessness standard, a plaintiff would need only show that the defendant was objectively "unreasonable" in not taking action to abate such a risk, *id.* at 836 (describing civil recklessness as failing to act reasonably in the face of a high risk of harm).

Reasonable minds could read *Brawner* in different ways. *See Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) ("*Brawner* is far from clear[.]"). To my mind, *Brawner* did not clarify what it means for a defendant officer to "act[] deliberately (not accidentally), but also recklessly" in failing to act, thereby giving rise to liability. 14 F.4th at 596. Instead, *Brawner* left the issue for future panels to ponder. One was *Trozzi*. There, a unanimous panel held that a pre-trial deliberate indifference claim required a showing that:

> (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

29 F.4th at 757–58. Where did this three-part test come from? *Brawner*. The first prong is the old objective prong cited in *Brawner*. 14 F.4th at 597 ("(1) that she had an objectively serious medical need . . ."). The second prong parrots *Brawner*'s modification of the old subjective prong and its focus on the harm facing the detainee, *id.* at 596 (observing that a defendant must, at the very least, face "an unjustifiably high risk of harm that is . . . so obvious that it should be known" (citation omitted)), albeit with the caveat that we judge reasonability from the perspective of the jail official in question, a principle acknowledged in *Brawner*, *id.* at 597 ("[A] reasonable official in Nurse Massengale's position would have known . . . ."). The final prong, admittedly, introduces into the mix a state of mind beyond civil recklessness. But the emphasis is not on the nature of the risks to the detainee's health or safety (i.e., the subject of *Farmer*'s

subjective prong that *Brawner* modified), but rather the defendant's *response* to those risks. *Brawner* is replete with references to that separate state-of-mind inquiry. Its formulation, remember, still requires that a defendant's behavior be "deliberate[] (not accidental[])," *id.* at 596; *see also id.* at 597 (requiring defendant's conduct to be "intentional (not accidental)"), language echoing *Kingsley* and its maintenance of a subjective state of mind requirement, 576 U.S. at 395–96.

Following a thorough discussion, *Trozzi* adopted a confined understanding of *Brawner*. And for good reason. Reading *Brawner* as eliminating any state-of-mind inquiry would ignore language in *Brawner* itself requiring that the actor's "lack of action" be "intentional (not accidental)." 14 F.4th at 597. A nebulous "reasonableness" approach would likewise turn a blind eye to *Brawner*'s repeated assertions that it was not imposing a negligence standard, but merely "modif[ying]" *Farmer*'s subjective prong. *Id.* at 593, 596. Above all, *Brawner*'s raison d'être, *Kingsley*, itself maintained the foundational rule that a constitutional tort must take into consideration the subjective state of mind at play. 576 U.S. at 395–96. Accepting *Brawner*'s conclusion that *Kingsley* governs, *Trozzi* attempted to translate the "two separate state-of-mind questions" in the excessive force context to this new frontier. *Trozzi*, 29 F.4th at 757. It did so by explaining that civil recklessness governs the external question of the degree of harm facing the detainee, while criminal recklessness, at the very least, governs the behavior of the government official. *See id.* at 757–58. Any other understanding of *Brawner* would simply adopt the plaintiff-friendly part of *Kingsley* and omit the rest, contrary to longstanding precedent restraining our substantive due process jurisprudence. *See Kingsley*, 576 U.S. at 396; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998); *Daniels v. Williams*, 474 U.S. 327, 331–32 (1986).

That takes us to today's case. The panel opinion read the three-part test from *Trozzi* as "irreconcilable with *Brawner*." *Helphenstine*, 60 F.4th at 316. I, of course, disagree. Either way, *Helphenstine*'s main point of emphasis was to recite the various disagreements among the circuits on the *Kingsley* question. *Id.* After having done so, the panel concluded that *Brawner* settled all of these disagreements by "requir[ing] us to lower the subjective component from actual knowledge to recklessness." *Id.* at 316. In many respects, this feels like two ships passing

in the night. *Trozzi* did not hold that *Brawner* refrained from lowering the subjective component. Instead, *Trozzi*'s second prong expressly incorporated the civil recklessness standard from *Brawner*'s modified subjective approach with a caveat about its appropriate focus. 29 F.4th at 757–58. What *Brawner* (and, more to the point, *Kingsley*) did not do was say that the *only* state of mind at issue was with respect to the risks to the detainee. There still needed to be an examination of whether the defendant's inaction was accidental, *see Brawner*, 14 F.4th at 597, which *Trozzi* held cannot be supported tautologically by simply pointing to the inaction itself, *see* 29 F.4th at 757. That approach also bears out in the analogous failure-to-protect claim, where we require an intentional state of mind concerning the officer's "decision," separate and apart from the *Brawner* inquiry. *Westmoreland*, 29 F.4th at 729 (maj. op.)*; see also Buetenmiller*, 53 F.4th at 945–46 (explaining *Westmoreland*'s intentionality prong).

Otherwise, there is nothing left for a court to do save for applying a generic "reasonableness" standard. Which, in all candor, leads to results hard to square with one another. *Helphenstine* is a good example. We held that it is normally reasonable for prison officials to manage a detainee going through drug or alcohol withdrawal without seeking outside medical assistance. *Helphenstine*, 60 F.4th at 321. That is so even if the official sees "[s]tuff coming out" of the detainee's mouth. *Id.* But if the "stuff" is "vomit[]" that occurs "at least once," it is now unreasonable for a prison official not to recognize the need for immediate outside medical help. *Id.* at 317–18. Or consider *Greene v. Crawford County*, 22 F.4th 593 (6th Cir. 2022). There, we held, it is unreasonable not to seek medical help based on hearsay from a coworker about a detainee's lack of sleep and delusional thoughts, *id.* at 610–11, but it is reasonable if you only hear about the detainee's delusions, *id.* at 613.

So where does that leave us? Three judges in *Trozzi* thought a narrow interpretation of *Brawner* was not only possible but indeed necessary. Prior opinions had largely said the same. *See Hyman*, 27 F.4th at 1237 (noting the opacity of *Brawner*'s new standard). Then, in response to an en banc petition asserting that *Trozzi* was irreconcilable with *Brawner*, "[l]ess than a majority of the judges" ultimately voted in favor of rehearing. *Trozzi v. Lake County*, 2022 WL 2914589, at *1 (6th Cir. July 12, 2022). And now a different panel reads *Trozzi* as irreconcilable with *Brawner*, yet laments the deep confusion these issues have caused "all over the map."

*Helphenstine*, 60 F.4th at 316.  Meanwhile, all sides to the en banc briefing in this case—including the detainee's estate—agree that *Brawner* was wrongly decided and confusing.  *See* Lewis County's Pet. at 3–4, 7–12 (discussing the "tremendous confusion in attempting to consistently apply the nebulous" *Brawner* standard by both this Court and by the district courts in our Circuit); Von Luhrte's Pet. at 1, 7–15 (describing the "discordant approaches to analyzing deliberate indifference" in this Circuit); Helphenstine's Resp. at 11–13 (refusing to defend *Brawner* and the "confusion" it "caused among the panels of and district courts in this Circuit").

With signs pointing in all directions, even the most careful reader would likely find herself at a crossroads.  For judges and academics, these are theoretical concepts to debate.  But for prison officials, these decisions—as incongruent as they are—govern their everyday conduct.  *See Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989) (describing the "Herculean obstacles" prison officials face in "effective[ly] discharg[ing] . . . the[ir] duties").  And as we continue to lower the bar for liability, we increasingly put these officials in impossible situations, ones the Constitution surely was never contemplated to resolve.  *See Brawner II*, 18 F.4th at 557 (Readler, J., dissenting from denial of rehearing en banc).  For all involved, we must do better.

\* \* \* \* \*

A year and a half into the experience, *Brawner*'s promise that "[m]ere negligence is insufficient" appears to be an empty one.  14 F.4th at 596.  I can understand our en banc court's reluctance to take up the issue here, given the many competing views on the underlying legal standard in our circuit and others along with the high bar for convening en banc proceedings.  But at some point, intervention is needed.  With confusion rampant coast-to-coast, the Supreme Court would appear to be the proper forum.  For the sake of litigants and courts alike, the Supreme Court should soon grant certiorari in a case involving allegedly unconstitutional deliberate indifference toward a pretrial detainee.

It may be too much to ask for the Supreme Court to revisit the application of substantive due process principles in this context, but reconsidering *Estelle* would not be a bad place to start.  At the very least, the Supreme Court can resolve whether *Kingsley*'s excessive force analysis

should be grafted on to deliberate indifference claims. And, if *Kingsley* sweeps so broadly, what test are the inferior courts to use in resolving those cases? As both *Trozzi* and this panel decision recognize, the *Kingsley* circuit split is more than mature—it is having offspring. *Trozzi*, 29 F.4th at 754; *Helphenstine*, 60 F.4th at 316 (noting three circuit splits to emerge in the "circuits that extend *Kingsley*'s objective inquiry to deliberate indifference"). Disagreements abound, from whether to apply *Kingsley* to deliberate indifference claims, to the test to apply if so, to whether the same test applies in various settings for conditions of confinement claims. This is no small matter. As court records reflect, these cases populate every docket across the federal courts. *See IDB Appeals 2008–Present*, Fed. Jud. Ctr., https://www.fjc.gov/research/idb/interactive/21/IDB-appeals-since-2008 (last visited Apr. 18, 2023) (listing more than 76,000 "prisoner civil rights" and "prison condition" claims in the federal appellate courts since 2008, approximately 16.8% of all civil appeals); *see also* Zhen Zeng, Bureau of Justice Statistics, NCJ 251774, Jail Inmates in 2017, at 1 (2019) (reporting that almost two-thirds of jail inmates were "unconvicted"). But until Supreme Court intervention comes to pass, we are left to muddle on, following paths leading in any and all directions.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk